UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

**COLIN VEITCH,**
**VSM DEVELOPMENT, INC.,**

      Plaintiffs,

v.

**VIRGIN MANAGEMENT USA, INC.,**
**VIRGIN MANAGEMENT LTD.,**
**VIRGIN GROUP INVESTMENTS LTD.,**
**VIRGIN CRUISES**

      Defendants.

_____/

## COMPLAINT

Plaintiffs, Colin Veitch and VSM Development Inc. (collectively, "Veitch" or "Plaintiffs"), sue Defendants, Virgin Management USA, Inc., Virgin Management Ltd., Virgin Group Investments Ltd., and Virgin Cruises (collectively "Virgin" or "Defendants"), and allege as follows:

## INTRODUCTION

This is an action for misappropriation of a business idea, business plan, and business that was fully developed by Mr. Colin Veitch and presented to Virgin pursuant to non-disclosure, non-use, and other agreements. In 2010, Mr. Veitch discovered that the way to break the barriers to entry in the cruise industry was constructing and financing two new "Ultra Ships." Ultra Ships are massive cruise ships that feature an array of attractions, generate their own consumer demand, and command premium pricing and onboard revenue. Mr. Veitch determined that a fleet of two Ultra Ships alone would enable a new entrant to successfully shatter the very strong

barriers to entry to this well protected, highly profitable industry, and reward pioneering investors with extremely profitable returns.

After obtaining an agreement that Virgin would not use Mr. Veitch's ideas and business plan without his consent, Mr. Veitch presented the idea to Virgin in early 2011, and Virgin quickly signed on as Mr. Veitch's brand partner.

In May 2011, the parties agreed to the terms on which they would proceed together to develop the venture.  Virgin sought a guaranteed return in the form of a licensing fee for its brand that would be paid regardless of the performance of the ships, and ahead of even the equity investors, and a higher return if the ships were successful as planned.  Virgin's licensing fee for its brand would generate initially $16 million per year if the ships performed as expected (and $8 million per year regardless of performance).  In exchange for this large and guaranteed licensing fee, Virgin agreed to accept a smaller percentage -- 10% -- of the so-called Promote which would be available to split between Mr. Veitch and Virgin.[1]  In the event the venture performed as planned, Virgin expected this agreement -- its licensing fee and its 10% share of the available Promote -- to return $427 million - $483 million to Virgin over a ten year horizon.

Mr. Veitch, in exchange for his ideas, plan and leadership in developing the business to the point where it was investor ready, would receive a 90% share of the available Promote.[2]  That

---

[1] A "Carried Interest", also known as a "Promote", and discussed in further detail later in this complaint, is a standard feature of private equity type investments. It is designed to align the interests of the investors and the active managers. Essentially, the investors providing the cash funding demand a base return on their money – for example 8% per annum - and once that base return has been achieved they share any returns above that with the active manager(s) of the investment. In this case, the active manager(s) would be Mr. Veitch and Virgin. Typically, the returns above the required base return would be split 80% to the cash investors and 20% to the active manager(s). If the investment were to do poorly, the active manager(s) may receive nothing at all. If the investment were to do very well, the active manager(s) would receive 20% of all profits above the required base level; potentially very substantial rewards.

[2] The parties agreed to set aside one-third of the Promote to incentivize early investors providing the initial funding before the main fund-raising, and then they agreed a split between themselves (90/10) of the remaining two-thirds of the Promote.  This early funding, in the end, was not required as Mr. Veitch decided to fund the work and was able

meant that, relative to Virgin, Mr. Veitch would receive nothing unless the ships were profitable, and would receive a substantial return if they were as profitable as he had proposed. Mr. Veitch, by Virgin's calculation, would receive $315 million if he delivered the performance he was proposing.[3] This agreement is hereinafter referred to as the "Veitch-Virgin Agreement."

The pairing of Mr. Veitch and Virgin seemed ideal: Mr. Veitch is a former cruise industry CEO renowned for his vision and numerous innovations that had changed the cruise industry -- and who had developed a break through business idea; and the Virgin brand is associated with cutting edge products in the travel industry.

With the Veitch-Virgin Agreement in place, Mr. Veitch spent the next year assembling a team of industry experts to design the ships, signed a letter of intent with a German shipyard to build the ships, obtained a letter of intent with a German bank to provide debt financing for the ships, presented to and secured the support of two German government ministries responsible for providing export credit guarantees to the banks providing the debt financing, and completed the management presentation and other materials necessary for the road show to enlist the equity investors.

---

to persuade multiple team members to work "on spec". Virgin, therefore, provided no funding of the development work, which was all funded by Mr. Veitch or performed "on spec" by parties Mr. Veitch persuaded to join the team.

[3] The Promote at this stage was calculated based upon the expectation of an IPO or other sale of the company once the two ships had been successfully launched. Later in the development of the project, the investment bank, Allen & Company, calculated the returns under the alternative scenario of no IPO/sale but instead an annual receipt of cash flows over 20 years. In this analysis, royalties to Virgin had risen from an initial $16 million a year to almost $30 million a year on average, and so there would be a total of $570 million of royalties solely to Virgin as well as a Promote of $1 billion to be split between Virgin and Mr. Veitch. (There would also be a very healthy return of $4 billion to investors over and above the return of their original investment, and there would be $320 million for participants in the management incentive program. Mr. Veitch, in recognition of his attractive participation in the Promote, had opted not to participate in the management incentive program in order to ensure maximum availability of incentives for his management team.)

In fact, Mr. Veitch and Virgin prepared a video rendering of the ship and the branding, and Virgin's founder, Sir Richard Branson, recorded a video expressing his and Virgin's full support, stating:

> Well hello it's Richard.  I just want to thank you for this opportunity to discuss the cruise project.  We at Virgin are very excited about getting into the cruise industry...
>
> The cruise business is also **strategic and important to the growth of Virgin**. **Cruise has the potential to be one of our biggest, sexiest businesses, hence our excitement**.
>
> We are also pleased to be working with Colin Veitch, the teams of Meyer Werft and KfW IPEX-Bank.  We've got talented people at the ready.  So here's to getting our ships in the water, and making some waves, just like we have in all our other businesses.  I hope that the next time I raise this glass with you, is to say bon voyage.  Cheers.

(*Richard Branson video-taped message,* October 2011.)

Upon recognizing the potential for Virgin Cruises to be one of Virgin's "biggest, sexiest businesses," however, the dark side of Virgin quickly emerged.

Immediately after Mr. Veitch secured the commitments from the shipyard to build the ship and the bank to finance the ship, Virgin sought to turn the Veitch-Virgin Agreement on its head.  Instead of Mr. Veitch receiving 90% of the Promote to Virgin's 10%, Virgin insisted on a sliding scale under which the Promote up to $100 million would be divided 80% for Virgin and 20% for Mr. Veitch, up to $400 million would be divided 70% for Virgin and 30% for Mr. Veitch, and up to $600 million divided 60% for Virgin and 40% for Mr. Veitch.  Moreover, Virgin's share of the Promote would be vested, but Mr. Veitch's share would be unvested and earned only if Mr. Veitch remained employed.  Due to the vesting proposal, Virgin could have ended up with 98% of the Promote and Mr. Veitch only 2%.  This proposal, if accepted, would have shifted almost all of the economics of the Venture into Virgin's coffers.

Mr. Veitch attempted to reason with Virgin, but Virgin stated that its board of directors had no flexibility.  Virgin's final demand was that its 10% of the Promote be increased to 60% and that Mr. Veitch's share of the Promote be reduced from 90% to 40%, with only 10% of that vested, with the remainder to be earned over a period of five years only if Mr. Veitch served as CEO of the cruise line for that entire period.

This proposal would have changed Mr. Veitch's role from that of the founder and fully vested owner of the business, to an employee -- indeed an indentured servant -- whose ownership and rewards depended completely upon Virgin's whims. At the same time, regardless of how much or how little Virgin would have done to help the business realize its full potential, Mr. Veitch's delivery of a successful venture would result in enormous returns to Virgin, far in excess of those to Mr. Veitch. And, running alongside this unfair imbalance, would be a huge annual licensing fee to Virgin regardless of whether the business even turned a profit or the original investors got their money back.

It now appears that Virgin never intended to abide by the deal it initially struck with Mr. Veitch.  In 2014, the renowned investigative journalist Tom Bower published his expose: *Branson Behind the Mask* (Faber & Faber 2014).  The book recounts numerous instances of Virgin luring in businessmen with agreements and promises of fair treatment only to renege at the last moment when they believed they had the greatest leverage to gain more control and better terms for Virgin.  According to Bower:

> Many former friends, partners and advisers resented the small reward for their contribution to Branson's ventures …. None had grasped that the embrace of the Virgin family implied ownership by the proprietor.  Enthusiastically, each offered unqualified loyalty to Virgin executives acting as creative catalysts.  Then, the relationships soured.  **Collaboration meant subservience, not equality**. … Talented men complained that their trust had been abused … Scattered across the world, they blamed misplaced faith in Branson for signing contracts tilted in his favour.

Tom Bower, "*Branson: Behind the Mask*", p. 60 (Faber & Faber 2014). Based upon similar acts in past business ventures, Bower has characterized Virgin's founder, Richard Branson, as a "**dream thief**." *Id.* at p. 236 (emphasis added).

As that label foreshadowed, Virgin proceeded without Mr. Veitch, engaging Mr. Tom McAlpin in the summer of 2012 to take over leadership of the project just weeks after squeezing Mr. Veitch out of their erstwhile "partnership."[4]  Under a shroud of secrecy, Virgin proceeded to obtain the debt and equity financing to proceed with the very business plan it stole from Mr. Veitch. They even used Allen & Company to raise the equity for Virgin Cruises, the very bank introduced into the project by Mr. Veitch in late 2010 even before he approached Virgin. On December 4, 2014, Virgin generated tremendous publicity when it formally announced the "formation of Virgin Cruises, its new cruise line business," based on the financing and construction of two new Ultra Ships, just as Mr. Veitch had planned.

Virgin's proceeding with the Virgin Cruises business is in breach of the non-disclosure and not-use agreement it signed with Mr. Veitch, constituted misappropriation of Mr. Veitch's novel business idea, constituted unfair competition and unjustly enriches Virgin, and is in breach of both the Veitch-Virgin Agreement and the joint venture or partnership the parties had created to pursue the venture.

### PARTIES

1.     Plaintiff Colin Veitch is an individual domiciled in Florida.

2.     Plaintiff, VSM Development Inc., is a Florida corporation with its headquarters in Florida.

---

[4] Mr. McAlpin was announced to the world as Virgin Cruises founding CEO in December 2014. However, Virgin had reported his involvement as early as July 2012 in a conversation with Allen & Company.

3.      Defendant Virgin Management USA, Inc. is a Delaware corporation with a principal place of business at 65 Bleecker Street, 6th floor, New York, NY 10012.

4.      Defendant, Virgin Management Ltd., is a company based and incorporated in the United Kingdom.

5.      Defendant, Virgin Group Investments Ltd., is a company incorporated in the British Virgin Islands with a principal place of business in the British Virgin Islands.

6.      Defendant, Virgin Cruises, is a corporation Virgin has announced will be headquartered in the State of Florida.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, as this Court has diversity jurisdiction over the parties because the parties are domiciled and reside in different states and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, interest, and costs.

8.      Defendants are also subject to personal jurisdiction within this District because (1) Defendants have negotiated and entered into agreements in this District, (2) pursuant to Florida Statutes §§ 48.193(1)(a), (f), (g) and 48.193(2), and (3) because an agreement that is the subject matter of this action contains a consent to the personal jurisdiction of this judicial district.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) because the agreements that are the subject matter of this action were negotiated and/or entered into in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District and Virgin Management USA and Mr. Veitch specifically agreed that "any action or proceeding seeking to enforce any provision of this Agreement or to resolve any dispute arising out of or in connection with this Agreement shall be brought exclusively in a court located in

either New York County, New York or Miami-Dade County, Florida." Plaintiff, Colin Veitch ("Mr. Veitch"), is domiciled in the State of Florida.

## COLIN VEITCH

10.    Mr. Veitch is the former President and Chief Executive Officer of Norwegian Cruise Line ("NCL"), a position he held for nine years, from 2000 through 2008.

11.    In the almost 50 year history of NCL, the oldest cruise line in South Florida, he is the longest serving CEO by far, and the most influential in the strategic and operational development of the company to its present-day good fortunes. Prior to joining NCL, he was in turn Chief Financial Officer and then Senior Vice President, Marketing and Corporate Finance, for eight years at Princess Cruises based in Los Angeles, as well as acting Managing Director at Princess' sister company in Sydney, Australia, P&O Cruises.

12.    Over his nine-year tenure at NCL, Mr. Veitch led both NCL and the entire cruise industry through fundamental changes, primarily through the introduction of "Freestyle Cruising", as well as through the development of bold new deployments and itineraries, opening up entirely new markets to cruise consumers and cruise lines alike (for example, cruising, year-round, from New York to the Bahamas and Caribbean, cruising to Alaska from Seattle, and inter-island cruising in Hawaii).

13.    Freestyle Cruising, announced in 2000 shortly after Mr. Veitch joined NCL, did away with all kinds of out-of-date features of the traditional cruise product and sought to position NCL's cruises more competitively against landside resorts. Freestyle Cruising eliminated, at a stroke, the then-universal stifling cruise line practice of having two mandatory dinner times -- 6:30 and 8:30 P.M. for example – with specified dress codes each evening, in a single enormous dining room, typically at large tables shared with strangers.  Instead, Freestyle Cruising offered a

range of dining choices all over the ships, and empowered the passengers to choose their restaurants, the times they dined and their attire for the evening.

14.     Beyond dining, Freestyle Cruising presented a raft of new, high-quality entertainment options, such as improvisational comedy from the Second City comedy troupe based in Chicago and, in due course, even contemporary Las Vegas acts like The Blue Man Group. Freestyle Cruising did away with the down-market final night experience – standard on virtually every ship in the industry at that point – of passengers passing cash tips in envelopes to crew members throughout the ship. Under Freestyle Cruising, a per diem service charge was added to passengers' bills and no tipping was required. Passengers could spend their final evening relaxing instead of paying the crew. Many more elements were included in this dramatic overhaul of the unquestioned patterns and practices of the entire industry.

15.     Freestyle Cruising was designed not only to enhance the passenger experience but also to reach a new audience of younger consumers.

16.     While initially derided by other cruise lines, Freestyle Cruising quickly revolutionized the industry, becoming the model of a modern cruise product.  Today, all new ships built by every major brand have, *perforce*, incorporated major elements of Freestyle Cruising in order to respond more adequately to the changing needs and expectations of today's consumers.

17.     While at NCL, Mr. Veitch designed and built nine ships with combined construction cost of $4.25 billion.  Each new ship, designed to deliver Freestyle Cruising, retired one older traditional ship.  The result was, by 2008, the youngest, most contemporary fleet in the industry.

18.     Crowning this fleet, at the time of Mr. Veitch and Virgin striking their deal, was one of only three Ultra Ships in the industry: *Norwegian Epic*, which was designed between 2005 and 2007 by Mr. Veitch and his former shareholder/chairman. Norwegian Epic was launched, to great acclaim, in 2010 and voted Best Cruise Ship of the Year in 2011 by the readers of the largest travel trade magazine in the country.

19.     When he announced that project in 2006, Mr. Veitch noted it was "the third generation" of Freestyle Cruising and would "take the Freestyle Cruising product and develop it further." In fact, the *Epic* would break cruise design standards, as much for what it wouldn't have as for what it would. For the first time, a major cruise ship was introduced without an obvious principal dining room, without a principal main theater, and without a traditional large buffet restaurant. Instead, the dining and the entertainment experiences were completely deconstructed from the old model and an entirely new distributed model, offering unprecedented choice and variety, was presented. Hitherto distinct areas, such as the casino, were integrated in an open plan, free flowing layout that consumers took to immediately. An exclusive two-deck complex of suites around a private pool, gym, restaurant, bar, and club created a ship-within-a-ship, without parallel anywhere at sea. And low-yielding interior space was transformed into a high-yielding attractive complex of studio cabins for single travelers.

20.     When NCL introduced the ship, its then CEO, Kevin Sheehan, emphasized again that the "Norwegian Epic represents the next level of Freestyle Cruising."[5] Its introduction "made headlines for features such as expansive, brand-name entertainment like Blue Man Group; revolutionary accommodations such as single-occupancy studios; and a massive water park."[6]

---

[5] http://www.travelweekly.com/Cruise-Travel/N-Y-debut-caps-Norwegian-Epic-s-long-journey-to-completion

[6] *Id.*

21.     It is for these and many other reasons that Travel Weekly recently published an article entitled "Colin Veitch, Visionary," noting that "[a] case can be made that **the former head of Norwegian Cruise Line was the most influential and creative cruise CEO of the past decade**."

**THE "ULTRA SHIPS" BUSINESS PLAN**

22.     After his retirement as CEO of Norwegian Cruise Lines, Mr. Veitch analyzed the successful introduction of what he referred to as the Ultra Ship *Norwegian Epic*, as well as the introduction of Royal Caribbean's new Ultra Ship, the *Oasis of the Seas*.

23.     Mr. Veitch realized that the mere introduction of these Ultra Ships had the ability to generate tremendous publicity and consumer excitement, and that the ships had the ability to charge significant premiums in ticket prices and generate substantially higher on board revenue.

24.     Mr. Veitch believed that the excitement and high returns that these new Ultra Ships were generating ought not necessarily be available only to the existing cruise lines. Instead, such high returns should be available to a new company that had the expertise not only to design, build, market and operate these new Ultra Ships, but also the knowledge and credibility to obtain the debt and equity necessary to finance the construction of the ships.

25.     The new company would offer a much higher return on investment than any of the "big three" companies – Carnival, Royal Caribbean, and Norwegian – because the first two of those companies had sizeable legacy fleets of older, lower-earning ships, and the third, NCL, even though it had the youngest fleet, had only one Ultra Ship and a fleet of significantly smaller ships.

26.     In all three cases, the staggeringly attractive financial returns of an Ultra Ship were diluted by the lesser earnings of the legacy fleet and/or smaller ships. No investor could

access a pure investment in the most attractive class of assets, the Ultra Ship. The Ultra Ship was not an unproven prototype project; it was a proven concept generating real returns. But, the only Ultra Ships were buried in the aggregate fleets of older and smaller ships of the big three lines. Mr. Veitch's Ultra Ships project would create a pure investment opportunity and, into the bargain, attract both cruisers from other lines and also entirely new cruisers attracted by the new "hot ticket".

27.     Based upon these new dynamics, Mr. Veitch believed it was possible to break the forbidding barriers to entering the cruise industry as a newcomer.

28.     Mr. Veitch thereafter prepared a detailed business plan entitled "Ultra Ships – A Greenfield Opportunity in the Cruise Industry" (hereinafter, the "Ultra Ships Plan" or just "the Plan").  The Ultra Ships Plan was 30 pages long, plus appendices, and provided detailed analysis of the Investment Opportunity, the Investment Rationale, the Investment Variables, the Return Sensitivities, the Economics of Cruising, Key Personnel, as well as illustrations of Ultra Ships.[7] A true and correct copy of the Ultra Ships Plan, and its Data Appendix, is attached as **Exhibit A**.

### A.     Profits & Return on Investment

29.     The Ultra Ships Plan explained that the consumer appeal and the financial success of the Ultra Ship had been decisively demonstrated by the successful introductions of the *Epic* the *Oasis of the Seas*.  Because the "Ultra Ships are the most exciting and attractive to consumers," they were "generating extraordinary returns."  In fact, the *Epic* and *Oasis* were already "generating disproportionately strong consumer demand, commanding substantially the

---

[7]As part of the Plan, Mr. Veitch also prepared a Data Appendix that contained detailed tables and charts that explained the financial model, including assumptions, calculations of returns, and Scenarios and Sensitivity Analysis on Each Assumption.

highest ticket prices in their respective fleets, and realizing by far the greatest on board discretionary spending."

30.     The Ultra Ships Plan further noted that the premiums for tickets on the *Epic* and the *Oasis* "were generally between 30-60% higher than other ships" and that, even "with the higher ticket prices, consumers see great value in the ticket purchase even at a higher price point because of all the options and features that you can participate in when you're on board.'"

31.     The Plan further explained it was "not only in ticket revenue that these Ultra Ships command a premium; the on board earnings are markedly higher than on ships with less space and, consequently, less choice and variety."  Mr. Veitch's Plan also provided his analysis of financial data indicating that net on board revenue for smaller ships peaked at just over $52 per capacity day and that the new ships approached $70 per capacity day, an increase of 35%.

32.     The Ultra Ships Plan further explained that, while ticketing and onboard revenues increased dramatically, costs did not.  In fact, it explained that for NCL, "the cost per passenger-cabin has not been disproportionately higher than the cost of the cabins on the large legacy fleets on top of which it now sits."

33.     Moreover, the Plan explained that the scale of the Ultra Ships "permits for efficient operation from the outset, independent of economies that would otherwise be generated by a collection of smaller less efficient ships.  Shoreside operations, and general and administrative support, are in several ways more efficient when such a large number of passengers and such a large amount of revenue can be handled with single plans and sets of actions."

**B.      Branding & New Customers**

34.     The Ultra Ships Plan also explained "a new Ultra Ship would not be dependent upon having an established Cruise brand."  Instead, a new company based upon a new Ultra Ship with its "distinctiveness, and its unmatched range of amenities and features, as well as its sheer size, commands consumer attention as a stand-alone attraction, in much the same way that the breakthrough resort hotels in Las Vegas have done. The ship is its own brand, and that brand awareness can be built with a ship-specific marketing campaign …."

35.     The Plan explained that a "standard legacy ship relies heavily on repeat business from a broad customer base that may have been on that ship before, or may have been on that ship's sister ships, or that may have cruised before with another brand altogether.  However, an Ultra Ship does not need to rely on repeat business.  An Ultra Ship, well designed and well launched, will be the hottest ticket in town **and will attract first time cruisers and experienced customers of other brands alike**, all of them enthused and curious to experience the unique offerings of the ship that everyone is talking about."

**C.      Breaking the Barriers to Entry**

36.     The Ultra Ships Plan also addressed the very high barriers to entering the cruise industry.  The barriers to entry most often cited by the cruise lines themselves are (a) possession of a recognized consumer brand, (b) access to large amounts of capital to build a multi-ship fleet in order to obtain operating and marketing scale economies, (c) access to scarce shipyard building slots, and (d) an installed customer base to maintain high occupancy across a fleet of ships.[8]

---

[8] The very high barriers to entry in the cruise market had dissuaded all but two companies from entering the large cruise ship market in the past two decades.  Disney was able to enter the cruise market based upon its established

37.     The Ultra Ships Plan addressed each of these, and more, and explained that: "Real though these barriers have certainly been, and formidable as they will continue to be in terms of dissuading anyone from trying to replicate the corporate entities that have already been built, the recent success of the Ultra Ships, coupled with other developments in distribution and consumer demand, has opened the door to a green field entrant with a differentiated strategy, and has demonstrated that these barriers may be less relevant and less effective than in the recent past."

38.     The Ultra Ships Plan also addressed how to raise the equity for the venture, noting that the "opportunity exists to start from scratch, without the constraints of a legacy fleet, and to invest in the pure earning power of the state-of-the-art cruise ship concept, the Ultra Ship" and that the "direct investment described in this paper and modeled in the accompanying data appendix, spans a five year course of design, build, and introduction leading up to a realization of the investment between the introduction of the first and second ships" with an estimated equity requirement of $563 million.

39.     The ideas contained in the Ultra Ships Plan were novel both generally and in the industry itself.  For example, only an individual with Mr. Veitch's knowledge of the finances and consumer appeal of cruise ships could have identified this opportunity, available only at that time, and created the Plan.  The Plan contained very specific ideas and specific plans for developing and implementing the ideas.  To the best of Mr. Veitch's knowledge, nobody had developed such a plan in the past, and the ideas, including the idea for breaking the barriers to entering the cruise industry, had never been used in the industry.

---

brand and customer base, as well as corporate financial resources.  Similarly, MSC Cruises was funded by the enormous cash flow of the container shipping line Mediterranean Shipping Company.

### ALLEN & COMPANY

40.     Since the proposed business was dependent on major equity financing from outside third parties, Mr. Veitch's first step was to enlist the assistance of a major investment bank.

41.     The purpose was to make sure the investment bank believed in the merits of the project enough to raise the equity financing.

42.     Mr. Veitch chose to consult with Allen & Company ("Allen & Co.") because its strength is with the kinds of very wealthy investors and funds that Mr. Veitch had targeted for this project.  Those were investors who would be attracted to the possibility of putting several hundred million to work over an extended period at very high returns.

43.     Mr. Veitch sent Allen & Co., confidentially, a copy of the Ultra Ships Plan, including all attachments in November 2010.  Allen & Co. studied the plan and reviewed the financials, and expressed strong interest in supporting the plan.

### VIRGIN GROUP

44.     Mr. Veitch considered enlisting a "branding partner" for the venture.

45.     Virgin promotes itself on its website as "a leading international investment group and one of the world's most recognized and respected brands."  The site further claims that, "[c]onceived in 1970 by Sir Richard Branson, the Virgin Group has gone on to grow successful businesses in sectors ranging from mobile telephony, travel, financial services, leisure, music, holidays and health & wellness."

46.     Virgin for many years sought entry into the cruise industry.  It had, however, never succeeded due in part to the (a) significant barriers to entry, (b) inability to finance the construction of the ships, and (c) lack of a viable business plan.  For example, it had considered

purchasing older, smaller cruise ships, and had considering partnering with an existing cruise line.  None of its efforts, however, had succeeded, and it had since largely given up on the idea.

47.     In December 2010, Mr. Veitch met with Mr. Anthony Marino, a Managing Partner with Virgin Group, who led Virgin's investment program in North America.  Mr. Marino had led the creation of multiple Virgin-branded businesses, and was then serving as CEO for Virgin Hotels.

48.     Mr. Marino confirmed that while Virgin was not actively seeking to enter the cruise industry, it might be interested if the right plan was presented.

## THE NONDISCLOSURE AGREEMENT

49.     On February 17, 2011, Mr. Veitch informed Mr. Marino that he had developed a business plan for a new entrant in the cruise industry and indicated that, if Virgin would like to meet, he would send them a Non-Disclosure Agreement.

50.     Virgin agreed, but preemptively sent its own Non-Disclosure Agreement ("NDA").

51.     The NDA defined "Confidential Information" as "**all ideas** and all non-public confidential or proprietary information and materials which the Receiving Party receives or acquires from, or on behalf of, the Disclosing Party, **in the course of evaluating the Potential Transaction**."  In addition, it states that "Confidential Information shall be deemed to **include all notes, summaries, analysis, studies or other documents prepared by Receiving Party** that contain, **or are based upon, in whole or in part, Confidential Information** …."

52.     Mr. Veitch signed and returned the NDA, a true and correct copy of which is attached hereto as **Exhibit B**.

53.     After the NDA was executed, Veitch presented Confidential Information to Virgin in planning for possible entry into the cruise industry.

54.     On March 11, 2011, pursuant to the NDA, Mr. Veitch presented the Ultra Ships Plan to Virgin.  Virgin expressed a strong interest in Mr. Veitch's project.

55.     On April 13, 2011, Mr. Veitch again met with Virgin in New York City.  There, they discussed not only the Ultra Ships Plan, but also the structure of the potential deal.  Virgin's main interest was licensing its brand rather than investing capital.  Virgin explained that as a licensor, they expected a royalty from the top line as their main return, as well as a smaller "equity kicker" on the back end to help boost returns.

56.     A week later, Mr. Veitch met with Anthony Marino and Peter Norris, the Chairman of Virgin Group, in Miami.  Norris had studied the project and quizzed Mr. Veitch about the specifics.  Mr. Norris left the meeting convinced to proceed.

## THE VEITCH-VIRGIN AGREEMENT

57.     In May of 2011, Virgin and Mr. Veitch negotiated a deal between the two of them to share in the control, risks, and profits of the proposed venture.

58.     Mr. Veitch's proposal was to finance the project similar to a private equity fund offering.  That meant that they would obtain outside passive investors who would invest money and expect to earn a minimum return (e.g., 8%).[9]  Mr. Veitch and Virgin, as the Promoters of the project, would not share in the upside unless it surpassed the minimum return.  If it did surpass the minimum return, then Mr. Veitch and Virgin each would share in the excess.  The share of

---

[9] The initial proposal envisioned two equity raises.  In the original proposal, the first round investors would contribute $50 million and, even though they were passive investors, they would get some part of the Promote, to encourage them to invest in the early stage.  The second, much bigger, round of investors would not get a part of the Promote.

the excess value that the passive investors would give up would be 20%, which is typical in the private equity industry.

59.     This share of the excess in returns is called the "Promote."  One earns a share of the Promote based both on having the idea and plan and then effectively doing the work to make the business successful and profitable.

60.     Virgin, however, made it clear that their primary interest was in getting a licensing fee.  Virgin wanted a stream of revenue from the licensing fee regardless of whether the new cruise line was profitable.  If it did succeed, and was profitable, then Virgin also wanted a back end equity kicker (or share of the Promote) to help boost their returns.  In terms of importance to Virgin, the licensing fee was far more important.  Accordingly, that was the deal Mr. Veitch and Virgin negotiated.  Virgin would get a large licensing fee, and Mr. Veitch would get a larger share of the Promote.

61.     At a meeting on May 17, 2011, Virgin proposed a 2% base license fee with another 1% override above the level of the base case revenue, plus a share of the Promote.  Mr. Veitch then sent a revised financial model to Virgin along with a letter confirming the mutual understanding of the basic structure for the cruise line, which reflects that Virgin was primarily interested in the licensing and royalty aspect.

62.     Virgin then proposed even higher licensing fees, with a 2.25% base license fee and a 2.25% override and, based on these even higher licensing fees, asked Mr. Veitch to come back with a proposal on the Promote.

63.     Given Virgin's interest in obtaining large licensing fees, Mr. Veitch responded by proposing that he receive 90% of the Promote, and Virgin receive 10% of the Promote (which would be paid in shares in the company).[10]

64.     On May 20, 2011, Virgin responded: "We have reviewed your document of yesterday, **and in the interests of moving our discussion to a conclusion, we can largely accept the proposal with some changes**." (Emphasis added.)  A true and correct copy of this e-mail, and another which together form the Veitch-Virgin Agreement are attached as **<u>Exhibit C</u>**.

65.     Mr. Veitch held a phone conference with Virgin where, after discussing possible changes, both parties agreed to stick with the new numbers they had proposed in their e-mail. Thus the Veitch-Virgin Agreement was concluded.

66.     Both parties recognized that when the fundraising began, the investors might seek certain changes in the deal, such as the minimum return or the percentage of the Promote that would be available to Mr. Veitch and Virgin.  However, as between Mr. Veitch and Virgin, the economics of the deal were finalized at this point.

67.     Virgin and Mr. Veitch also agreed to invest capital to show the major investors they had "skin in the game."  Virgin agreed to invest up to $10 million (but indicated that a maximum of $20 million), and Mr. Veitch agreed to invest at least $1 million (with a maximum of $5 million).

---

[10] At the time, Mr. Veitch and Virgin were contemplating an early equity raise of $50 million before the main equity raise.  To motivate the early equity investors, Mr. Veitch and Virgin agreed to provide them with a share of the Promote as well.  Within this contemplated structure, the early equity investors would receive 33% of the Promote, and Mr. Veitch and Virgin would receive 67% of the Promote, split between them 90% for Mr. Veitch and 10% for Virgin. They later decided not to do the early equity raise, and so they had an additional 33% of the Promote to divide between them.

68.     Based on these economics, the original deal was essentially a brand partnership between Veitch and Virgin, where Veitch would develop the business and Virgin would license its brand.

69.     As to control of the venture, Mr. Veitch and Virgin agreed to share control in the development of the project and then, once the investors were on board, establish a formal general partner that would be owned and controlled jointly by Mr. Veitch and Virgin.  This plan was reflected in later documents: For example, on December 18, 2011, Virgin sent a "high level description of the investment terms."  While the description was not accurate, it nevertheless did state the intent that "[t]he Virgin Group and Colin Veitch (the Principal) shall own and control the General Partner."

70.     While Mr. Veitch and Virgin agreed to the economic terms as of May 2011, due to Virgin's breach they never reached the stage of formally establishing the entity that they would both own jointly and would serve as the general partner of the cruise line.  Rather, Mr. Veitch and Virgin proceeded as partners, intending and agreeing to share control over the development of the project as partners or co-venturers.[11]

71.     While this partnership was demonstrated through the parties' actions, it was also referenced in numerous documents.  For example, on October 17, 2011, Virgin noted it had "found like-minded partners" in Mr. Veitch and Meyer Werft, the ship builder.  On November 4, 2011, Virgin emailed Mr. Veitch noting that:  "We are very happy with the progress and are confident that we have all the ingredients for a successful partnership."  And when Virgin sought

---

[11] In reality, however, Mr. Veitch led all aspects of the development of the project with Virgin's input being limited to contributions to the branding of the venture.

to enlist its own investment banker, it noted that on the fee agreement Virgin "included both VGIL and VSM on the document as partners."[12]

## PARTNERS AND JOINT VENTURERS

72.     With the financial agreement set, particularly as to the share of the Promote, Mr. Veitch set out to develop the business.

73.     The first step was convening a "kick-off" meeting at Allen & Co.'s New York offices on June 23, 2011.[13]

74.     At that meeting, Allen & Co. recommended -- and Mr. Veitch agreed -- that the best and easiest way to raise money would be to present potential investors with a complete investor package - an "investment ready" project.

75.     That would mean preparing a General Arrangement Plan (i.e., the initial design and engineering work) and detailed specifications for the proposed ships, obtaining a letter of intent with a shipyard to build the proposed ships, and obtaining a letter of comfort with a bank for the debt financing of the proposed ships.   Once complete, this list of deliverables would be taken to the investors, the venture would be ready for the equity injection, and the detailed work could then begin on day one.

76.     Mr. Veitch's original work plan had a budget of approximately $5 million.

77.     Virgin, however, refused to contribute that amount of funds to developing the business, and even asked whether Allen & Co. could fund it. In the end, the lack of funding forced Mr. Veitch to convince his team members to work largely "on spec."

---

[12] VGIL is Virgin Group Investments Ltd., and VSM is Mr. Veitch's investment vehicle, VSM Development, Inc.

[13] Following the meeting, Allen & Co.'s Mr. Brooks spent a week at its famous retreat in Sun Valley, Idaho informally presenting the Ultra Ships project to several investors.  The investors reacted favorably to Mr. Veitch's idea of circumventing the traditional barriers to entry of the cruise ship market via building two new Ultra Ships.

78.     Following the June 23, 2011 meeting, Mr. Veitch prepared and circulated a "Phase I Work Plan" that listed all the work that would need to be done to make the project "investment ready," and included an estimated budget of $415,000, excluding legal work, even with most of the work done "on spec."  Virgin again claimed it did not have the budget even for this minor amount and declined to contribute any funds at all.

79.     Because Virgin was unwilling to commit any funds, Mr. Veitch spent hundreds of thousands of dollars of his own money and, of course, devoted substantial time and expertise.

80.     Mr. Veitch assembled a team of leading industry experts, including the London-based cruise ship design firm, SMC Design ("SMC"), a naval architect, Markus Aarnio and his firm Foreship Oy, of Finland ("Foreship"), and the German shipbuilding firm, Meyer Werft, GmbH ("Meyer Werft").  Mr. Veitch required everyone to sign confidentiality and non-disclosure agreements.  As such, he executed confidentiality and non-disclosure agreements with Meyer Werft on July 27, 2011, SMC on August 1, 2011, Randall Marine Services LLC on August 1, 2011, jMMY Group on August 1, 2011, and Markus Aarnio and Foreship on August 2, 2011.[14]

81.     Each of these agreements specified that the "venture" was "headed by Colin Veitch" and noted that Mr. Veitch also had a "business partner, also referred to as its 'brand partner'" or language similar thereto.

## DEVELOPMENT OF THE VIRGIN ULTRA SHIP

82.     On August 1, 2011, Meyer Werft -- one of the worlds' leading builders of luxury passenger ships -- committed to the project, and promptly began working.  Its first step was to generate a General Arrangement Plan ("GAP").  The GAP is the floor plan of the ship, from the

---

[14] As the project advanced, Mr. Veitch had at least four additional parties sign non-disclosure agreements in February and March 2012 as the design work and creation of detailed specifications continued.

tank bottoms to the funnel; deck by deck.  It can then be stacked to make a three dimensional model.

83.    On August 19, 2011, Meyer sent the first version ("A1") of the GAP.

84.    In subsequent months, Mr. Veitch and Meyer Werft and their teams reworked and created more than a dozen more versions, including versions B1, B2, C2, C4, C5, C6, C8, C9, C10, C11, C12, C13, and C14.

85.    Over the course of the next four months, Mr. Veitch and his team organized numerous meetings and workshops to design and develop the Virgin Ultra Ship.  These began on August 2, 2011, with an all-day working session in SMC offices.  On August 3, 2011, the team continued with an all-day brainstorming session (which Virgin did not attend).  On September 8, 2011, Mr. Veitch led a two-day working session between his team and Meyer Werft in London.  Again, there were no Virgin participants.  The next week, on September 14, 2011, Mr. Veitch and several of his team attended a two-day branding workshop in London (which Virgin requested and organized).  On November 8, 2011, one of Mr. Veitch's team, Pete Randall, attended, with Meyer Werft, a working session with the United States Coast Guard that had been organized by Mr. Randall (a Veitch team member and former USCG Commander himself).  On November 11, 2011, Pete Randall and Markus Aarnio completed an advanced draft of the full technical specification of the Virgin Ultra Ship, including the fueling of the ships.  From November 21 through 23, the design team held further working sessions in London.  On and on the work continued, with only a few days break at Christmas.

86.    With the GAP, the design work, and the detailed specification (a document running to multiple volumes and thousands of pages) at advanced stages, Meyer Werft agreed to enter into the Letter of Intent to construct the Virgin Ultra Ship.  The parties to the Letter of

Intent were VSM Development, Inc. and Virgin Group Investments Ltd.  It is signed by Mr. Veitch in his capacity as CEO of VSM Development.  This was one of the key components needed to take the Ultra Ships plan to the investors.  A true and correct copy of that Letter of Intent, dated March 12, 2012, is attached as **Exhibit D**.

## DEBT FINANCING

87.     Simultaneously while designing the Virgin Ultra Ship, Mr. Veitch also set out to secure the debt financing necessary to construct the ship.

88.     In August of 2011, Mr. Veitch contacted KfW, a leading German bank that specialized in financing shipbuilding projects.  KfW's head of shipping, Dr. Carsten Wiebers, was interested and encouraged Mr. Veitch to proceed.

89.     On October 13, 2011, Mr. Veitch attended a meeting with KfW in Frankfurt at which he, Virgin, and Meyer Werft (represented by its principal Bernard Meyer) were present.

90.     KfW again expressed its support and began its due diligence.  Mr. Veitch prepared a several page response to KfW answering questions it had about the project.  Virgin made only minimal changes--both indicating that Virgin would only invest a minor amount and that royalties may be payable before the ship is built. KfW pressed for Virgin to invest, but Virgin was unwilling.

91.     After organizing and providing dozens of pages of analysis and due diligence to KfW, Mr. Veitch organized and attended on January 25, 2012 a meeting in Berlin with KfW and Meyer Werft (including its principal owner, Bernard Meyer), and a separate presentation to Germany's Ministry of Finance and Ministry of Economic Affairs.   The meetings went extremely well and all the attendees expressed strong support for the project.

92.     Shortly thereafter, on March 29, 2012 KfW provided the requested Letter of Comfort stating that it would provide the debt financing necessary to construct the Virgin Ultra Ships.   This was another key component needed to take the Ultra Ships plan to the equity investors.  A true and correct copy of that Letter of Comfort, dated March 29, 2012, is attached as **Exhibit E**.

## THE EQUITY FINANCING

93.     Simultaneously with leading the design of the Virgin Ultra Ship, securing the shipbuilding contract, and securing the debt financing commitment, Mr. Veitch continued to work with Allen & Co. on all aspects necessary for the equity financing.  This included developing and refining the financial model, the management presentation, and various supporting documents.

94.      On October 26, 2011, Mr. Veitch went to New York City and presented the plan in its current state to Allen & Co. In attendance were George Tennet (former CIA director), Bill Bradley (former US Senator), Kaveh Khosrowshahi, and Harry Wagner, along with Allen & Co's London-based team.  Herb Allen stopped in briefly but did not attend the presentation.

95.     Six days later, on November 1, 2011, Allen & Co. advised Mr. Veitch that Herb Allen supported the project, and that Allen & Co. would want to invest the Company's own money in the project.

96.      The enthusiasm for the project was not limited to Allen & Co.  The investors Allen & Co. had already consulted, including the head of the Qatar Investment Authority/Qatar Holdings, expressed great enthusiasm for the return profile, the analysis of traditional barriers to entry, the brand, and even the size of the check requested.

97.    On December 21, Allen & Co. produced the first version of the management presentation for the planned road show before the equity investors.

98.    Over the next few months, both Mr. Veitch and Virgin repeatedly revised and commented on the management presentation and the "teaser."  Allen & Co. sent the 11th version of the management presentation on February 3, 2012, the 15th version on February 28, 2012, the 19th version on March 28, 2012, and the 20th version on April 5, 2012.

99.    On February 8, 2012, Virgin suggested revising the management presentation to add a section on "Barriers to Entry" immediately after the introduction.  The proposed content is: "Traditional barriers and why so few new entrants. Virgin + Colin = core team that can overcome." The content of this section is drawn directly from the corresponding section in Mr. Veitch's Ultra Ships Plan.

100.    Moreover, Virgin also added a section on "The Package" whose key message is: "Fully baked plan ready for equity investment," and Mr. Veitch added a comment, which Virgin agreed with: "Funds immediately productive in building value. Development dollars have already been spent."

101.    Allen & Co. also confirmed that the marketing strategy for the fund raising would focus on approaching 23 sovereign wealth funds and global pension plans (as a first tier), and 66 large family offices (as a second tier).

102.    The management presentation was entitled "Virgin Cruises: A Unique Opportunity to Develop 'Ultra Ships.'"  The cover showed the current version of the ship's design:



# Virgin Cruises
## A Unique Opportunity to Develop "Ultra Ships"

103.    This presentation explained in detail the investment opportunity for a "Greenfield

Entrant to an Established Profitable Business:"

➢ New cruise line operating only the largest, most profitable, type of ship - the "Ultra Ship" – under one of the world's leading consumer brands: Virgin

❖ Innovative design concept aimed at a younger audience than the legacy fleet of the existing players: 30-40 year olds, and the young at heart

❖ Strong marketing advantage from the "Virgin" brand and existing 65 million-strong customer base

❖ Capitalizes on strategic stagnation by the legacy cruise operators

104.    This presentation explained Mr. Veitch's key role:

➢ Business will be built and managed by Virgin and by Colin Veitch, a 17-year industry veteran, former CEO of Norwegian Cruise Line, and senior executive of P&O/Princess Cruises

❖ Designed and built 9 of the industry's most innovative and profitable ships between 2000 and 2010, including the "Ultra Ship" Norwegian Epic

❖ Developed and implemented the industry-changing "Freestyle Cruising" concept

❖ Now leading team which has developed an innovative new design and product concept for the Virgin "Ultra Ships"

105.    The presentation also explained various of the financial aspect of the project:

- Total ship-building costs of €1.75bn. Total Project costs €1.85bn ($2.5bn)
  - Competitive shipyard contract is available and state-backed export credit financing for 80% of contract price
- Equity contributions: 20% of ship costs plus business start-up costs, or c. €410-480m ($550-650m)
  - Equity funded in staged increments over 5 years
  - Ships expected to launch in 2015 and 2017
- Expected gross equity returns of c. 30% with liquidity via public floatation or trade sale
  - Returns leveraged by government-backed, credit-enhanced, 80% debt financing of asset
  - Base-line returns in excess of 20% through dividend distributions over the life of the asset, even if no IPO or trade sale
- Extraordinary *return opportunity*
  - Depressed shipyard order book – attractive construction terms
  - State-backed financing on attractive terms
  - Expected high equity returns as a result of "pure" investment in Ultra Ships without dilution from legacy fleet

106.    The presentation devoted 12 pages to explaining how the "Ultra Ships" plan would break down the formidable barriers to entry.  These items relied almost entirely on Mr. Veitch's initial Ultra Ships Plan as well as ideas derived and developed from that plan.  A true and correct copy of this Management Presentation is attached as **<u>Exhibit F</u>**.

107.    Later versions of the management presentation (including the final version) have a slide at the end, with the one piece missing, which is the equity investment.



A true and correct copy of this version of the Management Presentation is attached as **Exhibit G**.

108.    As both Virgin and Mr. Veitch had indicated in their revisions, the project was ready to move forward.  Once the equity was raised, the shipbuilding contract would be placed, the detailed design work would be completed, and the investors would get value from day one.

## VIRGIN CHANGES FROM BRAND PARTNER TO BULLY

109.    Beginning with the initial meeting in March 2011, Virgin had always made it abundantly clear that its role would be to serve as a "brand partner."  This is reflected in the deal between Mr. Veitch and Virgin, in which Virgin's returns are tied to licensing its brand, and in the various documents listing Virgin as the "brand partner."

110.    Moreover, when third parties such as KfW inquired of Virgin's role, and Virgin's potential investment, Virgin stressed that: "We need to be very clear with them on this. **They need to look at us as a brand licensor and not a corporate sponsor of the overall deal**. If

Virgin being the latter is required for Hermes, this will all come to a halt rather quickly I am afraid."

111.    In addition to its statements, Virgin's actions also reflected its limited role as a brand partner. First, Virgin refused to fund any of the development of the project.  Second, Virgin's only participation in the development of the project was having input into the branding and participating in branding workshops.

112.    In fact, whereas many thousands of man hours were spent by Mr. Veitch and his team, SMC's team, and Meyer's team, Virgin's contribution was limited to perhaps 100 hours.

113.    Virgin's interest, however, began to change in late 2011.

114.    In October, Mr. Veitch helped Virgin prepare materials to present at the Virgin retreat at Sir Richard Branson's home on Necker Island during the first week of November.

115.    On December 2, 2011, Mr. Veitch made his first presentation to Virgin's investment committee in London.  The presentation was enthusiastically received.

116.    Given the advanced state of the project, the enthusiastic reception by both the cruise and investment professionals, and by Virgin's investment committee, Virgin began taking a more keen interest in the project.

117.    In Sir Richard Branson's own words, recorded on video:  "We at Virgin are very excited about getting into the cruise industry...  The cruise business is also **strategic and important to the growth of Virgin.  Cruise has the potential to be one of our biggest, sexiest businesses, hence our excitement**."

118.    After having the benefit of a year's worth of Mr. Veitch's work, and after seeing the value of that work and the interest from the investment community, and after seeing the potential for huge returns, Virgin reneged on its deal.

119.    The first tangible declaration of Virgin's change of heart came on February 25, 2012, when it sent Mr. Veitch a new term sheet and side letter that reflected a dramatic departure from the previous agreements.

120.    The new proposal essentially cast Mr. Veitch as an employee of Virgin.  Among the major departures was that Veitch's share of the Promote would now be dependent on him serving the company as its CEO after its launch.

121.    Instead of accepting the 10% of the Promote to which it had agreed, Virgin now insisted that it have a minimum of 60% of the Promote.

122.    For Mr. Veitch, Virgin would not agree to him receiving 90% of the Promote, but rather would only agree that he would receive 10% of the Promote that would be vested, and that if he continued to be employed as the CEO for a period of years, he could potentially earn an additional 30% of the Promote, for a potential grand total of 40% over time.

123.    That, of course, is a far cry from the 90% of the Promote Virgin had originally agreed would belong to Mr. Veitch.

124.    Allen & Co. attempted to mediate between Virgin and Mr. Veitch, but Virgin stated that it did not have any "flexibility" in the "firm view of their board."

125.    Virgin's last minute breach should have brought the project to an abrupt end. But Allen & Co, foreseeing what has indeed happened, cautioned Mr. Veitch that Virgin would be likely to forge ahead with his project anyway. **"I also fear that you have done too good a job convincing Virgin of the merits of this opportunity. They may end up competing with you down the road."**

126.    Mr. Veitch's counsel sent Virgin a letter reminding Virgin that it had no authorization to continue with the project without Mr. Veitch, emphasizing that Virgin may not,

for three years after the NDA, directly or indirectly use in any way or manner whatsoever the Confidential Information or the substance or contents thereof.

127.    In response, Virgin stated that they would abide by the terms of the NDA.

## VIRGIN ANNOUNCES THE NEW VIRGIN CRUISES

128.    Virgin has not honored its obligations to Mr. Veitch.  Instead, it has proceeded without him under the very Ultra Ships Plan Mr. Veitch developed.

129.    On February 28, 2014, Sky News reported that "Virgin Group has appointed the US-based corporate advisory firm Allen & Co. to oversee the development of a cruise operation that would eventually aim to compete with industry giants including Carnival Corporation." The story reported that Virgin executives and their advisers have already held detailed talks with banks about raising an estimated $1bn of debt to finance the acquisition of the company's first vessels" and "$700m of equity by selling stakes in Virgin Cruises to outside investors."[15]

130.    A month later, on March 26, 2014, the Australian magazine Traveler quoted Mr. Branson proclaiming, "We are building two large ships quite from scratch and we feel that the Virgin brand will work well with cruises" and noting that "most of the money is now committed."

131.    On December 4, 2014, Virgin issued a press release confirming the plan to "construct two new world class cruise ships," and stating that, "[w]e plan to shake up the cruise industry" using "latest ships offering a great quality, a real sense of fun and many exciting activities all delivered with the famed Virgin service."

132.    The press release also stated that part of their focus would be on "a new generation of guests."  Nick Fox, Virgin Group director of external relations, elaborated in an

---

[15] http://news.sky.com/story/1218963/bransons-virgin-to-pilot-new-cruises-venture

email: "We will also be trying to attract a broader market than traditionally goes cruising over time."[16]

133.     Fox News likewise reported that "Virgin Cruises plans on the delivery of two new 4,200-passenger cruise ships late this decade and begin selling Caribbean voyages."  It further explained that the new ultra ship "commands premium pricing far in excess of its slightly older sister ships or competitive set. That premium can be 40 percent or more than a slightly older vessel that has many of the same attributes of the newer ship."  Further, despite the higher price, "[t]ravelers pay for the bragging rights of saying they have been on the latest and greatest ship…"  Finally, Fox also noted that the new Virgin Cruises "have the potential to draw people in who may not have considered a cruise in the past."

134.     Of course, all of this is based directly on Mr. Veitch's Ultra Ships Plan and the work Mr. Veitch did pursuant to his deal with Virgin.

## COUNT I
## BREACH OF CONTRACT

135.     Plaintiffs repeat and reallege each and every allegation of the Complaint contained in the Introduction and Paragraphs 1 through 135 as if fully set forth herein.

136.     Veitch and Virgin agreed to be bound by the terms of Virgin's NDA.

137.     The NDA expressly provided that Virgin could not use the Confidential Information which Veitch presented to Virgin without Veitch's permission.

138.     The NDA defined "Confidential Information" as "**all ideas** and all non-public confidential or proprietary information and materials which the Receiving Party receives or acquires from, or on behalf of, the Disclosing Party, **in the course of evaluating the Potential**

---

[16] http://www.miamiherald.com/living/travel/cruises/article4283117.html

**Transaction**."   In addition, it states that "Confidential Information shall be deemed to **include all notes, summaries, analysis, studies or other documents prepared by Receiving Party** that contain, **or are based upon, in whole or in part, Confidential Information** …."

139.   Further, pursuant to the NDA, Mr. Veitch then presented Confidential Information to Virgin, including the Ultra Ships Plan.

140.   This Confidential Information, due to its novelty and originality, both generally and to Virgin specifically, was of tangible value.

141.   After reneging on the Veitch-Virgin Agreement, Virgin proceeded to use Veitch's Confidential Information without Veitch's consent in a blatant and continuing breach of the Non-Disclosure Agreement.

142.   WHEREFORE, Plaintiffs demand judgment for compensatory damages, attorneys' fees and costs, pre-and post-judgment interest, and any and all further relief that is proper and just.

**COUNT II**
**BREACH OF CONTRACT FOR INJUNCTION**

143.   Plaintiffs incorporate by reference all prior allegations of the complaint as if fully set forth herein.

144.   Veitch and Virgin's relationship was governed by the NDA.

145.   The NDA expressly provided that Virgin could not use the Confidential Information without Veitch's permission through the subsidiary, Virgin Cruises.

146.   However, after their prospective business relationship failed to blossom, Virgin then proceeded to use Veitch's Confidential Information without his consent.

147.   Using Veitch's business plan without his consent is a breach of the NDA.

148.   Further, the NDA recognizes that:

> [T]he unauthorized disclosure or use of Confidential Information will cause irreparable harm and significant injury for which money damages will be inadequate and/or difficult to ascertain.  The Disclosing Party shall therefore be entitled to seek injunctive and other equitable relief without the requirement of posting a bond or other security.  The remedies in this section shall be in addition to and not in limitation of any other remedies to which Disclosing Party may be entitled under this Agreement or otherwise at law or in equity.

149.    Therefore, as the parties expressly agreed, an injunction against the use of Veitch's Confidential Information is expressly required to adequately redress the damage Veitch suffered and will continue to suffer from Virgin's breach of the NDA.

WHEREFORE, Plaintiffs demand judgment for an injunction to be entered against further use of the Confidential Information by Virgin, attorneys' fees and costs, and any and all further relief that is proper and just. Specifically, Plaintiffs demand that Virgin cease all activities designed to lead to the construction of the Ultra Ships it has announced, and, furthermore, that if Virgin proceeds, regardless, with building these ships, they be enjoined from bringing them into US waters and US ports and from selling passage on them to US consumers, wherever in the world they may be deployed.

## COUNT III
## MISAPPROPRIATION

150.    Plaintiffs incorporate by reference all prior allegations of the complaint as if fully set forth herein.

151.    Pursuant to both the common law and Florida Stat. § 688.008(1), Virgin misappropriated the business ideas which Veitch presented to Virgin.

152.    Veitch presented Virgin with a business idea and other strategic ideas to launch a new cruise line, including the Ultra Ships Plan and other Confidential Information disclosed pursuant to the NDA.

-36-

153.     Veitch took steps to protect the secrecy of the Ultra Ships Plan and other Confidential Information, as it was disclosed with the express understanding that the disclosure was made in confidence, as expressly stipulated in the NDA.

154.     The Ultra Ships Plan contains novel ideas, including a plan to break down the barriers to entering the cruise line industry by designing and building two new ultra ships that would be developed using equity financing from third parties based upon their high return potential.

155.     The Ultra Ships Plan and other Confidential Information which Mr. Veitch disclosed to Virgin pursuant to the NDA were of actual or potential economic value which was derived from their secrecy.

156.     After the deterioration of his relationship with Virgin, Mr. Veitch learned that Virgin plans to improperly make use of the Ultra Ships Plan and other Confidential Information without his consent.

WHEREFORE, Plaintiffs respectfully request a judgment against Defendants and actual damages, pre-and post-judgment interest, and any and all further relief that is just and proper.

**COUNT IV**
**UNJUST ENRICHMENT**

157.     Plaintiffs incorporate by reference all prior allegations of the complaint as if fully set forth herein.

158.     This claim for unjust enrichment is asserted in the alternative to the breach of contract claim asserted against Defendants.

159.     Virgin's planned entry into the cruise business uses the business plan Veitch proposed to them, and as well as design and product ideas.  Virgin is even using the investment bank that Mr. Veitch brought to the fold to raise money.

160.    In particular, all the ideas and concepts behind the Ultra Ships Plan, and the additional Confidential Information developed and disclosed pursuant to the NDA, is Veitch's work product.  Virgin contributed little more than their name and their ideas of how to reflect their "brand voice" on the ships.

161.    Yet, despite the fact that during the crucial development period, Mr. Veitch contributed the key ideas and plans, his own labor, leveraged his relationships throughout the industry to have work done on spec, and even contributed his own money, Virgin now stands to benefit without Mr. Veitch receiving any consideration.

162.    Further, rather than partnering with Mr. Veitch, Virgin exploited his work product and entered the market, thereby "boxing out" Mr. Veitch from entering the market.

163.    With Virgin now in the market, and Mr. Veitch having tapped his connections already to develop the venture, it would be near impossible for Mr. Veitch to begin anew with a different partner or on his own.

164.    Plaintiffs conferred benefits upon Defendants by presenting them the Ultra Ships Plan, and the additional Confidential Information developed and disclosed pursuant to the NDA, necessary to launch a cruise line.  These benefits are of real and tangible value to both Plaintiffs and Defendants.

165.    Defendants had knowledge of the benefits conferred upon them by Plaintiffs, and voluntarily accepted and retained those benefits.

166.    Under the circumstances, it would be inequitable for Defendants to retain the benefits conferred by Plaintiffs without paying for their fair value.

167.    Plaintiffs, by not receiving fair value for conferring its Ultra Ships Plan and not benefiting from Defendants future use of the Ultra Ships Plan, and the additional Confidential

Information developed and disclosed pursuant to the NDA, have suffered and will continue to suffer damages as a direct, foreseeable and proximate result of Defendant's unjust enrichment.

WHEREFORE, Plaintiffs respectfully request a judgment against Defendants and actual damages, pre-and post-judgment interest, and any and all further relief that is just and proper.

## COUNT V
## UNFAIR COMPETITION

168.    Plaintiffs incorporate by reference all prior allegations of the complaint as if fully set forth herein.

169.    Significant time, labor, and money were expended by Mr. Veitch in developing the Ultra Ships Plan and the additional Confidential Information developed and disclosed pursuant to the NDA.

170.    However, rather than partnering with Mr. Veitch, Virgin exploited his work product and entered the market, thereby "boxing out" Veitch from entering the market.

171.    As a result, Mr. Veitch has suffered damage.

172.    Virgin engaged in unfair competition by virtue of acting with commercial immorality.

173.    Virgin engaged in unfair competition as it exploited the skill, expenditures and labors of Mr. Veitch before setting itself up as a competitor to Mr. Veitch.

174.    Virgin engaged in unfair competition as it misappropriated Mr. Veitch's Ultra Ships Plan, and the additional Confidential Information developed and disclosed pursuant to the NDA, in order to obtain a commercial advantage.

175.    Virgin's unfair and deceptive actions violated Florida's Deceptive and Unfair Trade Practices Act.

WHEREFORE, Plaintiffs respectfully request a judgment against Defendants and actual damages, pre-and post-judgment interest, and any and all further relief that is just and proper.

**COUNT VI**
**BREACH OF CONTRACT**

176.    Plaintiffs incorporate by reference all prior allegations of the complaint as if fully set forth herein.

177.    The parties reached the Veitch-Virgin Agreement in May 2011 through meetings, negotiations, and the exchange of e-mails setting forth a complete and binding agreement between Veitch and Virgin.

178.    Under to the Veitch-Virgin Agreement, Virgin and Mr. Veitch reached an understanding as to the essential terms of their relationship.  Key among those terms was, as consideration for their respective obligations to Virgin Cruises, Virgin would get a large licensing fee and 10% of the Promote, while Mr. Veitch would get 90% of the Promote.

179.    Subsequently, and pursuant to the Veitch-Virgin Agreement, both parties began performing under the terms of the Agreement, and expended substantial time and resources furthering the venture by obtaining financing, beginning the ship building process, and seeking out investors.

180.    Then, in 2012, Virgin breached the Veitch-Virgin Agreement by demanding 60% of the Promote for itself, and demanding that Mr. Veitch accept only 10% of the Promote on a vested basis, and a mere 30% more on an unvested basis.

181.    Under the Veitch-Virgin Agreement, Mr. Veitch is owed 90% of the Promote that was to be split between Mr. Veitch and Virgin.  Virgin's refusal to honor that agreement is a breach of the Veitch-Virgin Agreement.

182.     Thus, as a direct and proximate result of Virgin's breach of the Veitch-Virgin Agreement, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs demand judgment for compensatory damages, declaratory relief, attorneys' fees and costs, pre-and post-judgment interest, and any and all further relief that is proper and just.

**COUNT VII**
**BREACH OF DUTY OF GOOD FAITH**

183.     Plaintiffs incorporate by reference all prior allegations of the complaint as if fully set forth herein.

184.     The Veitch-Virgin Agreement did not contain any reservation of any rights not to be bound until any further agreements were reached.

185.     The Veitch-Virgin Agreement created an enforceable obligation on Virgin to negotiate in good faith.

186.     The Veitch-Virgin Agreement resulted in the creation of a joint venture which entailed, at a minimum, a duty to deal in good faith to conclude documents containing the final details of the partnership.

187.     Virgin acted in bad faith when it:

(a)     proposed terms that did not conform to and in fact directly contradicted the Veitch-Virgin Agreement;

(b)     proposed and demanded terms that were drastically different from the Veitch-Virgin Agreement; and

(c)     proposed and demanded terms that were significantly more favorable to Virgin than had been negotiated in the Veitch-Virgin Agreement.

WHEREFORE, Plaintiffs demand judgment for compensatory damages, declaratory relief, attorneys' fees and costs, pre-and post-judgment interest, and any and all further relief that is proper and just.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY

188.    Plaintiffs incorporate by reference all prior allegations of the complaint as if fully set forth herein.

189.    Under Florida law, a partnership is created only where both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business.  A joint venture, like a partnership, may be created by express or implied contract, and the contractual relationship consists of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses, and (4) joint control or right of control.

190.    Here, the agreement reached by Veitch and Virgin established both a partnership and a joint venture.  In fact, the parties referred to each other as partners and co-venturers.

191.    In other words, the alliance between Veitch  and Virgin for the development of a new cruise line formed a fiduciary relationship, as expressed through course of dealings, oral statements, and written statements consisted of:

> (a)    Veitch and Virgin had a common purpose in creating a new cruise line;
>
> (b)    Veitch and Virgin negotiated a right to share profits (and had a risk of losses) that the cruise line may incur;
>
> (c)    Veitch and Virgin shared a community of interest in the performance of a common purpose, the mutual profitability of the cruise line venture;

(d)     Both Veitch and Virgin contributed labor and/or capital to the enterprise; and

(e)     Both Veitch and Virgin agreed to share in the assets and liabilities of the business.

192.    The trust and confidence placed by Veitch in Virgin formed a fiduciary relationship where Veitch reasonably expected that Virgin would not force out Veitch, and then use Veitch's plan to create the cruise line without him.

193.    However, Virgin breached its fiduciary duty of loyalty by forcing out Veitch and then subsequently using Veitch's ideas, plans, and labor, thereby preventing Veitch from eventually profiting from the cruise line.

194.    As a direct and proximate result of Virgin's breach, and Veitch's resultant inability to participate in the cruise ship venture, Veitch is damaged in the amount of his efforts and expenditures, and will incur further harm from lost profits and lost equity.

WHEREFORE Plaintiffs respectfully requests that judgment be entered in its favor, and against Defendants, and that Plaintiffs be awarded damages, including pre- and post-judgment interest, declarative relief of Plaintiffs' entitlement to future distributions pursuant to the May 20, 2011 Deal, and any other and further relief this court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment for damages in an amount to be proved at trial; an injunction to be entered against further use of the confidential information disclosed pursuant to the NDA; and such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury of all issues.

Dated this 11th day of March, 2015.        Respectfully submitted,

By:   /s/ Jeffrey Gutchess
        Jeffrey W. Gutchess (FBN 702641)
        jgutchess@bilzin.com
        Daniel Tropin (FBN 100424)
        dtropin@bilzin.com
        Brandon Rose (FBN 99984)
        brose@bilzin.com
        **BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
        1450 Brickell Ave., 23rd Floor
        Miami, FL 33131
        Telephone: (305) 350-7312
        Facsimile: (305) 351-2132
        eService@bilzin.com
        margote@bilzin.com

*Attorneys for Plaintiffs.*