# COMPOSITE EXHIBIT C

**From:** Colin VEITCH <colin_veitch@me.com>
**Sent:** Thursday, May 19, 2011 4:50 PM
**To:** Anthony S. Marino; Nirmal Saverimuttu
**Subject:** Structure - response
**Attachments:** Structure - May 19th 2011.doc

Anthony and Nirmal,

Please see attached note. I'm available to discuss once you have reviewed.

Best regards,
Colin

May 19th, 2011

Anthony and Nirmal:

I'd like to keep working with this, but in the interest of having a back and forth, let me put forward a tentative proposal before today is out. It has to be noted, though, that:

a) both of us are trying to keep our own equity commitments to a minimum and each of us may need to move off that as the bankers advise on what the main investors are indicating they would be comfortable seeing. For now, though, let's go with what each of us has targeted as our own contributions;
b) more broadly, the royalty rate and the promote split and sub-splits will also be subject to further review as we get into the fund raising.

My main observation is that the heavier than expected royalty rate means that the back-end "kicker" or "brand promote" must be lower than might otherwise be the case. Whether you take out value as a stream of royalties or as a series of dividends and distributions, it all adds up to value going to you. The terminal value of the license arrangement is also not something that should be minimized. Not only must it be worth at least as much as the quantum by which it is reducing the EV at the point of liquidity, but the potential for it to grow substantially as the business adds further ships is surely a great attraction. In contrast, the equity holders, in order to realize the value of their investment, must sell and forego the future potential. You get to be cash positive as soon as both ships are in operation, then sell your equity at the right moment and cash in your promote, but still hang on to a low-risk, rich, top-line participation in the future growth. That is an attractive structure. Let's continue tweaking numbers and running scenarios, but that structure is attractive.

The challenge with this structure is in including any sort of significant promote participation beyond the B Shares promote. Taking your royalty rate of 2.25+2.25, and modeling even a 20% participation in the C shares promote (and a 40/60 split of the total promote between B and C that we briefly discussed, with a view to making the B Shares more attractive), would give you, in the Base Case, 20% of total net distributions from inception to the point of liquidity, including a terminal value for future royalties. I'm not sure that would fly with the main investors. In contrast to the less than 6% that I would receive in this case, it is not a structure I would be especially excited about either. So....

Take a look at what this would do for you:

Base royalty: 2.0%
Override royalty: 2.0%

Investment commitment: $10 million

B/C split of promote: 33/67

Virgin share of C shares: 10%

May 19th, 2011

By my reckoning, this would give you 17% of all net distributions in the Base Case, including royalties current and future. Net distributions being distributions in excess of the originally invested capital, plus all royalties paid out and a PV of future royalties to be paid out.

This percentage drops gradually as the scenarios progress through greater and greater success, such that in an extreme upside scenario (5% higher NTR assumption; 10% higher OBR assumption; 3% growth rates in NTR and OBR; 4% growth rate in fuel; and EBITDA multiple of 12) you would receive 11% of all net distributions.

That your share is relatively less in percent (although absolutely far more in dollars) as the venture is more and more successful is obviously a function of your focusing on royalties in trade off for equity and promote participation. Your downside looks very comfortable. Your upside is nice too, but not as leveraged as if you were to focus on equity and promote over royalties.

Let me also make another few comments:

- You note that Virgin has yet to break into cruise, but has a large capacity for patiently waiting for the right deal. This is a good deal and it will materialize into royalty producing ships within four to five years. That should be weighed against the challenges of breaking into the industry in another way with more conventional ships. Paradoxically, it may be that the more conventional the approach, the more difficult will be the equity raising. And, you are not actively considering another approach anyway, as far as you have indicated;
- The royalty stream is different and more reliable than in many other types of businesses where you may be considering, or may have already done, licensing deals. Cruise ships sail full and the price at which they sell is within an identifiable range. Filling the ship and selling tickets within this range is an entirely manageable task, and the stream of royalty payments should be seen as both more predictable and more reliable than in many other businesses;
- Success with two ships will lead to more being built and the application of the license agreement to these additional ships too. I.e. you are looking at the start of a potentially very large royalty stream;
- There is scope for great synergies with other group businesses, like the airlines. There is also scope for considerably increased volume at good margins through Virgin Holidays. This ought to be a main focus of their cruise selling business;
- Because the royalty stream commences even before the first ship is in the water, and the first ship itself produces several million of royalties in its first year, your reach-in-the-pocket net cash exposure will be significantly less than the headline commitment of capital, be it $10 million or $20 million. In fact, if your commitment is only $10 million, you will be in net positive cash territory by the first year of operation of the second ship - far ahead of any other investor;

2

May 19th, 2011

- It is important that whatever we take to investors does not contain a license/royalty arrangement that is out of line with the kinds of deals they are used to seeing. This is particularly true of investors who may have seen other Virgin deals, including the AD guys who did the Galactica deal with you. It would be helpful in progressing our own discussions if you could do a reality check against other deals that these investors may have seen from your group;
- We are not quite negotiating in a vacuum, because each of us has real targets and thresholds that are important to incorporate as best we can; but we are missing the targets and thresholds of the other potential providers of seed capital and of main capital. We won't get a better handle on that until we can take a broadly agreed heads of terms to the bank, ideally early at the start of next week.

That's my most creative suggestion for now. I'll continue thinking, and perhaps consider further the question of minimums and maximums too. Meantime, I welcome your feedback on the above.

Regards,
Colin

**From:** Nirmal Saverimuttu <Nirmal.Saverimuttu@virginusa.com>
**Sent:** Friday, May 20, 2011 6:07 PM
**To:** Colin VEITCH
**Cc:** .
**Subject:** Virgin Cruises

Colin

We have reviewed your document of yesterday, and in the interests of moving our discussion to a conclusion, we can largely accept the proposal with some changes.

As explained, we are contemplating exclusive, worldwide rights to the brand in Cruise. As a result there is significant opportunity cost to us and we need to be mindful of this as we agree a royalty rate and associated economics. We also note that:

a) The "Base Case" is unlikely to be the plan we take to investors and it is not a stretch to imagine outperformance of this plan. We cannot ignore the fact that the final investor plan economics will be attractive to other investors and yourself – both from an IRR and absolute dollars perspective – even at royalty rates greater than 0.5%
b) This is only a deal between the two of us and the prospective co-investor(s) and major investor(s) are yet to have a say. We are extremely wary that we will likely be asked to change our terms – Virgin on the royalty rates and you on the promote

Taking note of the above, we need to find a balance that adequately compensates the brand and yourself for our efforts while maintaining some flexibility for future negotiations. To that end, we are prepared to move forward on the following basis:

- Base royalty: 2.25%
- Override: 2%
- Virgin investment commitment: $10 million
- B/C split of promote: 33/67
- Virgin share of C: 10%

A summary of the associated economics of this proposal is as follows[1]:

1

|  | Base Case | Realistic Upside Case |
|---|---|---|
| **Colin Veitch** | | |
| IRR | 93.3% | 115.3% |
| Proceeds $m | $122 | $315 |
| Proceeds % of Total Distributions | 6% | 9% |
| **Virgin** | | |
| IRR | 73.8% | 78.7% |
| Proceeds $m (excluding TV of royalty) | $156 | $240 |
| Proceeds % of Total Distributions | 7% | 7% |
| Proceeds $m (including TV of royalty, EBITDA multiple) | $353 | $483 |
| Proceeds % of Total Distributions | 17% | 13% |
| Proceeds $m (including TV of royalty, perpetuity) | $129 | $427 |
| Proceeds % of Total Distributions | 15% | 12% |

In our minds the Base Case is more akin to a downside case as the venture should outperform industry averages given the superior product. Current Oasis premiums support this view. Thus the "Realistic Upside Case" (ie 3% revenue growth) represents a more likely base case.

In this Realistic Upside Case, your take is a very attractive $315m or 9% of proceeds. This compares favorably to Virgin's take of 12-13% of proceeds. Even in the 'downside' base case the return to you is $122m.

We also wanted to clarify the royalty minimums and phasing. Our proposal is:

- $1m minimum royalty for first 5 years
- $4m minimum royalty after year 5
- Phasing in of royalty at 50%/75%/100% over 3 years

Note the $4m represents 50% of the approx $8m royalty that a 100% occupancy ship can generate.

We believe the above represents a fair compromise from our respective starting positions and is a structure we can sell to investors, while retaining some limited flexibility. We will of course, need to reconsider the above is there is a material movement (including our $10m commitment). Additionally, if the total cash required in the $50m round changes such that Virgin is above 25% of the capital, we will want to look at Virgin's relative commitment.

Please let us know your thoughts. I am available this weekend or early Monday to discuss.

Regards,
Nirmal

[1] Perpetuity calculated as at 2021 on basis of 2% growth and 15% discount rate.

Nirmal Saverimuttu
Principal
**Virgin Management USA, Inc.**
65 Bleecker Street, 6th floor
New York, NY 10012
Direct: 212.981.3924
Fax: 212.497.9051