# Exhibit D

**THIS LETTER OF INTENT** is dated March 12, 2012 and made between: VSM Development Inc., a corporation organized and existing under the laws of the State of Florida, with its principal office and office for service of process located at 9801 West Suburban Drive, Pinecrest, FL 33156, USA (**VSM**); Virgin Group Investments Limited, a company organized and existing under the laws of the British Virgin Islands, with its principal office located at La Motte Chambers, St. Helier Jersey, Channel Islands JE1 1PB (**VGI**); and MEYER WERFT GmbH, Papenburg, Germany (**Builder**) in respect of Newbuildings Hull Nos. S. 699 and S. 700

This Letter of Intent refers to the discussions held so far between on one side VSM and VGI (together, the **Customers**), and on the other side the Builder, and it records their declared intentions formed as a result of those discussions.

The Customers and the Builder intend to agree the terms of two shipbuilding contracts for the construction of two passenger cruise ships as sister ships each with about 2408 passenger cabins (each, a **Ship** and together, the **Ships**). Each shipbuilding contract will be for the construction of one Ship.

The Customers may nominate a separate affiliate to make each shipbuilding contract as buyer subject to the performance of the obligations of each buyer being guaranteed on terms acceptable to the Builder.

The potential refund to the buyer under each shipbuilding contract of each pre-delivery instalment of the contract price will be secured by a refund guarantee which is to be issued by a first class bank or insurance company acceptable to the buyer and on terms acceptable to the buyer.

The making and effectiveness of the shipbuilding contracts shall be subject to and conditional upon the parties agreeing the detailed terms and conditions of the shipbuilding contracts and related documentation, and the other matters provided for in this Letter of Intent.

A) Each shipbuilding contract will be subject to mutual agreement of the parties in their sole discretion on all conditions, terms and details of the shipbuilding contracts, the specifications and other related documentation, which are to include the following main terms and conditions:

(1) Main Particulars

GRT: 172,900

Length overall: approx., but not more than, 340 m

Length between perpendiculars: approx. 331 m

Breadth moulded: approx. 41.2-41.6 m

Depth to bulkhead deck: approx. 11.6 m

Number of passenger cabins: approx. 2408, allocated as follows [descriptions and numbers of different grades].

| | |
|---|---|
| Owner - Suite | 2 |
| Grand - Suite | 4 |
| Courtyard - Suite | 44 |
| Loft – Suite | 2 |
| Aft - Suite | 8 |
| Studio - Suite | 32 |
| Spa – Suite | 12 |
| FC - Family Cabin | 15 |
| FCW - Window Family | 10 |

| V - Verandah | 966 |
|---|---|
| B-S – Balcony Sea | 244 |
| B-L - Balcony Lagoon | 272 |
| W-S - Window Sea | 63 |
| W – Window Cabin | 57 |
| I-1 - Inside | 408 |
| I-SIN - Inside Single | 220 |
| V-ADA – Verandah ADA | 13 |
| B-ADA - Balcony ADA | 12 |
| W-ADA - Window ADA | 4 |
| I-ADA - Inside ADA | 20 |

Number of crew cabins: approx. 1440

| CA – Captain's Class | 1 |
|---|---|
| SO – Senior Officer | 6 |
| OFF – Officer Single | 106 |
| SC – Senior Crew | 113 |
| C1S – Crew Single Shared | 664 |
| Crew Double - | 550 |

Number of crew berths: approx. 1990

Classification: DNV.

(2) Scope of Supply in accordance with:

- Specification No. P9232-C11 dated March 6, 2012; and

- General Arrangement Plan No. P9232-C11 dated March 6, 2012.

The Builder and the Buyer acknowledge that the specification referenced above is still open for minor changes to be agreed upon between the parties by 30 March 2012 in order to conform the specification with the GA and with design details already known to the parties but not apparent on the GA.The parties will co-operate and work closely together in good faith and on an open book basis in order to try to identify and agree on cost savings in the construction of the Ships which shall not diminish the general appearance, safety and operational aspects of the Ships. The agreed cost savings will be recorded as modifications to the specifications for the Ships.

The Builder will act in good faith and on an open book basis to implement the Customers' modification requests in order to ensure that modifications are made at the lowest possible cost and in the timeliest possible way. In costing modification requests, (a) the Builder will give due credit to the Customers where implementation of a modification request relieves the Builder from costs or work that it would otherwise have had to incur or perform in designing, engineering and building the Ship, and (b) the Customers will be duly debited where implementation of a modification request burdens the Builder with costs or work which are in excess of costs and work that the Builder would otherwise have had to incur or perform in designing, engineering and building the Ship.

For all purposes of each shipbuilding contract, the expression "open book basis" means the provision by or on behalf of the Builder (subject to such provision being reasonably practicable on the part of the Builder without breaching confidentiality restrictions legally binding on the Builder) of such information and documentation as reasonably may be required in order to afford transparency to the buyer in relation to the Builder's calculation of the total design costs, labor costs, material costs and Builder's compensation referred to in Annex A.

Within the contract price for each Ship the implicit unit cost of each grade of passenger cabin is listed in Annex "B" to this Letter of Intent.

Until phase 6-7 of the architectural plan, the Customers may modify the number of passenger cabins on a Ship on the cost basis and within the scale parameters referred to in paragraphs (i) (ii) and (iii).

(i) The cost increase referable to each cabin added to a Ship, and the cost saving referable to each cabin removed from a Ship, will be as specified for each grade of cabin in Annex "B". In addition, (a) due credit will be given to the Customers where the addition or removal of cabins relieves the Builder from costs or work that the Builder would otherwise have had to incur or perform in designing, engineering and building the Ship, and (b) the Customers will be duly debited where the addition or removal of cabins burdens the Builder with costs or work which are in excess of costs and work that the Builder would otherwise have had to incur or perform in designing, engineering and building the Ship.

(ii) The number of passenger cabins on each Ship will not exceed 2440 cabins with 4650 lower berths.

(iii) Cabin modifications will not lead to a gross tonnage of each Ship in excess of 173,000 GT. Apart from this permitted increase in the gross tonnage, the cabin modifications will not change any of the other main dimensions or main technical characteristics of the Ship as defined in the specifications.

Notwithstanding the above, the Builder will use its good faith efforts to finalize the design of each Ship with a hull width closer to 41.6 m than 41.2 m and in this event an additional 20 suites shall be added to the forward suites complex without any increase in the Contract Price for either Ship. Furthermore, the parties aim to finalize the GA with a total of 2,000 crew berths without any increase in the Contract Price for either Ship

Subject to the foregoing provisions of this Letter of Intent, modifications to the specifications requested after the signing of the shipbuilding contracts will be agreed in accordance with the conditions for modifications provided for in the shipbuilding contracts. If any of such modifications result in any reduction or increase in costs this shall be effected through an adjustment in the final delivery payment for the relevant Ship.

(3) Contract Price for each Ship

- Hull No. S.699: € 830,000,000 (Euros eight-hundred-thirty-million).

- Hull No. S. 700: € 830,000,000 (Euros eight-hundred-thirty-million)

The Contract Price for each Ship includes a lump sum allowance of € 50,000,000 (Euros fifty-million) which may be applied by each buyer for buyer's project costs, buyer's supplies and/or modifications.

The Contract Price also includes lump sum amounts as follows:

- Sound and Light: € 8,000,000 (Euros eight-million)
- Galleys: € 12,000,000 (Euros twelve-million)
- "Sky Diver (equipment only – installation included in Contract Price): € 2,000,000 (Euros two-million).

The Customers and the Builder agree that the aforementioned Contract Price for each Ship reflects the actual stage of their still ongoing discussions. Before the intended agreement on the shipbuilding contracts and the specification, and subject always to the above provisions regarding additional suites and the number of crew berths, any and all adjustments of the Contract Price for each Ship due to modifications shall be recorded by the Builder and the Customers in a value engineering list in order to agree on a Final Contract Price for each Ship.

(4) Terms of Payment for each Ship as below, not to be made prior to receipt of appropriate invoice and a corresponding refund guarantee (in the case of each pre-delivery installment):

- € 41,500,000 (Euros forty-one-million-five-hundred-thousand) within 3 banking days after the signing of each shipbuilding contract.

- € 41,500,000 (Euros forty-one-million-five-hundred-thousand) on the date falling 24 months before the contractual Delivery Date.

- € 41,500,000 (Euros forty-one-million-five-hundred-thousand) on the date falling 18 months before the contractual Delivery Date.

- € 41,500,000 (Euros forty-one-million-five-hundred-thousand) on the date falling (i) 12 months before the contractual Delivery Date.

- Balance at delivery

(5) Delivery Time/Place of Delivery

The parties will work towards signing the shipbuilding contract for Hull No. S. 699 by 29 June 2012 with a view to the shipbuilding contract becoming effective by 6 July 2012. Subject to the shipbuilding contract for Hull No. S. 699 becoming effective by 6 July 2012, the Ship shall be delivered at Eemshaven or at another North European sea port selected by the Builder, and reasonably acceptable to the buyer, on a delivery date which is a business day within the Autumn of 2015 or the Spring of 2016 and which is to be declared by the Builder to the buyer before the buyer signs the shipbuilding contract for Hull No. S. 699.

The parties will work towards signing the shipbuilding contract for Hull No. S. 700 by 29 June 2012 with a view to the shipbuilding contract becoming effective by 6 July 2012. Subject to the shipbuilding contract for Hull No. S. 700 becoming effective by 6 July 2012, the Ship shall be delivered at Eemshaven or at another North European sea port selected by the Builder, and reasonably acceptable to the buyer, on a delivery date which is a business day within the Spring of 2017 or the Autumn of 2017 and which is to be declared by the Builder to the buyer before the buyer signs the shipbuilding contract for Hull No. S. 700. The delivery date for Hull No. S. 700 shall be about 18 months later than the initial contractual delivery date for Hull No. S. 699.

(6) The Ships will be constructed for registration by each buyer on delivery under the Bahamas flag or the Bermuda flag. Each buyer will notify its flag election to the Builder by the effective date of the relevant shipbuilding contract.

B) This Letter of Intent records the declared intentions of the parties but it is agreed that the orders for the Ships are subject to satisfaction of the following further conditions:

  (i) the Customers finalizing their co-venturing arrangements, obtaining financing for the Ships and agreeing all related security arrangements, upon terms acceptable to the Customers in their sole discretion;

  (ii) the Customers obtaining all necessary approvals from their lenders;

  (iii) the Builder, acting reasonably, accepting the Customers' financing for the Ships;

  (iv) the shipbuilding contract, the specifications and other related documentation for each Ship being finalized and signed by the duly authorized representatives of each party; and

  (v) each shipbuilding contract becoming fully effective in accordance with its terms and conditions.

1125663 23991046.1

In connection with (i) above, if so requested by the Customers the Builder will re-execute this Letter of Intent in favor of an entity established by the Customers on condition that the Customers guarantee for this entity.

The Builder and the Customers will work together in good faith with a view to agreeing all terms, conditions, details and other matters in relation to the shipbuilding contracts and specifications referred to above so that the relevant documentation can be signed by 29 June 2012. Subject to further agreement between the parties, should both shipbuilding contracts not become effective by 6 July 2012, each shipbuilding contract shall be null and void ab initio.

In addition, each party agrees that - without any liability - it will in good faith try to satisfy its conditions as soon as practicable after signature of this Letter of Intent; it will keep the other party fully and promptly informed about any change in circumstances that would be likely to postpone satisfaction of any conditions to a date after 29 June 2012; and it will immediately notify the other party if at any time it believes that it will not be possible to satisfy or waive any of its conditions by 6 July 2012.

C) Neither party will disclose the existence or any of the contents of this Letter of Intent, or any of the negotiations referred to herein, to any third party save and except:

(i) with the prior written consent of the other party;

(ii) to the extent necessary in connection with the Customers' co-venturing and financing arrangements or to achieve the conclusion and effectiveness of the shipbuilding contracts, subject to the confidentiality restrictions provided for herein;

(iii) as required by the rules or regulations of any applicable stock exchange or regulatory body from time to time having jurisdiction over either of the Customers, or any entity nominated by them as the buyer of a Ship, or the Builder; or

(iv) as required by law.

Subject to the foregoing provisions, the contents and release arrangements for any public announcements in relation to the matters referred to in and contemplated by this Letter of Intent shall be agreed in writing in advance between the Customers and the Builder.

D) This Letter of Intent is governed by, and shall be construed in accordance with, English law and it is subject to the exclusive jurisdiction of the English courts. Each party hereby submits itself to the jurisdiction of the English courts for the purposes of this Letter of Intent.

E) This Letter of Intent takes precedence over and supersedes any and all previous oral and written correspondence, discussions and exchanges, direct or indirect, between the Customers and the Builder (or any of their respective representatives) in relation to the matters referred to in this Letter of Intent.

F) This Letter of Intent will be treated as having been signed by the parties hereto at the time and on the date when each party has signed and initialed a complete, legible and identical counterpart of the Letter and exchanged the same by email or fax with the other party. Thereafter, for record purposes three identical original counterparts of this Letter shall be signed and initialed by each of the parties after which one original counterpart will be retained by VSM, one will be retained by VGI and the other will be retained by the Builder.

For and on behalf of
**VSM Development, Inc**.

..........................................

Colin Veitch, Chief Executive Officer

For and on behalf of
**MEYER WERFT GmbH**

..........................................

Bernard Meyer, Managing Partner

For and on behalf of
**Virgin Group Investments Limited**

..........................................

All in the presence of: ..........................................
Thomas Weigend

### Annex "A"

The total sums of the following cost elements regarding modifications to the specification for the Ships shall be provided by the Builder to the buyer:

(a) design cost,

(b) labor cost,

(c) material cost and

(d) Builder's compensation as defined hereinafter.

The Builder's compensation for modifications according to item (d) amounts to 25 % and will be imposed on the total sum of design, labor and material cost as per item (a) to (c) for each modification. The Builder's compensation rate is based on the following cost considerations/flat rate figures:

(1)  5 % pre-financing

Due to different durations from a modification to delivery of a Ship

(2)  3 % guarantee

As some modifications are new techniques and some are well proven.

(3)  2 % insurance

We have to report every increase in scope of production to our insurance company and report the process of construction which will increase the value of insured goods.

(4)  3 % risk

Very often there are no examples or references for further modifications available. Often the level of details is limited and modifications are made under time pressure and we often detect further costs while proceeding.

(5)  3 % effect on processes/flow of operation

Either in the design phase or in the construction phase modifications result in an unexpected change of the flow of processes and schedules and therefore in higher operating expenses, which are not within the Contract Price. After steel cutting has begun this effect is more than 3% and has to be calculated individually.

(6)  5 % miscellaneous

This part covers all costs for modifications not being part of items (1) to (5) above, such as:

- approval costs (e.g. flag state, classification)

- travel expenses

- effect on other drawing work, installations etc by this modification, which cannot be calculated

- overtime extra payment (as we are working with full load under normal conditions for modifications

either in design or in production we have to go for higher workload. Overtime extra payment is 25 % based on labor agreement)

- transportation (e.g. fork-lift, cranes)

- storage

- rescheduling

- etc.

(7)  4 % profit

No further explanations needed.

**(End of Annex A)**

Annex "B"

## Unit costs for passenger cabins:

| | |
|---|---|
| Courtyard – Suite | each 82,000 € |
| Loft – Suite | each 140,000 € |
| Aft - Suite | each 80,000 € |
| Studio - Suite | each 76,000 € |
| FC - Family Cabin | each 38,000 € |
| FCW - Window Family | each 38,000 € |
| V - Verandah | each 29,000 € |
| B-S – Balcony Sea | each 26,000 € |
| B-L - Balcony Lagoon | each 26,000 € |
| W-S - Window Sea | each 29,000 € |
| W – Window Cabin | each 24,000 € |
| I-1 - Inside | each 23,000 € |
| I-SIN - Inside Single | each 23,000 € |

The abovementioned unit costs for the passenger cabins include the related part of the supply and discharge systems such as air conditioning, hot and cold water, grey and black water and electrical systems as described in the specifications, but exclude balconies and windows.

**(End of Annex B)**

**ADDENDUM NO. 1 TO THE LETTER OF INTENT** dated March 12, 2012 between: VSM Development, Inc. c/o 9801 West Suburban Drive, Pinecrest, FL 33156, USA (**VSM**); Virgin Group Investments Limited, a company organized and existing under the laws of the British Virgin Islands, with its principal office located at La Motte Chambers, St. Helier Jersey, Channel Islands JE1 1PB (**VGI**); and MEYER WERFT GmbH, Papenburg, Germany (**Builder**) in respect of newbuildings with Hull Nos. S. 699 and S. 700

With reference to the above-mentioned Letter of Intent it is hereby agreed that:

In order to facilitate the reduction of the amount of the refund guarantee referred to in A) (4) after each payment as stipulated hereinafter the refund guarantee for each instalment shall be split into two parts, i.e. the amount of the instalment less the part of the Buyer's Allowance and the amount of the part of the Buyer's Allowance (**Buyer's Allowance Refund Guarantee**).

The Contract Price for each Ship mentioned in A) (3) includes a lump sum allowance of € 50,000,000 (Euros fifty-million) which may be applied by each buyer for buyer's project costs, buyer's supplies and /or modifications. For the avoidance of doubt, this sum shall be financed as part of the purchase price of each ship.

Under each shipbuilding contract this lump sum allowance will be accounted for and paid by the Builder as follows:

(a) Upon its receipt of the first instalment of the contract price the Builder shall immediately pay to the buyer the sum of € 2,500,000 (Euros two-million-five-hundred-thousand). Upon the buyer's receipt of this payment, the buyer shall return the Buyer's Allowance Refund Guarantee to the Builder.

(b) Upon its receipt of the second instalment of the contract price the Builder shall immediately pay to the buyer the sum of € 2,500,000 (Euros two-million-five-hundred-thousand). Upon the buyer's receipt of this payment, the buyer shall return the Buyer's Allowance Refund Guarantee to the Builder.

(c) Upon its receipt of the third instalment of the contract price the Builder shall immediately pay to the buyer the sum of € 2,500,000 (Euros two-million-five-hundred-thousand). Upon the buyer's receipt of this payment, the buyer shall return the Buyer's Allowance Refund Guarantee to the Builder.

(d) Upon its receipt of the fourth instalment of the contract price the Builder shall immediately pay to the buyer the sum of € 2,500,000 (Euros two-million-five-hundred-thousand). Upon the buyer's receipt of this payment, the buyer shall return the Buyer's Allowance Refund Guarantee to the Builder.

(e) For each payment of € 2,500,000 (Euros two-million-five-hundred-thousand) hereunder the buyer shall provide the Builder with a corresponding invoice. The invoice shall not require any specific explanation of paid or planned expenditures.

(f) At delivery of the Ship the Builder shall apply the balance of the lump sum allowance, in the amount of € 40,000,000 (Euros forty-million), in or towards payment of any sums due to the Builder at delivery in respect of agreed modification costs.

(g) At delivery of the Ship the buyer shall provide the Builder with a written statement (in such form as the Builder may reasonably request) signed by two directors or other authorized officers of the buyer and describing the categories of items ordered by or on behalf of the buyer, and the other expenditures made or to be made in respect of orders placed by or on behalf of the buyer, the total value of each such category and the aggregate total value of such orders in respect of which the lump sum allowance has been applied during the construction period or is to be applied using the amounts referred to in paragraphs (a) to (d) above and any remainder amount referred to in paragraph (h) below.

(h) If any part of the lump sum allowance remains after the application referred to in paragraph (f) above, at delivery of the Ship the relevant remainder amount shall, upon its receipt of the instalment of the

Contract Price due at delivery, be paid by the Builder to the buyer by way of a refund of the unutilized portion of the lump sum allowance, and the buyer shall provide the Builder with a corresponding invoice.

Date: March 12, 2012

For and on behalf of
VSM Development, Inc.

..................................
Colin Veitch, Chief Executive Officer

For and on behalf of
MEYER WERFT GmbH

..................................
Bernard Meyer, Managing Partner

For and on behalf of
**Virgin Group Investments Limited**

..................................

All in the presence of:

..................................
Thomas Weigend

1125663 23991046.1

**THIS LETTER OF INTENT** is dated February ~~12~~ March 12, 2012 and made between: VSM Development Inc., a corporation organized and existing under the laws of the State of Florida, with its principal office and office for service of process located at 9801 West Suburban Drive, Pinecrest, FL 33156, USA (**VSM**); Virgin Group Investments Limited, a company organized and existing under the laws of the British Virgin Islands, with its principal office located at La Motte Chambers, St. Helier Jersey, Channel Islands JE1 1PB (**VGI**); and MEYER WERFT GmbH, Papenburg, Germany (**Builder**) in respect of Newbuildings Hull Nos. S. 699 and S. 700

This Letter of Intent refers to the discussions held so far between on one side VSM and VGI (together, the **Customers**), and on the other side the Builder, and it records their declared intentions formed as a result of those discussions.

The Customers and the Builder intend to agree the terms of two shipbuilding contracts for the construction of two passenger cruise ships as sister ships each with about 2408 passenger cabins (each, a **Ship** and together, the **Ships**). Each shipbuilding contract will be for the construction of one Ship.

The Customers may nominate a separate affiliate to make each shipbuilding contract as buyer subject to the performance of the obligations of each buyer being guaranteed on terms acceptable to the Builder.

The potential refund to the buyer under each shipbuilding contract of each pre-delivery instalment of the contract price will be secured by a refund guarantee which is to be issued by a first class bank or insurance company acceptable to the buyer and on terms acceptable to the buyer.

The making and effectiveness of the shipbuilding contracts shall be subject to and conditional upon the parties agreeing the detailed terms and conditions of the shipbuilding contracts and related documentation, and the other matters provided for in this Letter of Intent.

A) Each shipbuilding contract will be subject to mutual agreement of the parties in their sole discretion on all conditions, terms and details of the shipbuilding contracts, the specifications and other related documentation, which are to include the following main terms and conditions:

(1) Main Particulars

GRT: 172,900

Length overall:  approx., but not more than, 340 m

Length between perpendiculars: approx. 331 m

Breadth moulded: approx. 41.2-41.6 m

Depth to bulkhead deck: approx. 11.6 m

Number of passenger cabins: approx. 2408, allocated as follows [descriptions and numbers of different grades].

| | |
|---|---|
| Owner - Suite | 2 |
| Grand - Suite | 4 |
| Courtyard - Suite | 44 |
| Loft – Suite | 2 |
| Aft - Suite | 8 |
| Studio - Suite | 32 |
| Spa – Suite | 12 |
| FC - Family Cabin | 15 |
| FCW - Window Family | 10 |

1125663 23991046.1

| | |
|---|---|
| V - Verandah | 966 |
| B-S – Balcony Sea | 244 |
| B-L - Balcony Lagoon | 272 |
| W-S - Window Sea | 63 |
| W – Window Cabin | 57 |
| I-1 - Inside | 408 |
| I-SIN - Inside Single | 220 |
| V-ADA – Verandah ADA | 13 |
| B-ADA - Balcony ADA | 12 |
| W-ADA - Window ADA | 4 |
| I-ADA - Inside ADA | 20 |

Number of crew cabins: approx. 1440

| | |
|---|---|
| CA – Captain's Class | 1 |
| SO – Senior Officer | 6 |
| OFF – Officer Single | 106 |
| SC – Senior Crew | 113 |
| C1S – Crew Single Shared | 664 |
| Crew Double - | 550 |

Number of crew berths: approx. 1990

Classification: DNV.

(2) Scope of Supply in accordance with:

- Specification No. P9232-C11 dated March 6, 2012; and

- General Arrangement Plan No. P9232-C11 dated March 6, 2012.

The Builder and the Buyer acknowledge that the specification referenced above is still open for minor changes to be agreed upon between the parties by 30 March 2012 in order to conform the specification with the GA and with design details already known to the parties but not apparent on the GA. The parties will co-operate and work closely together in good faith and on an open book basis in order to try to identify and agree on cost savings in the construction of the Ships which shall not diminish the general appearance, safety and operational aspects of the Ships. The agreed cost savings will be recorded as modifications to the specifications for the Ships.

The Builder will act in good faith and on an open book basis to implement the Customers' modification requests in order to ensure that modifications are made at the lowest possible cost and in the timeliest possible way. In costing modification requests, (a) the Builder will give due credit to the Customers where implementation of a modification request relieves the Builder from costs or work that it would otherwise have had to incur or perform in designing, engineering and building the Ship, and (b) the Customers will be duly debited where implementation of a modification request burdens the Builder with costs or work which are in excess of costs and work that the Builder would otherwise have had to incur or perform in designing, engineering and building the Ship.

For all purposes of each shipbuilding contract, the expression "open book basis" means the provision by or on behalf of the Builder (subject to such provision being reasonably practicable on the part of the Builder without breaching confidentiality restrictions legally binding on the Builder) of such information and documentation as reasonably may be required in order to afford transparency to the buyer in relation to the Builder's calculation of the total design costs, labor costs, material costs and Builder's compensation referred to in Annex A.

1125663 23991046.1

Within the contract price for each Ship the implicit unit cost of each grade of passenger cabin is listed in Annex "B" to this Letter of Intent.

Until phase 6-7 of the architectural plan, the Customers may modify the number of passenger cabins on a Ship on the cost basis and within the scale parameters referred to in paragraphs (i) (ii) and (iii).

(i) The cost increase referable to each cabin added to a Ship, and the cost saving referable to each cabin removed from a Ship, will be as specified for each grade of cabin in Annex "B". In addition, (a) due credit will be given to the Customers where the addition or removal of cabins relieves the Builder from costs or work that the Builder would otherwise have had to incur or perform in designing, engineering and building the Ship, and (b) the Customers will be duly debited where the addition or removal of cabins burdens the Builder with costs or work which are in excess of costs and work that the Builder would otherwise have had to incur or perform in designing, engineering and building the Ship.

(ii) The number of passenger cabins on each Ship will not exceed 2440 cabins with 4650 lower berths.

(iii) Cabin modifications will not lead to a gross tonnage of each Ship in excess of 173,000 GT. Apart from this permitted increase in the gross tonnage, the cabin modifications will not change any of the other main dimensions or main technical characteristics of the Ship as defined in the specifications.

Notwithstanding the above, the Builder will use its good faith efforts to finalize the design of each Ship with a hull width closer to 41.6 m than 41.2 m and in this event an additional 20 suites shall be added to the forward suites complex without any increase in the Contract Price for either Ship. Furthermore, the parties aim to finalize the GA with a total of 2,000 crew berths without any increase in the Contract Price for either Ship

Subject to the foregoing provisions of this Letter of Intent, modifications to the specifications requested after the signing of the shipbuilding contracts will be agreed in accordance with the conditions for modifications provided for in the shipbuilding contracts. If any of such modifications result in any reduction or increase in costs this shall be effected through an adjustment in the final delivery payment for the relevant Ship.

(3) Contract Price for each Ship

- Hull No. S.699: € 830,000,000 (Euros eight-hundred-thirty-million).

- Hull No. S. 700: € 830,000,000 (Euros eight-hundred-thirty-million)

The Contract Price for each Ship includes a lump sum allowance of € 50,000,000 (Euros fifty-million) which may be applied by each buyer for buyer's project costs, buyer's supplies and/or modifications.

The Contract Price also includes lump sum amounts as follows:

- Sound and Light: € 8,000,000 (Euros eight-million)
- Galleys: € 12,000,000 (Euros twelve-million)
- "Sky Diver (equipment only – installation included in Contract Price): € 2,000,000 (Euros two-million).

The Customers and the Builder agree that the aforementioned Contract Price for each Ship reflects the actual stage of their still ongoing discussions. Before the intended agreement on the shipbuilding contracts and the specification, and subject always to the above provisions regarding additional suites and the number of crew berths, any and all adjustments of the Contract Price for each Ship due to modifications shall be recorded by the Builder and the Customers in a value engineering list in order to agree on a Final Contract Price for each Ship.

(4) Terms of Payment for each Ship as below, not to be made prior to receipt of appropriate invoice and a corresponding refund guarantee (in the case of each pre-delivery installment):

- € 41,500,000 (Euros forty-one-million-five-hundred-thousand) within 3 banking days after the signing of each shipbuilding contract.

- € 41,500,000 (Euros forty-one-million-five-hundred-thousand) on the date falling 24 months before the contractual Delivery Date.

- € 41,500,000 (Euros forty-one-million-five-hundred-thousand) on the date falling 18 months before the contractual Delivery Date.

- € 41,500,000 (Euros forty-one-million-five-hundred-thousand) on the date falling (i) 12 months before the contractual Delivery Date.

- Balance at delivery

(5) Delivery Time/Place of Delivery

The parties will work towards signing the shipbuilding contract for Hull No. S. 699 by 29 June 2012 with a view to the shipbuilding contract becoming effective by 6 July 2012. Subject to the shipbuilding contract for Hull No. S. 699 becoming effective by 6 July 2012, the Ship shall be delivered at Eemshaven or at another North European sea port selected by the Builder, and reasonably acceptable to the buyer, on a delivery date which is a business day within the Autumn of 2015 or the Spring of 2016 and which is to be declared by the Builder to the buyer before the buyer signs the shipbuilding contract for Hull No. S. 699.

The parties will work towards signing the shipbuilding contract for Hull No. S. 700 by 29 June 2012 with a view to the shipbuilding contract becoming effective by 6 July 2012. Subject to the shipbuilding contract for Hull No. S. 700 becoming effective by 6 July 2012, the Ship shall be delivered at Eemshaven or at another North European sea port selected by the Builder, and reasonably acceptable to the buyer, on a delivery date which is a business day within the Spring of 2017 or the Autumn of 2017 and which is to be declared by the Builder to the buyer before the buyer signs the shipbuilding contract for Hull No. S. 700. The delivery date for Hull No. S. 700 shall be about 18 months later than the initial contractual delivery date for Hull No. S. 699.

(6) The Ships will be constructed for registration by each buyer on delivery under the Bahamas flag or the Bermuda flag. Each buyer will notify its flag election to the Builder by the effective date of the relevant shipbuilding contract.

B) This Letter of Intent records the declared intentions of the parties but it is agreed that the orders for the Ships are subject to satisfaction of the following further conditions:

(i) the Customers finalizing their co-venturing arrangements, obtaining financing for the Ships and agreeing all related security arrangements, upon terms acceptable to the Customers in their sole discretion;

(ii) the Customers obtaining all necessary approvals from their lenders;

(iii) the Builder, acting reasonably, accepting the Customers' financing for the Ships;

(iv) the shipbuilding contract, the specifications and other related documentation for each Ship being finalized and signed by the duly authorized representatives of each party; and

(v) each shipbuilding contract becoming fully effective in accordance with its terms and conditions.

1125663 23991046.1

In connection with (i) above, if so requested by the Customers the Builder will re-execute this Letter of Intent in favor of an entity established by the Customers on condition that the Customers guarantee for this entity.

The Builder and the Customers will work together in good faith with a view to agreeing all terms, conditions, details and other matters in relation to the shipbuilding contracts and specifications referred to above so that the relevant documentation can be signed by 29 June 2012. Subject to further agreement between the parties, should both shipbuilding contracts not become effective by 6 July 2012, each shipbuilding contract shall be null and void ab initio.

In addition, each party agrees that - without any liability - it will in good faith try to satisfy its conditions as soon as practicable after signature of this Letter of Intent; it will keep the other party fully and promptly informed about any change in circumstances that would be likely to postpone satisfaction of any conditions to a date after 29 June 2012; and it will immediately notify the other party if at any time it believes that it will not be possible to satisfy or waive any of its conditions by 6 July 2012.

C) Neither party will disclose the existence or any of the contents of this Letter of Intent, or any of the negotiations referred to herein, to any third party save and except:

(i) with the prior written consent of the other party;

(ii) to the extent necessary in connection with the Customers' co-venturing and financing arrangements or to achieve the conclusion and effectiveness of the shipbuilding contracts, subject to the confidentiality restrictions provided for herein;

(iii) as required by the rules or regulations of any applicable stock exchange or regulatory body from time to time having jurisdiction over either of the Customers, or any entity nominated by them as the buyer of a Ship, or the Builder; or

(iv) as required by law.

Subject to the foregoing provisions, the contents and release arrangements for any public announcements in relation to the matters referred to in and contemplated by this Letter of Intent shall be agreed in writing in advance between the Customers and the Builder.

D) This Letter of Intent is governed by, and shall be construed in accordance with, English law and it is subject to the exclusive jurisdiction of the English courts. Each party hereby submits itself to the jurisdiction of the English courts for the purposes of this Letter of Intent.

E) This Letter of Intent takes precedence over and supersedes any and all previous oral and written correspondence, discussions and exchanges, direct or indirect, between the Customers and the Builder (or any of their respective representatives) in relation to the matters referred to in this Letter of Intent.

F) This Letter of Intent will be treated as having been signed by the parties hereto at the time and on the date when each party has signed and initialed a complete, legible and identical counterpart of the Letter and exchanged the same by email or fax with the other party. Thereafter, for record purposes three identical original counterparts of this Letter shall be signed and initialed by each of the parties after which one original counterpart will be retained by VSM, one will be retained by VGI and the other will be retained by the Builder.

1125663 23991046.1



For and on behalf of
**VSM Development, Inc.**

For and on behalf of
**MEYER WERFT GmbH**

...........................................

Colin Veitch, Chief Executive Officer

.........................................

Bernard Meyer, Managing Partner

For and on behalf of
**Virgin Group Investments Limited**

.....................................

**IAN CUMING
DIRECTOR**

All in the presence of: .......................................
Thomas Weigend

1125663 23991046.1

Annex "A"

The total sums of the following cost elements regarding modifications to the specification for the Ships shall be provided by the Builder to the buyer:

(a) design cost,

(b) labor cost,

(c) material cost and

(d) Builder's compensation as defined hereinafter.

The Builder's compensation for modifications according to item (d) amounts to 25 % and will be imposed on the total sum of design, labor and material cost as per item (a) to (c) for each modification. The Builder's compensation rate is based on the following cost considerations/flat rate figures:

(1) 5 % pre-financing

Due to different durations from a modification to delivery of a Ship

(2) 3 % guarantee

As some modifications are new techniques and some are well proven.

(3) 2 % insurance

We have to report every increase in scope of production to our insurance company and report the process of construction which will increase the value of insured goods.

(4) 3 % risk

Very often there are no examples or references for further modifications available. Often the level of details is limited and modifications are made under time pressure and we often detect further costs while proceeding.

(5) 3 % effect on processes/flow of operation

Either in the design phase or in the construction phase modifications result in an unexpected change of the flow of processes and schedules and therefore in higher operating expenses, which are not within the Contract Price. After steel cutting has begun this effect is more than 3% and has to be calculated individually.

(6) 5 % miscellaneous

This part covers all costs for modifications not being part of items (1) to (5) above, such as:

- approval costs (e.g. flag state, classification)

- travel expenses

- effect on other drawing work, installations etc by this modification, which cannot be calculated

- overtime extra payment (as we are working with full load under normal conditions for modifications either

in design or in production we have to go for higher workload. Overtime extra payment is 25 % based on labor agreement)

- transportation (e.g. fork-lift, cranes)

- storage

- rescheduling

- etc.

(7)  4 % profit

No further explanations needed.


**(End of Annex A)**



Annex "B"

## Unit costs for passenger cabins:

| | |
|---|---|
| Courtyard – Suite | each 82,000 € |
| Loft – Suite | each 140,000 € |
| Aft - Suite | each 80,000 € |
| Studio - Suite | each 76,000 € |
| FC - Family Cabin | each 38,000 € |
| FCW - Window Family | each 38,000 € |
| V - Verandah | each 29,000 € |
| B-S – Balcony Sea | each 26,000 € |
| B-L - Balcony Lagoon | each 26,000 € |
| W-S - Window Sea | each 29,000 € |
| W – Window Cabin | each 24,000 € |
| I-1 - Inside | each 23,000 € |
| I-SIN - Inside Single | each 23,000 € |

The abovementioned unit costs for the passenger cabins include the related part of the supply and discharge systems such as air conditioning, hot and cold water, grey and black water and electrical systems as described in the specifications, but exclude balconies and windows.

(End of Annex B)



**ADDENDUM NO. 1 TO THE LETTER OF INTENT** dated February ~~February~~ *MARCH 12th* 2012 between: VSM Development, Inc. c/o 9801 West Suburban Drive, Pinecrest, FL 33156, USA (**VSM**); Virgin Group Investments Limited, a company organized and existing under the laws of the British Virgin Islands, with its principal office located at La Motte Chambers, St. Helier Jersey, Channel Islands JE1 1PB (**VGI**); and MEYER WERFT GmbH, Papenburg, Germany (**Builder**) in respect of newbuildings with Hull Nos. S. 699 and S. 700

With reference to the above-mentioned Letter of Intent it is hereby agreed that:

In order to facilitate the reduction of the amount of the refund guarantee referred to in A) (4) after each payment as stipulated hereinafter the refund guarantee for each instalment shall be split into two parts, i.e. the amount of the instalment less the part of the Buyer's Allowance and the amount of the part of the Buyer's Allowance (**Buyer's Allowance Refund Guarantee**).

The Contract Price for each Ship mentioned in A) (3) includes a lump sum allowance of € 50,000,000 (Euros fifty-million) which may be applied by each buyer for buyer's project costs, buyer's supplies and /or modifications. For the avoidance of doubt, this sum shall be financed as part of the purchase price of each ship.

Under each shipbuilding contract this lump sum allowance will be accounted for and paid by the Builder as follows:

(a) Upon its receipt of the first instalment of the contract price the Builder shall immediately pay to the buyer the sum of € 2,500,000 (Euros two-million-five-hundred-thousand). Upon the buyer's receipt of this payment, the buyer shall return the Buyer's Allowance Refund Guarantee to the Builder.

(b) Upon its receipt of the second instalment of the contract price the Builder shall immediately pay to the buyer the sum of € 2,500,000 (Euros two-million-five-hundred-thousand). Upon the buyer's receipt of this payment, the buyer shall return the Buyer's Allowance Refund Guarantee to the Builder.

(c) Upon its receipt of the third instalment of the contract price the Builder shall immediately pay to the buyer the sum of € 2,500,000 (Euros two-million-five-hundred-thousand). Upon the buyer's receipt of this payment, the buyer shall return the Buyer's Allowance Refund Guarantee to the Builder.

(d) Upon its receipt of the fourth instalment of the contract price the Builder shall immediately pay to the buyer the sum of € 2,500,000 (Euros two-million-five-hundred-thousand). Upon the buyer's receipt of this payment, the buyer shall return the Buyer's Allowance Refund Guarantee to the Builder.

(e) For each payment of € 2,500,000 (Euros two-million-five-hundred-thousand) hereunder the buyer shall provide the Builder with a corresponding invoice. The invoice shall not require any specific explanation of paid or planned expenditures.

(f) At delivery of the Ship the Builder shall apply the balance of the lump sum allowance, in the amount of € 40,000,000 (Euros forty-million), in or towards payment of any sums due to the Builder at delivery in respect of agreed modification costs.

(g) At delivery of the Ship the buyer shall provide the Builder with a written statement (in such form as the Builder may reasonably request) signed by two directors or other authorized officers of the buyer and describing the categories of items ordered by or on behalf of the buyer, and the other expenditures made or to be made in respect of orders placed by or on behalf of the buyer, the total value of each such category and the aggregate total value of such orders in respect of which the lump sum allowance has been applied during the construction period or is to be applied using the amounts referred to in paragraphs (a) to (d) above and any remainder amount referred to in paragraph (h) below.

(h) If any part of the lump sum allowance remains after the application referred to in paragraph (f) above, at delivery of the Ship the relevant remainder amount shall, upon its receipt of the instalment of the Contract Price due at delivery, be paid by the Builder to the buyer by way of a refund of the unutilized portion of the lump sum allowance, and the buyer shall provide the Builder with a corresponding invoice.

Date: February MARCH 21, 2012

For and on behalf of
VSM Development, Inc.

.....................................
Colin Veitch, Chief Executive Officer

For and on behalf of
MEYER WERFT GmbH

.....................................
Bernard Meyer, Managing Partner

For and on behalf of
Virgin Group Investments Limited

.....................

**IAN CUMING
DIRECTOR**

All in the presence of:

.....................................

Thomas Weigend

1125663 23991046.1