## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 15-20989-CIV-MOORE/MCALILEY

**COLIN VEITCH,**
**VSM DEVELOPMENT, INC.**,

   Plaintiffs,

v.

**VIRGIN MANAGEMENT USA, INC.**,
**VIRGIN GROUP INVESTMENTS LTD.**,
**VIRGIN GROUP HOLDINGS LIMITED**
**VIRGIN ENTERPRISES LIMITED**
**VIRGIN CRUISES INTERMEDIATE LIMITED**
**VIRGIN CRUISES LIMITED**

   Defendants.

_____/

### AMENDED COMPLAINT

Plaintiffs, Colin Veitch and VSM Development Inc. (collectively, "Veitch" or "Plaintiffs"), sue Defendants, Virgin Management USA, Inc., Virgin Group Investments Ltd., Virgin Group Holdings Limited, Virgin Enterprises Limited and Virgin Cruises Intermediate Limited (collectively "Virgin" or "Defendants"), and allege as follows:

### INTRODUCTION

This is an action for misappropriation of a business idea, business plan, and business that was fully developed by Mr. Colin Veitch and presented to Virgin pursuant to non-disclosure, non-use, and other agreements.  In 2010, Mr. Veitch discovered that the way to break the barriers to entry in the cruise industry was constructing and financing two new "Ultra Ships."  Ultra Ships are massive cruise ships that feature an array of attractions, generate their own consumer demand, and command premium pricing and onboard revenue.  Mr. Veitch determined that a

fleet of two Ultra Ships alone would enable a new entrant to successfully shatter the very strong barriers to entry to this well protected, highly profitable industry, and reward pioneering, non-traditional, investors with extremely profitable returns.

After obtaining an agreement that Virgin would not use Mr. Veitch's ideas and business plan without his consent, Mr. Veitch presented the idea to Virgin in early 2011, and Virgin quickly signed on as Mr. Veitch's brand partner.

In May 2011, the parties agreed to the terms on which they would proceed together to develop the venture.  Virgin sought a guaranteed return in the form of a licensing fee for its brand that would be paid regardless of the performance of the ships, and ahead of even the equity investors, and a higher return if the ships were successful as planned.  Virgin's licensing fee for its brand would generate initially $16 million per year if the ships performed as expected (and $8 million per year regardless of performance).  In exchange for this large and guaranteed licensing fee, Virgin agreed to accept a smaller percentage -- 10% -- of the so-called Promote which would be available to split between Mr. Veitch and Virgin.[1]  In the event the venture performed as planned, Virgin expected this agreement -- its licensing fee and its 10% share of the available Promote -- to return $427 million - $483 million to Virgin over a ten year horizon.

Mr. Veitch, in exchange for his ideas, plan and leadership in developing the business to the point where it was investor ready, would receive a 90% share of the available Promote.[2]  That

---

[1] A "Carried Interest", also known as a "Promote", and discussed in further detail later in this complaint, is a standard feature of private equity type investments. It is designed to align the interests of the investors and the active managers. Essentially, the investors providing the cash funding demand a base return on their money – for example 8% per annum - and once that base return has been achieved they share any returns above that with the active manager(s) of the investment. In this case, the active manager(s) would be Mr. Veitch and Virgin. Typically, the returns above the required base return would be split 80% to the cash investors and 20% to the active manager(s). If the investment were to do poorly, the active manager(s) may receive nothing at all. If the investment were to do very well, the active manager(s) would receive 20% of all profits above the required base level; potentially very substantial rewards.

[2] The parties agreed to set aside one-third of the Promote to incentivize early investors providing the initial funding before the main fund-raising, and then they agreed a split between themselves (90/10) of the remaining two-thirds of

meant that, relative to Virgin, Mr. Veitch would receive nothing unless the ships were profitable, and would receive a substantial return if they were as profitable as he had proposed. Mr. Veitch, by Virgin's calculation, would receive $315 million if he delivered the performance he was proposing.[3] This agreement is hereinafter referred to as the "Veitch-Virgin Agreement." These returns and projected amounts were predicated on just the initial two-ship fleet, whereas Allen & Co., the investment bank charged with raising the equity financing, consistently told the parties that the returns would end up being much larger as the venture naturally added ships in response to a successful launch of the first two.

The pairing of Mr. Veitch and Virgin seemed ideal: Mr. Veitch is a former cruise industry CEO renowned for his vision and numerous innovations that had changed the cruise industry -- and who had developed a break through business idea; and the Virgin brand is associated with cutting edge products in the travel industry.

With the Veitch-Virgin Agreement in place, Mr. Veitch spent the next year assembling a team of industry experts to design the ships, signed a letter of intent with a German shipyard to build the ships, obtained a letter of intent with a German bank to provide debt financing for the ships, presented to and secured the support of two German government ministries responsible for

---

the Promote. This early funding, in the end, was not required as Mr. Veitch decided to fund the work and was able to persuade multiple team members to work "on spec". Virgin, therefore, provided no funding of the development work, which was all funded by Mr. Veitch or performed "on spec" by parties Mr. Veitch persuaded to join the team.

[3] The Promote at this stage was calculated based upon the expectation of an IPO or other sale of the company once the two ships had been successfully launched. Later in the development of the project, the investment bank, Allen & Company, calculated the returns under the alternative scenario of no IPO/sale but instead an annual receipt of cash flows over 20 years. In this analysis, royalties to Virgin had risen from an initial $16 million a year to almost $30 million a year on average, and so there would be a total of $570 million of royalties solely to Virgin as well as a Promote of $1 billion to be split between Virgin and Mr. Veitch. (There would also be a very healthy return of $4 billion to investors over and above the return of their original investment, and there would be $320 million for participants in the management incentive program. Mr. Veitch, in recognition of his attractive participation in the Promote, had opted not to participate in the management incentive program in order to ensure maximum availability of incentives for his management team.) Again, these projections were based on only the initial two ships rather than the intrinsic value of the platform that would have been created for additional ships and growth.

providing export credit guarantees to the banks providing the debt financing, and completed the management presentation and other materials necessary for the road show to enlist the equity investors.

In fact, Mr. Veitch and Virgin prepared a video rendering of the ship and the branding, and Virgin's founder, Sir Richard Branson, recorded a video expressing his and Virgin's full support, stating:

> Well hello it's Richard.  I just want to thank you for this opportunity to discuss the cruise project.  We at Virgin are very excited about getting into the cruise industry...
>
> The cruise business is also **strategic and important to the growth of Virgin**. **Cruise has the potential to be one of our biggest, sexiest businesses, hence our excitement**.
>
> We are also pleased to be working with Colin Veitch, the teams of Meyer Werft and KfW IPEX-Bank.  We've got talented people at the ready.  So here's to getting our ships in the water, and making some waves, just like we have in all our other businesses.  I hope that the next time I raise this glass with you, is to say bon voyage.  Cheers.

(*Richard Branson video-taped message,* October 2011.)

Upon recognizing the potential for Virgin Cruises to be one of Virgin's "biggest, sexiest businesses," however, the dark side of Virgin quickly emerged.

Immediately after Mr. Veitch secured the commitments from the shipyard to build the ship and the bank to finance the ship, Virgin sought to turn the Veitch-Virgin Agreement on its head.  Instead of Mr. Veitch receiving 90% of the Promote to Virgin's 10%, Virgin insisted on a sliding scale under which the Promote up to $100 million would be divided 80% for Virgin and 20% for Mr. Veitch, up to $400 million would be divided 70% for Virgin and 30% for Mr. Veitch, and up to $600 million divided 60% for Virgin and 40% for Mr. Veitch.  Moreover, Virgin's share of the Promote would be vested, but Mr. Veitch's share would be unvested and earned only if Mr. Veitch remained employed.  Due to the vesting proposal, Virgin could have

ended up with 98% of the Promote and Mr. Veitch only 2%. This proposal, if accepted, would have shifted almost all of the economics of the Venture into Virgin's coffers.

Mr. Veitch attempted to reason with Virgin, but Virgin stated that its board of directors had no flexibility. Virgin's final demand was that its 10% of the Promote be increased to 60% and that Mr. Veitch's share of the Promote be reduced from 90% to 40%, with only 10% of that vested, with the remainder to be earned over a period of five years only if Mr. Veitch served as CEO of the cruise line for that entire period.

This proposal would have changed Mr. Veitch's role from that of the founder and fully vested owner of the business, to an employee -- indeed an indentured servant -- whose ownership and rewards depended completely upon Virgin's whims. At the same time, regardless of how much or how little Virgin would have done to help the business realize its full potential, Mr. Veitch's delivery of a successful venture would result in enormous returns to Virgin, far in excess of those to Mr. Veitch. And, running alongside this unfair imbalance, would be a huge annual licensing fee to Virgin regardless of whether the business even turned a profit or the original investors got their money back.

It now appears that Virgin never intended to abide by the deal it initially struck with Mr. Veitch. In 2014, the renowned investigative journalist Tom Bower published his expose: *Branson Behind the Mask* (Faber & Faber 2014). The book recounts numerous instances of Virgin luring in businessmen with agreements and promises of fair treatment only to renege at the last moment when they believed they had the greatest leverage to gain more control and better terms for Virgin. According to Bower:

> Many former friends, partners and advisers resented the small reward for their contribution to Branson's ventures .... None had grasped that the embrace of the Virgin family implied ownership by the proprietor. Enthusiastically, each offered unqualified loyalty to Virgin executives acting as creative catalysts. Then, the

relationships soured. **Collaboration meant subservience, not equality**. …
Talented men complained that their trust had been abused … Scattered across the
world, they blamed misplaced faith in Branson for signing contracts tilted in his
favour.

Tom Bower, "*Branson: Behind the Mask*", p. 60 (Faber & Faber 2014).  Based upon similar acts

in past business ventures, Bower has characterized Virgin's founder, Richard Branson, as a

"**dream thief**."  *Id*. at p. 236 (emphasis added).

As that label foreshadowed, Virgin proceeded without Mr. Veitch, engaging Mr. Tom

McAlpin in the summer of 2012 to take over leadership of the project just weeks after squeezing

Mr. Veitch out of their erstwhile "partnership."[4]  Under a shroud of secrecy, Virgin proceeded to

obtain the debt and equity financing to proceed with the very business plan it stole from Mr.

Veitch. They even used Allen & Company to raise the equity for Virgin Cruises, the very bank

introduced into the project by Mr. Veitch in late 2010 even before he approached Virgin. On

December 4, 2014, Virgin generated tremendous publicity when it formally announced the

"formation of Virgin Cruises, its new cruise line business," based on the financing and

construction of two new Ultra Ships, just as Mr. Veitch had planned.

Virgin's proceeding with the Virgin Cruises business is in breach of the non-disclosure

and not-use agreement it signed with Mr. Veitch, constituted misappropriation of Mr. Veitch's

novel business idea, constituted unfair competition and unjustly enriches Virgin, and is in breach

of both the Veitch-Virgin Agreement and the joint venture or partnership the parties had created

to pursue the venture.

---

[4] Mr. McAlpin was announced to the world as Virgin Cruises founding CEO in December 2014.
However, Virgin had reported his involvement as early as July 2012 in a conversation with Allen &
Company.

## PARTIES

1.      Plaintiff Colin Veitch is an individual domiciled in Florida.

2.      Plaintiff, VSM Development Inc., is a Florida corporation with its headquarters in Florida.

3.      Defendant Virgin Management USA, Inc. (VMUSA) is a Delaware corporation with a principal place of business at 65 Bleecker Street, 6th floor, New York, NY 10012.

4.      Defendant Virgin Group Investments Limited., (VGIL) is a company incorporated in the British Virgin Islands with a principal place of business in the British Virgin Islands.

5.      Defendant Virgin Group Holdings Limited (VGHL) is a corporation organized under the laws of the British Virgin Islands with its principal office at La Motte Chambers, St. Helier, Jersey, Channel Islands JE1 1BJ.

6.      Defendant Virgin Enterprises Limited (VEL) is a corporation organized and existing under the laws of the United Kingdom, with is principal place of business in 120 Campden Hill Road, London,  W87AR, United Kingdom

7.      Defendant Virgin Cruises Intermediate Limited (Virgin Cruises) is a corporation organized under the laws of Bermuda.

8.      Defendant Virgin Cruises Limited (VCL) is a corporation organized under the laws of Bermuda.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, as this Court has diversity jurisdiction over the parties because the parties are domiciled and reside in different states and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, interest, and costs.

10.     Defendants are also subject to personal jurisdiction within this District because (1) Defendants have negotiated and entered into agreements in this District, (2) pursuant to Florida Statutes §§ 48.193(1)(a), (f), (g) and 48.193(2), and (3) because an agreement that is the subject matter of this action contains a consent to the personal jurisdiction of this judicial district.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) because the agreements that are the subject matter of this action were negotiated and/or entered into in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District and Virgin Management USA and Mr. Veitch specifically agreed that "any action or proceeding seeking to enforce any provision of this Agreement or to resolve any dispute arising out of or in connection with this Agreement shall be brought exclusively in a court located in either New York County, New York or Miami-Dade County, Florida." Plaintiff, Colin Veitch ("Mr. Veitch"), is domiciled in the State of Florida.

## COLIN VEITCH

12.     Mr. Veitch is the former President and Chief Executive Officer of Norwegian Cruise Line ("NCL"), a position he held for nine years, from 2000 through 2008.

13.     In the almost 50 year history of NCL, the oldest cruise line in South Florida, he is the longest serving CEO by far, and the most influential in the strategic and operational development of the company to its present-day good fortunes. Prior to joining NCL, he was in turn Chief Financial Officer and then Senior Vice President, Marketing and Corporate Finance, for eight years at Princess Cruises based in Los Angeles, as well as acting Managing Director at Princess' sister company in Sydney, Australia, P&O Cruises.

14.     Over his nine-year tenure at NCL, Mr. Veitch led both NCL and the entire cruise industry through fundamental changes, primarily through the introduction of "Freestyle

Cruising", as well as through the development of bold new deployments and itineraries, opening up entirely new markets to cruise consumers and cruise lines alike (for example, cruising, year-round, from New York to the Bahamas and Caribbean, cruising to Alaska from Seattle, and inter-island cruising in Hawaii).

15.    Freestyle Cruising, announced in 2000 shortly after Mr. Veitch joined NCL, did away with all kinds of out-of-date features of the traditional cruise product and sought to position NCL's cruises more competitively against landside resorts. Freestyle Cruising eliminated, at a stroke, the then-universal stifling cruise line practice of having two mandatory dinner times -- 6:30 and 8:30 P.M. for example – with specified dress codes each evening, in a single enormous dining room, typically at large tables shared with strangers.  Instead, Freestyle Cruising offered a range of dining choices all over the ships, and empowered the passengers to choose their restaurants, the times they dined and their attire for the evening.

16.    Beyond dining, Freestyle Cruising presented a raft of new, high-quality entertainment options, such as improvisational comedy from the Second City comedy troupe based in Chicago and, in due course, even contemporary Las Vegas acts like The Blue Man Group. Freestyle Cruising did away with the down-market final night experience – standard on virtually every ship in the industry at that point – of passengers passing cash tips in envelopes to crew members throughout the ship. Under Freestyle Cruising, a per diem service charge was added to passengers' bills and no tipping was required. Passengers could spend their final evening relaxing instead of paying the crew. Many more elements were included in this dramatic overhaul of the unquestioned patterns and practices of the entire industry.

17.    Freestyle Cruising was designed not only to enhance the passenger experience but also to reach a new audience of younger consumers.

18.     While initially derided by other cruise lines, Freestyle Cruising quickly revolutionized the industry, becoming the model of a modern cruise product.  Today, all new ships built by every major brand have, *perforce*, incorporated major elements of Freestyle Cruising in order to respond more adequately to the changing needs and expectations of today's consumers.

19.     While at NCL, Mr. Veitch designed and built nine ships with combined construction cost of $4.25 billion.  Each new ship, designed to deliver Freestyle Cruising, retired one older traditional ship.  The result was, by 2008, the youngest, most contemporary fleet in the industry.

20.     Crowning this fleet, at the time of Mr. Veitch and Virgin striking their deal, was one of only three Ultra Ships in the industry: *Norwegian Epic*, which was designed between 2005 and 2007 by Mr. Veitch and his former shareholder/chairman. Norwegian Epic was launched, to great acclaim, in 2010 and voted Best Cruise Ship of the Year in both 2011 and 2012 by the readers of the largest travel trade magazine in the country.

21.     When he announced that project in 2006, Mr. Veitch noted it was "the third generation" of Freestyle Cruising and would "take the Freestyle Cruising product and develop it further."  In fact, the *Epic* would break cruise design standards, as much for what it wouldn't have as for what it would. For the first time, a major cruise ship was introduced without an obvious principal dining room, without a principal main theater, and without a traditional large buffet restaurant. Instead, the dining and the entertainment experiences were completely deconstructed from the old model and an entirely new distributed model, offering unprecedented choice and variety, was presented. Hitherto distinct areas, such as the casino, were integrated in an open plan, free flowing layout that consumers took to immediately. An exclusive two-deck

complex of suites around a private pool, gym, restaurant, bar, and club created a ship-within-a-ship, without parallel anywhere at sea. And low-yielding interior space was transformed into a high-yielding attractive complex of studio cabins for single travelers.

22.    When NCL introduced the ship, its then CEO, Kevin Sheehan, emphasized again that the "Norwegian Epic represents the next level of Freestyle Cruising."[5]   Its introduction "made headlines for features such as expansive, brand-name entertainment like Blue Man Group; revolutionary accommodations such as single-occupancy studios; and a massive water park."[6]

23.    It is for these and many other reasons that Travel Weekly recently published an article entitled "Colin Veitch, Visionary," noting that "[a] case can be made that **the former head of Norwegian Cruise Line was the most influential and creative cruise CEO of the past decade**."

### THE "ULTRA SHIPS" BUSINESS PLAN

24.    After his retirement as CEO of Norwegian Cruise Lines, Mr. Veitch analyzed the successful introduction of what he referred to as the Ultra Ship *Norwegian Epic*, as well as the introduction of Royal Caribbean's new Ultra Ship, the *Oasis of the Seas*.

25.    Mr. Veitch realized that the mere introduction of these Ultra Ships had the ability to generate tremendous publicity and consumer excitement, and that the ships had the ability to charge significant premiums in ticket prices and generate substantially higher on board revenue.

26.    Mr. Veitch believed that the excitement and high returns that these new Ultra Ships were generating ought not necessarily be available only to the existing cruise lines. Instead, such high returns should be available to a new company that had the expertise not only

---

[5] http://www.travelweekly.com/Cruise-Travel/N-Y-debut-caps-Norwegian-Epic-s-long-journey-to-completion

[6] *Id.*

to design, build, market and operate these new Ultra Ships, but also the knowledge and credibility to obtain the debt and equity necessary to finance the construction of the ships.

27.     The new company would offer a much higher return on investment than any of the "big three" companies – Carnival, Royal Caribbean, and Norwegian – because the first two of those companies had sizeable legacy fleets of older, lower-earning ships, and the third, NCL, even though it had the youngest fleet, had only one Ultra Ship and a fleet of significantly smaller ships.

28.     In all three cases, the staggeringly attractive financial returns of an Ultra Ship were diluted by the lesser earnings of the legacy fleet and/or smaller ships. The specific earnings and return on investment of any type of ship, and the differential between the smaller, older ships and the very largest, newest ships, was something no cruise line ever disclosed to the general public or investment community. Mr. Veitch was aware of the specifics because of his 17+ years in top management positions in two of the three dominant cruise companies.  Furthermore, even if the specifics were known, no investor could access a pure investment in the most attractive class of assets, the Ultra Ship. The Ultra Ship was not an unproven prototype project with unpredictable returns; it was a proven concept generating real returns. But, the only Ultra Ships were buried in the aggregate fleets of older and smaller ships of the big three lines: their so-called Legacy Ships. Their returns were both shielded from outside view and diluted in their presentation, aggregated as they were with the returns of all the Legacy Ships in their respective companies' fleets. In the case of Norwegian Cruise Line, for instance, the financial results of the one Ultra Ship were mixed in with the results of ten Legacy Ships roughly half the size of the Ultra Ship. In the case of Royal Caribbean, the results of their two Ultra Ships were mixed in with the results of no fewer than 30 Legacy Ships whose average size was not even half that of

the two Ultra Ships.   Mr. Veitch's Ultra Ships project would create a pure investment opportunity and, into the bargain, attract both cruisers from other lines and also entirely new cruisers attracted by the new "hot ticket".

29.     Based upon these new dynamics, Mr. Veitch believed it was possible to break the forbidding barriers to entering the cruise industry as a newcomer and, at the same time, to tap into the huge available pools of non-traditional capital looking for just such an opportunity. Third party investment in a specific ship or class of cruise ship had never been done before. The existing cruise lines financed from within and from the public equity and debt markets. Investors, whether public or private, could only invest in the cruise companies, not in individual ships or classes of ships.

30.     Mr. Veitch thereafter prepared a detailed business plan entitled "Ultra Ships – A Greenfield Opportunity in the Cruise Industry" (hereinafter, the "Ultra Ships Plan" or just "the Plan").  The Ultra Ships Plan was 30 pages long, plus appendices, and provided detailed analysis of the Investment Opportunity, the Investment Rationale, the Investment Variables, the Return Sensitivities, the Economics of Cruising, Key Personnel, as well as illustrations of Ultra Ships.[7] A true and correct copy of the Ultra Ships Plan, and its Data Appendix, is attached as **Exhibit A**.

### A.     Profits & Return on Investment

31.     The Ultra Ships Plan explained that the consumer appeal and the financial success of the Ultra Ship had been decisively demonstrated by the successful introductions of the *Epic* the *Oasis of the Seas*.   Because the "Ultra Ships are the most exciting and attractive to consumers," they were "generating extraordinary returns."   In fact, the *Epic* and *Oasis* were

---

[7]As part of the Plan, Mr. Veitch also prepared a Data Appendix that contained detailed tables and charts that explained the financial model, including assumptions, calculations of returns, and Scenarios and Sensitivity Analysis on Each Assumption.

already "generating disproportionately strong consumer demand, commanding substantially the highest ticket prices in their respective fleets, and realizing by far the greatest on board discretionary spending."

32.    The Ultra Ships Plan further noted that the premiums for tickets on the *Epic* and the *Oasis* "were generally between 30-60% higher than other ships" and that, even "with the higher ticket prices, consumers see great value in the ticket purchase even at a higher price point because of all the options and features that you can participate in when you're on board.'"

33.    The Plan further explained it was "not only in ticket revenue that these Ultra Ships command a premium; the on board earnings are markedly higher than on ships with less space and, consequently, less choice and variety."  Mr. Veitch's Plan also provided his analysis of financial data indicating that net on board revenue for smaller ships peaked at just over $52 per capacity day and that the new ships approached $70 per capacity day, an increase of 35%.

34.    The Ultra Ships Plan further explained that, while ticketing and onboard revenues increased dramatically, costs did not.  In fact, it explained that for NCL, "the cost per passenger-cabin has not been disproportionately higher than the cost of the cabins on the large legacy fleets on top of which it now sits."

35.    Moreover, the Plan explained that the scale of the Ultra Ships "permits for efficient operation from the outset, independent of economies that would otherwise be generated by a collection of smaller less efficient ships.   Shoreside operations, and general and administrative support, are in several ways more efficient when such a large number of passengers and such a large amount of revenue can be handled with single plans and sets of actions."

###### B.    Branding & New Customers

36.    The Ultra Ships Plan also explained "a new Ultra Ship would not be dependent upon having an established Cruise brand."  Instead, a new company based upon a new Ultra Ship with its "distinctiveness, and its unmatched range of amenities and features, as well as its sheer size, commands consumer attention as a stand-alone attraction, in much the same way that the breakthrough resort hotels in Las Vegas have done. The ship is its own brand, and that brand awareness can be built with a ship-specific marketing campaign …."

37.    The Plan explained that a "standard legacy ship relies heavily on repeat business from a broad customer base that may have been on that ship before, or may have been on that ship's sister ships, or that may have cruised before with another brand altogether.  However, an Ultra Ship does not need to rely on repeat business.  An Ultra Ship, well designed and well launched, will be the hottest ticket in town **and will attract first time cruisers and experienced customers of other brands alike**, all of them enthused and curious to experience the unique offerings of the ship that everyone is talking about."

###### C.    Breaking the Barriers to Entry

38.    The Ultra Ships Plan also addressed the very high barriers to entering the cruise industry.  The barriers to entry most often cited by the cruise lines themselves are (a) possession of a recognized consumer brand, (b) access to large amounts of capital to build a multi-ship fleet in order to obtain operating and marketing scale economies, (c) access to scarce shipyard building slots, and (d) an installed customer base to maintain high occupancy across a fleet of ships. In fact, these "barriers to entry" had proven insurmountable for virtually all ventures seeking to enter this lucrative market. Virgin themselves have acknowledged that, in spite of

having had the ambition to enter the business for very many years (since the late 1970's according to Defendants) they had not succeeded because of cruise's high barriers to entry.[8]

39.     The Ultra Ships Plan addressed each of these, and more, and explained that: "Real though these barriers have certainly been, and formidable as they will continue to be in terms of dissuading anyone from trying to replicate the corporate entities that have already been built, the recent success of the Ultra Ships, coupled with other developments in distribution and consumer demand, has opened the door to a green field entrant with a differentiated strategy, and has demonstrated that these barriers may be less relevant and less effective than in the recent past."

40.     The idea that the industry had itself created the opening through which an audacious new entrant could gatecrash the carefully erected and very high barriers to *de novo* entry, was a completely novel idea. The industry had become more and more concentrated over its 50 year history, to the point that three main players controlled over 80 per cent of the worldwide capacity, and each of these three was in turn owned by an array of multi-billionaires. The idea of challenging this oligopoly head-on was not mooted by anyone. Companies, including Virgin, looked to enter the industry in ways that would not rock the boat and which, in some instances, would even involve the cooperation – or at least the consent - of one of the Big Three oligopolists. The conventional wisdom of an impenetrable industry had become not only axiomatic amongst the oligopolists, but had become unquestioned among aspiring entrants too. The Ultra Ships plan turned this on its head.

41.     The Ultra Ships Plan also addressed how to raise the equity for the venture, noting that the "opportunity exists to start from scratch, without the constraints of a legacy fleet, and to

---

[8] The very high barriers to entry in the cruise market had dissuaded all but two companies from entering the large cruise ship market in the past two decades. Disney was able to enter the cruise market based upon its established brand and customer base, as well as corporate financial resources. Similarly, MSC Cruises was funded by the enormous cash flow of the container shipping line Mediterranean Shipping Company.

invest in the pure earning power of the state-of-the-art cruise ship concept, the Ultra Ship" and that the "direct investment described in this paper and modeled in the accompanying data appendix, spans a five year course of design, build, and introduction leading up to a realization of the investment between the introduction of the first and second ships" with an estimated equity requirement of $563 million. Clearly, an equity commitment of over half a billion dollars (with further funds available for contingencies) would normally rule out most aspiring entrants. Even large companies would balk at investing such large sums of their own money in a new venture targeting a highly concentrated and protected market. But, the Ultra Ships business plan recognized that such an investment would present the ideal profile to private equity/sovereign wealth/family-office type investors. The Ultra Ships business plan was designed to enable a lightly funded new entrant to gatecrash the cruise business in a huge way by appealing to deep sources of capital who had not traditionally invested in the cruise industry, and for whom the publicly traded cruise stocks were unattractive.

42.    The ideas contained in the Ultra Ships Plan were novel both generally and in the industry itself.  Only an individual with Mr. Veitch's detailed and intimate first-hand knowledge of the finances and consumer appeal of cruise ships, as well as the strategic dynamics of the cruise industry, could have identified this opportunity, and created the Plan.  Mr. Veitch's entire 17 years in the cruise industry had been characterized by learning about it in the tiniest detail, questioning everything, and having the mindset to challenge convention and take calculated risks for strategic advantage. The Plan contained very specific ideas and specific plans for developing and implementing the ideas derived from his unique experience-based insights.  To the best of Mr. Veitch's knowledge, nobody had developed such a plan in the past, and the ideas, including

the idea for breaking the barriers to entering the cruise industry, had never been used in the industry.

## ALLEN & COMPANY

43.     Since the proposed business was dependent on major equity financing from outside third parties, Mr. Veitch's first step was to enlist the assistance of a major investment bank.

44.     The purpose was to make sure the investment bank believed in the merits of the project enough to raise the equity financing.

45.     Mr. Veitch chose to consult with Allen & Company ("Allen & Co.") because its strength is with the kinds of very wealthy investors and funds that Mr. Veitch had targeted for this project.  Those were investors who would be attracted to the possibility of putting several hundred million to work over an extended period at very high returns.

46.     Mr. Veitch sent Allen & Co., confidentially, a copy of the Ultra Ships Plan, including all attachments in November 2010.  Allen & Co. studied the plan and reviewed the financials, and expressed strong interest in supporting the plan.

## VIRGIN GROUP

47.     Mr. Veitch considered enlisting a "branding partner" for the venture.

48.     Virgin promotes itself on its website as "a leading international investment group and one of the world's most recognized and respected brands."  The site further claims that, "[c]onceived in 1970 by Sir Richard Branson, the Virgin Group has gone on to grow successful businesses in sectors ranging from mobile telephony, travel, financial services, leisure, music, holidays and health & wellness."

49.     Despite its own clients' public statements, counsel refers to it as "the alleged 'Virgin Group,'" apparently suggesting that they do not agree with the existence of such a "Group."

50.     The "Virgin Group" is not a U.S., British, or European corporation that operates with, and is accountable to, shareholders or a board of directors elected by shareholders.

51.     Rather, the "Virgin Group" operates as "a huge 'family office' with a portfolio run by professional investment managers and the profits channeled – via a number of trusts and a network of holding companies – to the Branson family."[9]

52.     In fact, the "sprawling business empire that makes up Richard Branson's Virgin investment group consists of about 400 operations, a tangled web of enterprises owned via a complicated series of offshore trusts and overseas holding companies."[10]

53.     An example of this "tangled web" can be found in the ownership of Virgin Group's flagship airline, Virgin Atlantic, " which runs through eleven companies.  Virgin Atlantic Airways (GB) is owned by Virgin Travel Group (GB), which in turn is owned by Virgin Atlantic (GB), which is owned by Bluebottle Investments (UK) Ltd (GB), which is owned by Bluebottle UK Ltd (GB), which is owned by Virgin Holdings Ltd (GB), which is owned by Virgin Holdings Ltd (GB), which is owned by Classboss Ltd (GB), which is owned by Virgin Wings Ltd (GB), which is owned by Bluebottle USA Mobile Inc.  (BVI), which is owned by Virgin Group Investments Ltd (BVI), which is finally owned by Virgin Group Holdings Ltd (BVI)."

---

[9] Sarah Gordon, Virgin Group: Brand it Like Branson, Financial Times, Nov. 5, 2014 http://www.ft.com/intl/cms/s/2/4d4fb05e-64cd-11e4-bb43-00144feabdc0.html#axzz3XuH84tN8

[10] Richard Wachman, Virgin Brands: What Does Richard Branson Really Own, The Guardian, January 7, 2012, http://www.theguardian.com/business/2012/jan/08/virgin-brands-richard-branson-owns

54.     Virgin Group Holdings Limited is owned by trusts whose principal beneficiary is Sir Richard Branson and his family.

55.     Upon information and belief, the directors, officers, employees, and the decision makers of Virgin Group Investments Ltd (BVI) and Virgin Group Holdings Ltd (BVI) are identical or substantially overlap.

56.     While each carries the name "Virgin Group," the Group normally does not distinguish which company is being used for which purpose, instead simply calling themselves collectively the "Virgin Group."

57.     In fact, the notion of the "Virgin Group" is at the core of their corporate strategy and was presented that way both to Mr. Veitch and to the world.

### Virgin Management – USA & Limited

58.     Virgin Management is held out to the public as an agent for Virgin Group for purposes of developing the Virgin Group's brand and managing the Virgin Group's investments.

59.     In fact, Virgin Management's LinkedIn page states: "Virgin Management USA (previously Virgin USA) is the **North American headquarters** of Sir Richard Branson's **Virgin Group**. Its role is to develop the Virgin brand in North America and to manage Virgin's investments in its portfolio companies."

60.     Likewise, at the time of Mr. Veitch's earliest contact with the Virgin Group, Virgin held out Mr. Jonathan Peachey as "the Chief Executive Officer of Virgin Management USA, the **regional headquarters of Virgin Group** in North America."[11]   Mr. Peachey's LinkedIn page describes his role as CEO of Virgin Management USA as: "Responsible for developing and managing Virgin Group's investment portfolio and brand interests in North

_____
[11] *Id.*

-20-

America (10 companies, over $1Bn invested across multiple consumer businesses -- aviation, mobile, space, lodging & hospitality, gaming, film & tv). Also advised Richard Branson on his early stage venture investments."

61.     In addition to his role as CEO of Virgin Management USA, Mr. Peachey also had a dual role as "Partner <u>Virgin Group</u>" in which he was a "Member of <u>Virgin Group's</u> nine-person Partnership Team that coordinates and oversees the development of the Virgin brand and its investment portfolio globally." (Emphasis added).

62.     In response to a letter from Mr. Veitch, Mr. Peachey wrote back on Nov. 23, 2009:

> I wanted to introduce you via email to Anthony Marino, the Managing Partner for Virgin's Leisure & Hospitality sector investments.  Anthony is responsible for the work we have done in looking at the cruise market, so I passed him your letter and career resume.  I know he'd be keen to connect with you.
>
> Anthony's contact details are as follows:
>
> Anthony S. Marino
> Managing Partner, Leisure
> **<u>Virgin Group</u>**

63.     Thereafter, Mr. Veitch had two primary contacts who worked out of the Virgin Management USA office in New York: Anthony Marino and Nirmal Saverimuttu.

64.     Mr. Marino describes his role as "Managing Partner" of Virgin Group, noting that he  "spent seven years on the leadership team of Sir Richard Branson's <u>Virgin Group</u>, leading its investment program and product innovation teams in North America. As Managing Partner, he led the creation of multiple Virgin businesses, including Virgin Money, Virgin Cruise and Virgin Hotels. Anthony founded the Virgin Hotels Group and served as its CEO and Head of Brand from 2009-2012.

65.     Likewise, Mr. Nirmal Saverimuttu describes himself as a "<u>Principal at Virgin Group</u>." He claims to have "responsibility for <u>Virgin Group's</u> North American investments in the aviation and leisure/hospitality segments. Key areas of focus include airlines, travel services, private aviation, hotels, gaming, cruises and lifestyle themed consumer services. Based in NYC."

### THE NONDISCLOSURE AGREEMENT

66.     Virgin for many years sought entry into the cruise industry.  It had, however, never succeeded due in part to the (a) significant barriers to entry, (b) inability to finance the construction of the ships, and (c) lack of a viable business plan.

67.     For example, it had considered purchasing older, smaller cruise ships, and had considering partnering with existing cruise lines.  None of its efforts, however, had succeeded, and it had since largely given up on the idea.

68.     In December 2010, Mr. Veitch met with Mr. Anthony Marino, a Managing Partner with <u>Virgin Group</u>, who led Virgin's investment program in North America.  Mr. Marino had led the creation of multiple Virgin-branded businesses, and was then serving as CEO for Virgin Hotels.

69.     Mr. Marino confirmed that while Virgin was not actively seeking to enter the cruise industry, it might be interested if the right plan was presented.

70.     On February 17, 2011, Mr. Veitch informed Mr. Marino that he had developed a business plan for a new entrant in the cruise industry and indicated that, if Virgin would like to meet, he would send them a Non-Disclosure Agreement. Mr. Marino's response email had his signature block:

> Anthony S. Marino
> **Managing Partner, Leisure**
> <u>**Virgin Group**</u>

71.     Virgin agreed, but preemptively sent its own Non-Disclosure Agreement ("NDA").  The email was signed:

>Nirmal Saverimuttu
>**Principal**
>**<u>Virgin Group</u>**

72.     The NDA defined "Confidential Information" as "**all ideas** and all non-public confidential or proprietary information and materials which the Receiving Party receives or acquires from, or on behalf of, the Disclosing Party, **in the course of evaluating the Potential Transaction**."   In addition, it states that "Confidential Information shall be deemed to **include all notes, summaries, analysis, studies or other documents prepared by Receiving Party** that contain, **or are based upon, in whole or in part, Confidential Information** …."

73.     On March 11, 2011, Mr. Veitch met with Virgin's Messrs. Marino and Saverimuttu in Virgin's offices in New York City for purposes of signing the NDA and presenting his Ultra Ships Business Plan.

74.     Mr. Veitch understood, and intended, that he was contracting with the "Virgin Group" through Virgin Management USA, and that Virgin Management USA was acting as the authorized agent for Virgin Group, and that its contracts and agreements were binding on Virgin Group.

75.     This understanding and intent came directly from representations of the Virgin Group.

76.     In fact, on the main wall in the New York offices of Virgin Management USA, there is a very large timeline with photos of the development of the Virgin Group, beginning with the magazine that Richard Branson first published as a sixteen year old dropout and running straight through to Virgin's airline and mobile phone business of today.

77.     Mr. Veitch signed and returned the NDA, a true and correct copy of which is attached hereto as **Exhibit B**.

78.     After the NDA was executed, Veitch presented Confidential Information to Virgin in planning for possible entry into the cruise industry.

79.     On March 11, 2011, pursuant to the NDA, Mr. Veitch presented the Ultra Ships Plan to Virgin.  Virgin expressed a strong interest in Mr. Veitch's project.

80.     On April 13, 2011, Mr. Veitch again met with Virgin in New York City.  There, they discussed not only the Ultra Ships Plan, but also the structure of the potential deal.  Virgin's main interest was licensing its brand rather than investing capital.  Virgin explained that as a licensor, they expected a royalty from the top line as their main return, as well as a smaller "equity kicker" on the back end to help boost returns. (It was on this occasion, too, that Mr. Veitch was asked by Messrs. Marino and Saverimuttu to meet the head of Virgin's marketing/branding group and to discuss with her the then-favored approach of entering the cruise market with small upmarket ships. He was told that the marketing group did not believe the Virgin brand was consistent with mass market cruising on mega ships.)

81.     In the April 13, 2011 meeting, Mr. Veitch showed Virgin a slide with a proposed structure for the deal. The thrust of this slide was to illustrate his idea to structure the venture as a single-purpose private-equity type investment, attracting its main equity funding from pure financial investors not traditionally invested in cruising.

82.     A week later, Mr. Veitch met with Anthony Marino and Peter Norris, the Chairman of Virgin Group, in Miami.  Norris had studied the project and quizzed Mr. Veitch about the specifics.  Mr. Norris left the meeting convinced to proceed.

83.     Mr. Norris is the Chairman of VGHL as reflected on his LinkedIn page:

Peter Norris

Chairman at Virgin Group Holdings Limited
Virgin Group Holdings Limited
November 2009 – Present (5 years 6 months)
https://www.linkedin.com/pub/peter-norris/28/843/69a

84.    When Mr. Veitch met with Mr. Norris in Miami it was at Virgin's instigation and

for the express purpose of allowing Mr. Norris to meet Mr. Veitch and assess his project and the

proposed venture.

85.    At a later date, Messrs. Marino and Saverimuttu confirmed to Mr. Veitch that

nothing was done without the approval of the Virgin Group's "non-executive chairman," Peter

Norris.[12]

## THE VEITCH-VIRGIN AGREEMENT

86.    In May of 2011, Mr. Veitch and Virgin came to an agreement as to the essential

terms between themselves for the proposed venture, which terms Mr. Veitch and Virgin agreed

to present to the investors in the venture.

87.    The process of negotiating that agreement began in April with the meetings in

New York and Miami, and culminated in daily negotiations between May 16 and May 20, 2011.

88.    Mr. Veitch held these negotiations with Mr. Marino and Mr. Saverimuttu, and

both made it clear that they were acting not on behalf of Virgin Management USA, but rather on

behalf of the Virgin Group generally and specifically the arms of the Virgin Group that dealt

---

[12] In addition to Mr. Norris at VGHL, Virgin's website explains that Josh Bayliss "is CEO of the Virgin Group and is responsible for the management of the Group's capital investments and the Virgin brand." In interviews with the press, Mr. Bayliss is referred to as "chief executive of Virgin Group Holdings, which manages Sir Richard's investment portfolio and the Virgin brand." Sarah Gordon, Virgin Group: Brand it Like Branson, Financial Times, Nov. 5, 2014 http://www.ft.com/intl/cms/s/2/4d4fb05e-64cd-11e4-bb43-00144feabdc0.html#axzz3XuH84tN8  The Financial Times reports that Virgin Group Holdings or "VGH makes a significant amount of its money not from cash flows from its investments – particularly since a number of large Virgin businesses do not turn a profit – but from the fees it charges companies for lending them the Virgin name." Id.

with licensing and investments (i.e., Virgin Group Holdings Limited, Virgin Group Investments Limited, and Virgin Enterprises Limited.

### A.     The Promote and the Licensing Fee

89.     Mr. Veitch's proposal was to finance the project similar to a private equity fund offering. Essentially, the venture would be structured as a single-purpose private equity fund. That meant that they would obtain outside passive investors who would invest money and expect to earn a minimum return (e.g., 8%).[13]  Mr. Veitch and Virgin, as the Promoters of the project, would not share in the upside unless it surpassed the minimum return.  If it did surpass the minimum return, then Mr. Veitch and Virgin each would share in the excess.  The share of the excess value that the passive investors would give up would be 20%, which is typical in the private equity industry.

90.     This share of the excess in returns is called the "Promote."  One earns a share of the Promote based both on having the idea and plan and then effectively doing the work to make the business successful and profitable.

91.     In addition to discussing their share of the Promote, the parties also had to discuss Virgin's licensing fee, which Virgin made clear was their primary interest.  Virgin wanted a stream of revenue from the licensing fee regardless of whether the new cruise line was profitable. If it did succeed, and was profitable, then Virgin also wanted a back end equity kicker (or share of the Promote) to help boost their returns.

---

[13] The initial proposal envisioned two equity raises.  In the original proposal, the first round investors would contribute $50 million and, even though they were passive investors, they would get some part of the Promote, to encourage them to invest in the early stage.  The second, much bigger, round of investors would not get a part of the Promote.

### B.      The Daily Negotiations

92.      The parties scheduled a meeting on May 17, 2011 in New York to discuss these issues.  On that day, Mr. Veitch met with Mr. Saverimuttu and Mr. Marino for six hours.  Three of those hours were reserved for, and devoted to, discussing the structure of the deal.

93.      The discussions of the structure of the deal were based on a financial model that Mr. Veitch had prepared with the assistance of Allen & Co., which Mr. Veitch and Virgin would use to anticipate their financial returns under various scenarios and structures.

94.      At that meeting, Virgin proposed a 2% base license fee with another 1% override above the level of the base case revenue, and they wanted the licensing fees to be paid immediately (i.e., in the years before the ships were built).  Virgin also wanted a share of the Promote that was equal to Mr. Veitch's share.

95.      Virgin also said they were comfortable investing only $10 million.  Mr. Veitch pointed out that a $10 million staged commitment, balanced on the other hand by a stream of 3% royalties (and a minimum royalty level even ahead of the ships entering service) actually meant they would have to reach into their pockets for a net $4.5 million before the first ship arrives. .

96.      Mr. Veitch used his spreadsheet to show Virgin that a) they were drawing too much value out of the venture, leaving insufficient to make it interesting to the other investors, b) their distribution potential versus his was dramatically lopsided, and c) even in the worst scenario they still came out ahead, because of the royalty stream exceeding the equity exposure.

97.      Virgin took all of this on board and the parties tried various permutations of factors.

98.    The next day, May 18, 2011, Mr. Veitch then sent a revised financial model to Virgin along with a letter confirming the mutual understanding of the basic structure for the cruise line, which reflects that Virgin was primarily interested in the licensing and royalty aspect.

99.    The parties also agreed to, and did, discuss the terms further by phone.

100.   Virgin moved off having the same share of the Promote as Mr. Veitch, recognizing that Mr. Veitch needed to see a reasonably hefty upside in order to be motivated to develop the business.

101.   Virgin then proposed even higher licensing fees, with a 2.25% base license fee and a 2.25% override and, based on these even higher licensing fees, asked Mr. Veitch to come back with a proposal on the Promote.

102.   Given Virgin's interest in obtaining large licensing fees, Mr. Veitch responded by proposing that he receive 90% of the Promote, and Virgin receive 10% of the Promote (which would be paid in shares in the company).[14]

103.   Accordingly, in an email dated May 19, 2011, Mr. Marino informed Mr. Veitch of "issues I need to contend with on this on my end[.]"  The first issue was the fee for a worldwide license, as opposed to a regional license.  The second, Mr. Marino noted: "Virgin always looks at these deals versus the opportunity cost of locking up the rights to the brand. While cruise has lived up to its rep[utation] as a high-barrier industry, the licensor's orientation is a patient one, and this is because the brand has shown a recurring ability to generate evergreen opportunities." He signed the email, "Anthony S. Marino, <u>Virgin Group</u>."

---

[14] At the time, Mr. Veitch and Virgin were contemplating an early equity raise of $50 million before the main equity raise.  To motivate the early equity investors, Mr. Veitch and Virgin agreed to provide them with a share of the Promote as well.  Within this contemplated structure, the early equity investors would receive 33% of the Promote, and Mr. Veitch and Virgin would receive 67% of the Promote, split between them 90% for Mr. Veitch and 10% for Virgin. They later decided not to do the early equity raise, and so they had an additional 33% of the Promote to divide between them.

104.    Both Mr. Marino's statements, and his signature line, indicated and confirmed that he was acting as agent on behalf of the Virgin Group, under the control of the Virgin Group, and was obtaining instructions and approvals from the Virgin Group. (In fact, throughout the parties relationship it was clear that Mr. Marino and Mr. Saverimuttu did not have authority to make decisions but rather were operating under the instructions and control of the Virgin Group.)

105.    In response to Mr. Marino's message, Mr. Veitch sent a detailed memo that same afternoon, running through the logic of his proposed structure and also noting that the proposed project would start generating sizeable cash flows to Virgin within 4-5 years whereas they had no other plan on the drawing board. "You note that Virgin has yet to break into cruise, but has a large capacity for patiently waiting for the right deal. This is a good deal and it will materialize into royalty producing ships within four to five years. That should be weighed against the challenges of breaking into the industry in another way with more conventional ships. Paradoxically, it may be that the more conventional the approach, the more difficult will be the equity raising. *And, you are not actively considering another approach anyway, as far as you have indicated.*" (emphasis added)

106.    On May 20, 2011, Virgin responded to this detailed memo: "We have reviewed your document of yesterday, **and in the interests of moving our discussion to a conclusion, we can largely accept the proposal with some changes**." (Emphasis added.)  Virgin took Mr. Veitch's proposed economics (royalty rate and override, and promote split) and did their own calculation of the returns to the parties and included this in their e-mail. A true and correct copy of this e-mail, and another which together form the Veitch-Virgin Agreement are attached as **Exhibit C**.  Virgin never disputed or even commented on Mr. Veitch's statement that they were not actively considering another approach.

-29-

107.   In terms of importance to Virgin, the licensing fee was far more important. Accordingly, that was the deal Mr. Veitch and Virgin negotiated.  Virgin would get a large licensing fee, and Mr. Veitch would get a larger share of the Promote.

108.   In addition to accepting the proposal, Mr. Saverimuttu noted that it was "a deal between the two of us …."  This statement recognized two things: 1) that there was a deal between Mr. Veitch and Virgin, and 2) that the deal that had been concluded at that point might need to be revisited at a later date if the third party investors requested any changes.

109.   The deal also included a base royalty fee of 2.25% and an override royalty fee of 2% to be paid to Virgin.  While the email did not specify which Virgin entity, the entity that licenses the brand and receives the fees is Virgin Enterprises Limited.  Upon information and believe, Mr. Saverimuttu was acting as an agent for, and taking instructions from Virgin Enterprise Limited, as well as VGHL in agreeing to these royalty fees.

110.   The deal also included a "Virgin investment commitment: $10 million."  Again, the email did not specify which Virgin entity would make the $10 million investment.  However, the Virgin entity responsible for such investments is Virgin Group Investments Limited.  Upon information and belief, Mr. Saverimuttu was acting as an agent for, and taking instructions from VGIL, as well as VGHL in committing to the $10 million investment.

111.   Mr. Veitch held a phone conference with Virgin where, after discussing possible changes, both parties agreed to stick with the new numbers they had proposed in their e-mail. Thus the Veitch-Virgin Agreement was concluded.

112.   Both parties recognized that when the fundraising began, the investors might seek certain changes in the deal, such as the minimum return or the percentage of the Promote that would be available to Mr. Veitch and Virgin.  However, as between Mr. Veitch and Virgin, the

essential terms – and in particular the economics of the deal between them -- were finalized at this point.

113.     Virgin and Mr. Veitch also agreed to invest capital to show the major investors they had "skin in the game."  Virgin agreed to invest up to $10 million (but indicated that a maximum of $20 million), and Mr. Veitch agreed to invest at least $1 million (with a maximum of $5 million).

114.     Based on these economics, the original deal was essentially a brand partnership between Veitch and Virgin, where Veitch would develop the business and Virgin would license its brand.

115.     As to control of the venture, Mr. Veitch and Virgin agreed to share control in the development of the project and then, once the investors were on board, establish a formal general partner that would be owned and controlled jointly by Mr. Veitch and Virgin.  This plan was reflected in later documents: For example, on December 18, 2011, Virgin sent a "high level description of the investment terms."  While the description was not accurate, it nevertheless did state the intent that "[t]he Virgin Group and Colin Veitch (the Principal) shall own and control the General Partner."

116.     While Mr. Veitch and Virgin agreed to the economic terms as of May 2011, due to Virgin's breach they never reached the stage of formally establishing the entity that they would both own jointly and would serve as the general partner of the cruise line.  Rather, Mr. Veitch and Virgin proceeded as partners, intending and agreeing to share control over the development of the project as partners or co-venturers.[15]

117.     This partnership arose out of these very same negotiations.

---

[15] In reality, however, Mr. Veitch led all aspects of the development of the project with Virgin's input being limited to contributions to the branding of the venture.

118.   At one point in the meeting on May 17, 2011, it became clear that Virgin saw themselves as more critical to the money raising and to the venture's success than Mr. Veitch did. Virgin pointed out that the project as it stands is "still a power point presentation".  Virgin said that if the project had been brought to them all packaged up and financed already, then it would just have been a licensing discussion; but instead it is a start-up and they and Mr. Veitch were therefore partners in this.

119.   Mr. Veitch agreed, noting in particular the equity upside for Virgin to incentivize Virgin as a partner.   Virgin agreed with this and said that they want to look at it in the same way as Mr. Veitch.

120.   While this partnership was demonstrated through the parties' actions, it was also referenced in numerous documents.  For example, on October 17, 2011, Virgin noted it had "found like-minded partners" in Mr. Veitch and Meyer Werft, the ship builder.  On November 4, 2011, Virgin emailed Mr. Veitch noting that:  "We are very happy with the progress and are confident that we have all the ingredients for a successful partnership."  And when Virgin sought to enlist its own investment banker, it noted that on the fee agreement Virgin "included both VGIL and VSM on the document as partners."[16]

## PARTNERS AND JOINT VENTURERS

121.   Mr. Saverimuttu's May 20, 2011 email (Ex. C) stated: "We [Virgin] are prepared to move forward on the following basis," and indeed that May 20, 2011 email was the very basis on which both Mr. Veitch and Virgin agreed to, and did, move forward in jointly developing what was to be known as Virgin Cruises.

---

[16] VGIL is Virgin Group Investments Ltd., and VSM is Mr. Veitch's investment vehicle, VSM Development, Inc.

122.    With the financial agreement set, particularly as to the share of the Promote, Mr. Veitch set out to develop the business.

123.    The first step was convening a "kick-off" meeting at Allen & Co.'s New York offices on June 23, 2011.[17]

124.    At that meeting, Allen & Co. recommended -- and Mr. Veitch agreed -- that the best and easiest way to raise money would be to present potential investors with a complete investor package - an "investment ready" project.

125.    That would mean preparing a General Arrangement Plan (i.e., the initial design and engineering work) and detailed specifications for the proposed ships, obtaining a letter of intent with a shipyard to build the proposed ships, and obtaining a letter of comfort with a bank for the debt financing of the proposed ships.   Once complete, this list of deliverables would be taken to the investors, the venture would be ready for the equity injection, and the detailed work could then begin on day one.

126.    Mr. Veitch's original work plan had a budget of approximately $5 million.

127.    Virgin, however, refused to contribute that amount of funds to developing the business, and even asked whether Allen & Co. could fund it. In the end, the lack of funding forced Mr. Veitch to convince his team members to work largely "on spec."

128.    Following the June 23, 2011 meeting, Mr. Veitch prepared and circulated a "Phase I Work Plan" that listed all the work that would need to be done to make the project "investment ready," and included an estimated budget of $415,000, excluding legal work, even

---

[17] Following the meeting, Allen & Co.'s Mr. Brooks spent a week at its famous retreat in Sun Valley, Idaho informally presenting the Ultra Ships project to several investors.  The investors reacted favorably to Mr. Veitch's idea of circumventing the traditional barriers to entry of the cruise ship market via building two new Ultra Ships.

with most of the work done "on spec."  Virgin again claimed it did not have the budget even for this minor amount and declined to contribute any funds at all.

129.    Because Virgin was unwilling to commit any funds, Mr. Veitch spent hundreds of thousands of dollars of his own money and, of course, devoted substantial time and expertise, and drew upon the goodwill he had developed over almost two decades in the industry in persuading a team of people to work largely "on spec".

130.    Mr. Veitch assembled a team of leading industry experts, including the London-based cruise ship design firm, SMC Design ("SMC"), a naval architect, Markus Aarnio and his firm Foreship Oy, of Finland ("Foreship"), and the German shipbuilding firm, Meyer Werft, GmbH ("Meyer Werft").   Mr. Veitch required everyone to sign confidentiality and non-disclosure agreements.  As such, he executed confidentiality and non-disclosure agreements with Meyer Werft on July 27, 2011, SMC on August 1, 2011, Randall Marine Services LLC on August 1, 2011, jMMY Group on August 1, 2011, and Markus Aarnio and Foreship on August 2, 2011.[18]

131.    Each of these agreements specified that the "venture" was "headed by Colin Veitch" and noted that Mr. Veitch also had a "business partner, also referred to as its 'brand partner'" or language similar thereto.

## DEVELOPMENT OF THE VIRGIN ULTRA SHIP

132.    On August 1, 2011, Meyer Werft -- one of the worlds' leading builders of luxury passenger ships -- committed to the project, and promptly began working.  Its first step was to generate a General Arrangement Plan ("GAP").  The GAP is the floor plan of the ship, from the

---

[18] As the project advanced, Mr. Veitch had at least four additional parties sign non-disclosure agreements in February and March 2012 as the design work and creation of detailed specifications continued.

tank bottoms to the funnel; deck by deck.  It can then be stacked to make a three dimensional model.

133.    On August 19, 2011, Meyer sent the first version ("A1") of the GAP.

134.    In subsequent months, Mr. Veitch and Meyer Werft and their teams reworked and created more than a dozen more versions, including versions B1, B2, C2, C4, C5, C6, C8, C9, C10, C11, C12, C13, and C14.

135.    Over the course of the next four months, Mr. Veitch and his team organized numerous meetings and workshops to design and develop the Virgin Ultra Ship.  These began on August 2, 2011, with an all-day working session in SMC offices.  On August 3, 2011, the team continued with an all-day brainstorming session (which Virgin did not attend).  On September 8, 2011, Mr. Veitch led a two-day working session between his team and Meyer Werft in London.  Again, there were no Virgin participants.  The next week, on September 14, 2011, Mr. Veitch and several of his team attended a two-day branding workshop in London (which Virgin requested and organized).  On November 8, 2011, one of Mr. Veitch's team, Pete Randall, attended, with Meyer Werft, a working session with the United States Coast Guard that had been organized by Mr. Randall (a Veitch team member and former USCG Commander himself).  On November 11, 2011, Pete Randall and Markus Aarnio completed an advanced draft of the full technical specification of the Virgin Ultra Ship, including the fueling of the ships.  From November 21 through 23, the design team held further working sessions in London.  On and on the work continued, with only a few days break at Christmas.

136.    With the GAP, the design work, and the detailed specification (a document running to multiple volumes and thousands of pages) at advanced stages, Meyer Werft agreed to enter into the Letter of Intent to construct the Virgin Ultra Ship.  The parties to the Letter of

Intent were VSM Development, Inc. and Virgin Group Investments Ltd. It is signed by Mr. Veitch in his capacity as CEO of VSM Development. This was one of the key components needed to take the Ultra Ships plan to the investors. A true and correct copy of that Letter of Intent, dated March 12, 2012, is attached as **Exhibit D**.

137. At Virgin's request, VGIL was the Virgin entity that was the party to the Meyer Werft LOI, and it was signed by Ian Cuming, Director of VGIL, further confirming VGIL's role as Mr. Veitch's partner and as the principal providing instructions to Mr. Saverimuttu and Virgin Management USA.

## DEBT FINANCING

138. Simultaneously while designing the Virgin Ultra Ship, Mr. Veitch also set out to secure the debt financing necessary to construct the ship.

139. In August of 2011, Mr. Veitch contacted KfW, a leading German bank that specialized in financing shipbuilding projects. KfW's head of shipping, Dr. Carsten Wiebers, was interested and encouraged Mr. Veitch to proceed.

140. On October 13, 2011, Mr. Veitch attended a meeting with KfW in Frankfurt at which he, Virgin, and Meyer Werft (represented by its principal Bernard Meyer) were present.

141. KfW again expressed its support and began its due diligence. Mr. Veitch prepared a several page response to KfW answering questions it had about the project. Virgin made only minimal changes--both indicating that Virgin would only invest a minor amount and that royalties may be payable before the ship is built. KfW pressed for Virgin to invest, but Virgin was unwilling.

142. After organizing and providing dozens of pages of analysis and due diligence to KfW, Mr. Veitch organized and attended on January 25, 2012 a meeting in Berlin with KfW and

Meyer Werft (including its principal owner, Bernard Meyer), and a separate presentation to Germany's Ministry of Finance and Ministry of Economic Affairs. The meetings went extremely well and all the attendees expressed strong support for the project.

143.   Shortly thereafter, on March 29, 2012 KfW provided the requested Letter of Interest stating that it would provide the debt financing necessary to construct the Virgin Ultra Ships. This was another key component needed to take the Ultra Ships plan to the equity investors. A true and correct copy of that Letter of Interest, dated March 29, 2012, is attached as **Exhibit E**.

144.   The KfW Letter of Interest was addressed to both VSM and the "**Virgin Group" and listed Mr. Marino as** Managing Partner of Virgin Group and Mr. Saverimuttu as Principal of the Virgin Group, further confirming that the "Virgin Group" and all of the entities included in the Virgin Group, were considered partners in the project.

## THE EQUITY FINANCING

145.   Simultaneously with leading the design of the Virgin Ultra Ship, securing the shipbuilding contract, and securing the debt financing commitment, Mr. Veitch continued to work with Allen & Co. on all aspects necessary for the equity financing. This included developing and refining the financial model, the management presentation, and various supporting documents.

146.   On October 26, 2011, Mr. Veitch went to New York City and presented the plan in its current state to Allen & Co. In attendance were George Tenet (former CIA director), Bill Bradley (former US Senator), Kaveh Khosrowshahi, and Harry Wagner, along with Allen & Co's London-based team. Herb Allen stopped in briefly but did not attend the presentation.

147.    Six days later, on November 1, 2011, Allen & Co. advised Mr. Veitch that Herb Allen supported the project, and that Allen & Co. would want to invest the Company's own money in the project.

148.    The enthusiasm for the project was not limited to Allen & Co.  The investors Allen & Co. had already consulted, including the head of the Qatar Investment Authority/Qatar Holdings, expressed great enthusiasm for the return profile, the analysis of traditional barriers to entry, the brand, and even the size of the check requested.

149.    On December 21, Allen & Co. produced the first version of the management presentation for the planned road show before the equity investors.

150.    Over the next few months, both Mr. Veitch and Virgin repeatedly revised and commented on the management presentation and the "teaser."  Allen & Co. sent the 11th version of the management presentation on February 3, 2012, the 15th version on February 28, 2012, the 19th version on March 28, 2012, and the 20th version on April 5, 2012.

151.    On February 8, 2012, Virgin suggested revising the management presentation to add a section on "Barriers to Entry" immediately after the introduction.  The proposed content is: "Traditional barriers and why so few new entrants. Virgin + Colin = core team that can overcome." The content of this section is drawn directly from the corresponding section in Mr. Veitch's Ultra Ships Plan.

152.    Moreover, Virgin also added a section on "The Package" whose key message is: "Fully baked plan ready for equity investment," and Mr. Veitch added a comment, which Virgin agreed with: "Funds immediately productive in building value. Development dollars have already been spent."

153.    Allen & Co. also confirmed that the marketing strategy for the fund raising would focus on approaching 23 sovereign wealth funds and global pension plans (as a first tier), and 66 large family offices (as a second tier).

154.    The management presentation was entitled "Virgin Cruises: A Unique Opportunity to Develop 'Ultra Ships.'"   The cover showed the current version of the ship's design:



# Virgin Cruises
### A Unique Opportunity to Develop "Ultra Ships"

155.    This presentation explained in detail the investment opportunity for a "Greenfield Entrant to an Established Profitable Business:"

> ➢ New cruise line operating only the largest, most profitable, type of ship - the "Ultra Ship" – under one of the world's leading consumer brands: Virgin
>
>   ❖ Innovative design concept aimed at a younger audience than the legacy fleet of the existing players: 30-40 year olds, and the young at heart
>
>   ❖ Strong marketing advantage from the "Virgin" brand and existing 65 million-strong customer base
>
>   ❖ Capitalizes on strategic stagnation by the legacy cruise operators

156.    This presentation explained Mr. Veitch's key role:

> Business will be built and managed by Virgin and by Colin Veitch, a 17-year industry veteran, former CEO of Norwegian Cruise Line, and senior executive of P&O/Princess Cruises
> ❖ Designed and built 9 of the industry's most innovative and profitable ships between 2000 and 2010, including the "Ultra Ship" Norwegian Epic
> ❖ Developed and implemented the industry-changing "Freestyle Cruising" concept
> ❖ Now leading team which has developed an innovative new design and product concept for the Virgin "Ultra Ships"

157.   The presentation also explained various of the financial aspect of the project:

> Total ship-building costs of €1.75bn. Total Project costs €1.85bn ($2.5bn)
> ❖ Competitive shipyard contract is available and state-backed export credit financing for 80% of contract price
> Equity contributions: 20% of ship costs plus business start-up costs, or c. €410-480m ($550-650m)
> ❖ Equity funded in staged increments over 5 years
> ❖ Ships expected to launch in 2015 and 2017
> Expected gross equity returns of c. 30% with liquidity via public floatation or trade sale
> ❖ Returns leveraged by government-backed, credit-enhanced, 80% debt financing of asset
> ❖ Base-line returns in excess of 20% through dividend distributions over the life of the asset, even if no IPO or trade sale
> Extraordinary *return opportunity*
> ❖ Depressed shipyard order book – attractive construction terms
> ❖ State-backed financing on attractive terms
> ❖ Expected high equity returns as a result of "pure" investment in Ultra Ships without dilution from legacy fleet

158.   The presentation devoted 12 pages to explaining how the "Ultra Ships" plan would break down the formidable barriers to entry.  These items relied almost entirely on Mr. Veitch's initial Ultra Ships Plan as well as ideas derived and developed from that plan.  A true and correct copy of this Management Presentation is attached as **Exhibit F**.

159.   Later versions of the management presentation (including the final version) have a slide at the end, with the one piece missing, which is the equity investment.



A true and correct copy of this version of the Management Presentation is attached as **Exhibit G**.

160.    As both Virgin and Mr. Veitch had indicated in their revisions, the project was ready to move forward.  Once the equity was raised, the shipbuilding contract would be placed, the detailed design work would be completed, and the investors would get value from day one.

**THE IDENTITY OF THE VIRGIN PARTNERS AND VIRGIN PRINCIPALS**

161.    Mr. Veitch and Virgin had called themselves partners, held themselves out to third parties as partners, and acted as partners and co-venturers.

162.    In doing so, Mr. Veitch had always believed that his partnership was with the "Virgin Group" and that the Virgin Group consisted of the various Virgin corporate entities that worked on, and approved, the project.  These corporate entities included, at the very least Virgin Group Holdings Limited, Virgin Group Investments Limited, and Virgin Enterprises Limited.

163.    On January 13, 2012, Mr. Saverimuttu  provided a slide showing the central role that Virgin Group Holdings Limited plays within the Virgin Group:



164.    This chart is not intended to show a hierarchical structure or a conventional chain of ownership. There are operating companies in the middle, grouped into six sectors. There is a top company above it all, holding Virgin's investments in these operating companies. And there are management companies (in at least the US, UK, and Australia) coordinating Virgin's involvement in all of these ventures, striking deals, negotiating license arrangements, structuring investments and incentives, providing administrative support, protecting the brand, etc. etc. Opposing counsel refers to it as the "alleged Virgin Group", but this graphic, and many other facts, demonstrate that far from being a collection of independently managed, independently directed, arms-length companies, the Virgin Group operates more akin to multiple pockets in a single suit. A further example would be both the form and the substance of the negotiation between Mr. Veitch and Virgin and April/May 2011. From beginning to end, Virgin's proposals

were always set out as permutations of royalty rates, equity kickers, and invested capital. In fact, these elements were to come from ostensibly different and separate companies (Virgin Enterprises Limited as licensor of the brand; Virgin Group Investments Limited, as investor of capital; an unknown virgin company plus several Virgin Group "partners" as recipients of the promote share), but a single Virgin Group "Partner" was confident enough of controlling these companies that he negotiated and agreed, on Virgin's behalf, a deal with Mr. Veitch consisting of elements from various Virgin Group companies in which the financial value of one element in one company had been internally traded off against that of another element in another company.

165.    While Mr. Norris and VGHL provided the instructions and authorizations for Messrs. Marino and Saverimuttu, the Virgin Group used VGIL for purposes of investments.

166.    On January 18, 2012, Mr. Thayer Thompson confirmed that the "entity we're going to use in advance of forming the Cruise entity: Virgin Group Investments Limited, a BVI company.  VGIL is one of the topco's that we use for new initiatives.  It's likely to be the shareholder of Virgin Cruises."

167.    From there on out, invoices were to be paid by VGIL.

168.    When Virgin sought to engage Jeffrey Culpepper (ex-CSFB) as an additional banker involved in the fundraising, Messrs. Thompson and Saverimuttu first sent the engagement letter to Mr. Veitch, noting that "[w]e wanted to share this with you before **we send to <u>our Board at VGIL</u>[.]**" This shows the degree of control exercised by VGIL, having to approve not only investments, but also letters engaging advisors.

169.    Mr. Thompson continued: "As you will see, we **included both VGIL and VSM on the document as partners.**"  That shows both that the deal was between Veitch and VGIL and that Veitch and VGIL were partners.

170.    Given the complexity of the Virgin Group (or partnership) structure, on December 18, 2011, Mr. Saverimuttu explained it further to Allen & Co. as follows: "Virgin Cruise development team currently includes a number of resources that have been strategically drawn from around the <u>Virgin Group</u>, including <u>Virgin America</u>, Virgin Galactic, Virgin Atlantic, Virgin Hotels, Virgin Media and <u>Virgin Management</u>." Mr. Saverimuttu further explained that the "<u>Virgin Group</u> has a very successful investment track record of creating value for our stakeholders and partners. The <u>Group</u> has created 8 'billion dollar business' that include: Virgin Records, Virgin Atlantic, Virgin Blue, Virgin Mobile UK / Virgin Media, Virgin Mobile USA, Virgin Galactic, Virgin Active and Virgin Money. The <u>Group</u> has generated IRR's >80% across the aviation portfolio and >50% across the telecoms portfolio. <u>We</u> have created value for a number of partners -both strategic and financial."

171.    On February 10, 2012, the parties retained Fried Frank, Harris, Shriver & Jacobson LLP to act as counsel to "Virgin Group Investments Limited and VSM Development, Inc. in a matter involving the raising of equity capital for an entity to be formed to engage in the cruise industry."

**VIRGIN CHANGES FROM BRAND PARTNER TO BULLY**

172.    Beginning with the initial meeting in March 2011, Virgin had always made it abundantly clear that its role would be to serve as a "brand partner." This is reflected in the deal between Mr. Veitch and Virgin, in which Virgin's returns are tied to licensing its brand, and in the various documents listing Virgin as the "brand partner."

173.    Moreover, when third parties such as KfW inquired of Virgin's role, and Virgin's potential investment, Virgin stressed that: "We need to be very clear with them on this. **They need to look at us as a brand licensor and not a corporate sponsor of the overall deal**. If

-44-

Virgin being the latter is required for Hermes, this will all come to a halt rather quickly I am afraid."

174.     In addition to its statements, Virgin's actions also reflected its limited role as a brand partner. First, Virgin refused to fund any of the development of the project.  Second, Virgin's only participation in the development of the project was having input into the branding and participating in branding workshops.

175.     In fact, whereas many thousands of man hours were spent by Mr. Veitch and his team, SMC's team, and Meyer's team, Virgin's contribution was limited to perhaps 100 hours.

176.     Virgin's interest, however, began to change in late 2011.

177.     On December 2, 2011, Mr. Veitch made his first presentation to Virgin Group's investment committee in London.

178.     Messrs. Marino and Saverimuttu told Mr. Veitch that the most important person on the Investment Committee is Mr. Patrick McCall.  On Virgin's websites, Patrick McCall is identified as

> Senior Partner: Patrick is a Senior Partner of the Virgin Group and currently holds board positions with Virgin Active, Virgin Galactic, Virgin Care, Virgin Trains and Virgin Unite.  As one of the Virgin Care directors Patrick sits on the Virgin Investment Advisory Committee which is responsible for advising the trustees on the group's investments and providing the strategic direction for the company.[19]

179.     Another member of the Investment Committee was Nick Fox who also identifies himself as "**Partner & Director of External Relations <u>Virgin</u>**" and describes that role as "Member of the <u>Partnership team</u> that manages the Branson Family interests, investments and protects and grows the Brand. Continue to have oversight of the communications, content and corporate relations."[20]

---

[19] http://www.virgincare.co.uk/staff/patrick-mccall/

[20] https://www.linkedin.com/pub/nick-fox/58/b36/895

180.    Sir Richard Branson has described the function of this Investment Committee as follows:

> We normally invite people to come along to Virgin's Investment Advisory Committee and present their plans in London, New York or Geneva … At these weekly meetings we have a team of six Virgin managers we can pull in to help examine projects
>
> ***
>
> The Virgin team acts just like any other commercial venture capitalist organization.  It assesses your potential, whether it fits with the group's ambitions and strategy, and of course brand values, and what the possible returns and profits will be.  Then it works out what kind of stake the Virgin Group should take.  In return, the new company gets the full range of Virgin's expertise – and I'll agree to help raise the profile, make key introductions and offer any advice that I can.

Richard Branson, "*Business Stripped Bare*" p. 8-9 (Penguin 2011).

181.    Mr. Veitch's presentation to Virgin's Investment Committee was enthusiastically received.

182.    After the presentation, Messrs. Marino and Saverimuttu advised Mr. Veitch that Virgin had authorized a budget for further work on the project.

183.    In addition to the presentation to the investment committee, Virgin personnel presented the Virgin Cruise business to Sir Richard Branson at his home on Necker Island during the Virgin Management Retreat. Mr. Veitch's team was asked for specific input to this presentation.  Mr. Veitch was told that Sir Richard would sometimes approve going ahead with a business even in the face of indecision and disagreement amongst the Virgin team, an approach known as Richard's "Screw It, Let's Do It" decision-making style. Conversely, he had been known to kill strongly supported projects on grounds that were not central to their pure business merits. In the case of cruise, the management and investment committee of Virgin were enthusiastically in favor of moving ahead, but there was concern that Sir Richard Branson would

concentrate on the environmental and sustainability aspects of the venture and be apt to kill it if there were not strong assurances that it would meet his aspirations for Virgin's "green" profile. Accordingly, the input from Mr. Veitch's team was concentrated on Veitch and Peter Randall creating slides solely focused on the proposed venture's best-in-industry environmental operating standards. The feedback after the meeting was that all had gone well and the venture had not been vetoed by Sir Richard.

184.   Given the advanced state of the project, the enthusiastic reception by both the cruise and investment professionals, and by Virgin's investment committee, Virgin began taking an even more keen interest in the project.

185.   In Sir Richard Branson's own words, recorded on video:  "We at Virgin are very excited about getting into the cruise industry...  The cruise business is also **strategic and important to the growth of Virgin**.  **Cruise has the potential to be one of our biggest, sexiest businesses, hence our excitement**."

186.   After having the benefit of a year's worth of Mr. Veitch's work, and after seeing the value of that work and the interest from the investment community, and after seeing the potential for huge returns, Virgin reneged on its deal.

187.   The first tangible declaration of Virgin's change of heart came on February 25, 2012, when it sent Mr. Veitch a new term sheet and side letter that reflected a dramatic departure from the previous agreements. This side letter was on the letterhead of "Virgin Group Investments Limited" and had a signature line for "Virgin Group Investments Limited."  Mr. Saverimuttu's email forwarding this side letter was signed, "Nirmal Saverimuttu, Principal, Virgin Group."

188.    Moreover, instead of Mr. Veitch receiving 90% of the Promote to Virgin's 10%, Virgin insisted on a sliding scale under which the Promote up to $100 million would be divided 80% for Virgin and 20% for Mr. Veitch, up to $400 million would be divided 70% for Virgin and 30% for Mr. Veitch, and up to $600 million divided 60% for Virgin and 40% for Mr. Veitch. Moreover, Virgin's share of the Promote would be vested, but Mr. Veitch's share would be unvested and earned only if Mr. Veitch remained employed.  Due to the vesting proposal, Virgin could have ended up with 98% of the Promote and Mr. Veitch only 2%.  This proposal, if accepted, would have shifted almost all of the economics of the Venture into Virgin's coffers.

189.    The new proposal essentially cast Mr. Veitch as an employee of Virgin.

190.    Rather than respond to the new proposal, Mr. Veitch thought it best to reiterate the principles of the relationship between him and Virgin.  He did that first in a telephone conference with Mr. Saverimuttu and followed it up with a document setting forth those principles.  In the email forwarding that document, Mr. Veitch specified that "[o]nce it is apparent that you, I and Peter Norris, are in accord on the principles of our relationship, you and I can then tackle the details of making the structure workable and fair."  Mr. Veitch's referred to Mr. Norris because Mr. Saverimuttu had again emphasized that any negotiations would have to be approved on the Virgin side by Mr. Norris in his role as "Nonexcecutive" Chairman of VGHL.

191.    The very first point on the "Principles of Ownership and Governance" document specified: "CV and Virgin are partners from the outset in the founding of Virgin Cruises."

192.    This statement was never challenged or refuted by Virgin.

193.    Thereafter, Mr. Veitch attempted to reason with Virgin, but Virgin's final demand was that its 10% of the Promote be increased to 60% and that Mr. Veitch's share of the Promote

be reduced from 90% to 40%, with only 10% of that vested, with the remainder to be earned over a period of five years only if Mr. Veitch served as CEO of the cruise line for that entire period.

194.    This proposal would have changed Mr. Veitch's role from that of the founder and fully vested owner of the business, to an employee -- indeed an indentured servant -- whose ownership and rewards depended completely upon Virgin's whims. At the same time, regardless of how much or how little Virgin would have done to help the business realize its full potential, Mr. Veitch's delivery of a successful venture would result in enormous returns to Virgin, far in excess of those to Mr. Veitch. And, running alongside this unfair imbalance, would be a huge annual licensing fee to Virgin regardless of whether the business even turned a profit or the original investors got their money back.

195.    That, of course, is a far cry from the 90% of the Promote Virgin had originally agreed would belong to Mr. Veitch.

196.    Allen & Co. attempted to mediate between Virgin and Mr. Veitch,

197.    In late May 2012, Mr. Saverimuttu informed Mr. Veitch that Virgin did not have any "flexibility" in the "firm view of their board."  Upon information and belief, the board to which Mr. Saverimuttu referred was either Mr. Norris of VGHL or the board of VGHL or VGIL.

198.    Virgin's last minute breach should have brought the project to an abrupt end. But Allen & Co, foreseeing what has indeed happened, cautioned Mr. Veitch that Virgin would be likely to forge ahead with his project anyway. **"I also fear that you have done too good a job convincing Virgin of the merits of this opportunity. They may end up competing with you down the road."**

199.    Mr. Veitch's counsel sent Virgin a letter reminding Virgin that it had no authorization to continue with the project without Mr. Veitch, emphasizing that Virgin may not,

for three years after the NDA, directly or indirectly use in any way or manner whatsoever the Confidential Information or the substance or contents thereof.

200.    In response, Virgin stated that they would abide by the terms of the NDA.

## VIRGIN ANNOUNCES THE NEW VIRGIN CRUISES

201.    Virgin has not honored its obligations to Mr. Veitch.  Instead, it has proceeded without him under the very Ultra Ships Plan Mr. Veitch developed.

202.    On February 28, 2014, Sky News reported that "Virgin Group has appointed the US-based corporate advisory firm Allen & Co. to oversee the development of a cruise operation that would eventually aim to compete with industry giants including Carnival Corporation." The story reported that Virgin executives and their advisers have already held detailed talks with banks about raising an estimated $1bn of debt to finance the acquisition of the company's first vessels" and "$700m of equity by selling stakes in Virgin Cruises to outside investors."[21]

203.    A month later, on March 26, 2014, the Australian magazine Traveler quoted Mr. Branson proclaiming, "We are building two large ships quite from scratch and we feel that the Virgin brand will work well with cruises" and noting that "most of the money is now committed."

204.    In fact, Virgin Group formed a number of new entities to establish the Virgin Cruises Business, including Virgin Cruises Intermediate Limited and Defendants Virgin Cruises Limited, the shareholders of which are private equity/sovereign wealth/family-office type investors.

205.    On December 4, 2014, Virgin issued a press release confirming the plan to "construct two new world class cruise ships," and stating that, "[w]e plan to shake up the cruise

---

[21] http://news.sky.com/story/1218963/bransons-virgin-to-pilot-new-cruises-venture

industry" using "latest ships offering a great quality, a real sense of fun and many exciting activities all delivered with the famed Virgin service."

206.     The press release also stated that part of their focus would be on "a new generation of guests."  Nick Fox, Virgin Group director of external relations, elaborated in an email: "We will also be trying to attract a broader market than traditionally goes cruising over time."[22]

207.     Fox News likewise reported that "Virgin Cruises plans on the delivery of two new 4,200-passenger cruise ships late this decade and begin selling Caribbean voyages."  It further explained that the new ultra ship "commands premium pricing far in excess of its slightly older sister ships or competitive set. That premium can be 40 percent or more than a slightly older vessel that has many of the same attributes of the newer ship."  Further, despite the higher price, "[t]ravelers pay for the bragging rights of saying they have been on the latest and greatest ship…"  Finally, Fox also noted that the new Virgin Cruises "have the potential to draw people in who may not have considered a cruise in the past."

208.     Of course, all of this is based directly on Mr. Veitch's Ultra Ships Plan and the work Mr. Veitch did pursuant to his deal with Virgin.


**COUNT I**
**BREACH OF CONTRACT**
**(Against VMUSA, VGIL, VGHL, and VES)**

209.     Plaintiffs incorporate by reference into this count paragraphs 24 to 208.

210.     On or about March 11, 2011, Mr. Veitch entered into the NDA with Virgin.

---

[22] http://www.miamiherald.com/living/travel/cruises/article4283117.html

211.    At the time of the signing of the NDA, Mr. Veitch understood from the representations of the Virgin Group, that the entity signing the NDA was doing so on behalf of the Virgin Group as an authorized agent of the Virgin Group.

212.    In particular, the representations of the Virgin Group included statements that Virgin Management USA was the North American headquarters of the Virgin Group, the declaration in the offices of Virgin Management USA setting forth the history of the Virgin Group, and the titles of Mr. Marino as "Managing Partner, Leisure, Virgin Group," and Mr. Saverimuttu as "Principal at Virgin Group" with "responsibility for Virgin Group's North American investments,"  and representations such as Virgin Management USA's CEO, Mr. Jonathan Peachey, being responsible for "developing and managing Virgin Group's investment portfolio and brand interests in North America."

213.    While Mr. Veitch did not know as of March 11, 2011 the specific names of the specific Virgin entities included in the Virgin Group, he did know that those entities would include those that had responsibility for Virgin's investments (i.e., VGIL), for Virgin's licensing (i.e., VEL), and for Virgin's overall decision making (i.e., VGHL).  Mr. Veitch intended each to be bound by the terms of the NDA.

214.    The NDA expressly provided that Virgin could not use the Confidential Information which Veitch presented to Virgin without Veitch's permission.

215.    The NDA defined "Confidential Information" as "**all ideas** and all non-public confidential or proprietary information and materials which the Receiving Party receives or acquires from, or on behalf of, the Disclosing Party, **in the course of evaluating the Potential Transaction**."  In addition, it states that "Confidential Information shall be deemed to **include**

**all notes, summaries, analysis, studies or other documents prepared by Receiving Party** that contain, **or are based upon, in whole or in part, Confidential Information** ….”

216.    Further, pursuant to the NDA, Mr. Veitch then presented Confidential Information to Virgin, including the Ultra Ships Plan.

217.    This Confidential Information, due to its novelty and originality, both generally and to Virgin specifically, was of tangible value.

218.    After reneging on the Veitch-Virgin Agreement, Virgin proceeded to use Plaintiffs' Confidential Information without consent in a blatant and continuing breach of the Non-Disclosure Agreement.

219.    Upon information and belief, the entities responsible for developing the "Virgin Cruises" announced in February 2014 and again in December 2014, and who improperly used the Confidential Information, were VGHL, VGIL, VEL, and Virgin Cruises, for whom Virgin USA acted as agent.

WHEREFORE, Plaintiffs demand judgment in their favor for: (a) actual damages; (b) an accounting of, and payment to Plaintiffs of all gains, capital, profits, and advantages derived by Defendants from their breach of the NDA; (c) imposition of a constructive trust over the Virgin Cruise business, including defendant Virgin Cruises Intermediate Limited, and also its parent company Virgin Cruises Limited, and its subsidiary Virgin Cruises US Limited, (d) injunctive relief, enjoining the Defendants from further use of Plaintiffs confidential and proprietary information contained in the Ultra Ships Business Plan or otherwise disclosed pursuant to the NDA, (e) interest, (f) court costs; and (g) any and all further relief that is proper and just.

## COUNT II
## BREACH OF CONTRACT FOR INJUNCTION
### (Against VMUSA, VGIL, VGHL, and VES)

220.    Plaintiffs incorporate by reference into this count paragraphs 24 to 208.

221.    Veitch and Virgin's relationship was governed by the NDA.

222.    The NDA expressly provided that Virgin could not use the Confidential Information without Veitch's permission through the subsidiary, Virgin Cruises.

223.    However, Virgin then proceeded to use Veitch's Confidential Information without his consent.

224.    Using Veitch's business plan without his consent is a breach of the NDA.

225.    Further, the NDA recognizes that:

> [T]he unauthorized disclosure or use of Confidential Information will cause irreparable harm and significant injury for which money damages will be inadequate and/or difficult to ascertain.  The Disclosing Party shall therefore be entitled to seek injunctive and other equitable relief without the requirement of posting a bond or other security.  The remedies in this section shall be in addition to and not in limitation of any other remedies to which Disclosing Party may be entitled under this Agreement or otherwise at law or in equity.

226.    Therefore, as the parties expressly agreed, an injunction against the use of Plaintiffs' Confidential Information is expressly required to adequately redress the damage Veitch suffered and will continue to suffer from Virgin's breach of the NDA.

WHEREFORE, Plaintiffs demand judgment for an injunction to be entered against further use of the Confidential Information by Virgin, attorneys' fees and costs, and any and all further relief that is proper and just. Specifically, Plaintiffs demand that Virgin cease all activities designed to lead to the construction of the Ultra Ships it has announced, and, furthermore, that if Virgin proceeds, regardless, with building these ships, they be enjoined from bringing them into US waters and US ports and from selling passage on them to US consumers, wherever in the

world they may be deployed, and that the three year non-use period set forth in the NDA be extended for an additional three years.

## COUNT III
## MISAPPROPRIATION
### (Against VMUSA, VGIL, VGHL, VEL, VGL and Virgin Cruises)

227.    Plaintiffs incorporate by reference into this count paragraphs 24 to 208.

228.    Plaintiffs incorporate by reference all prior allegations of the complaint as if fully set forth herein.

229.    Pursuant to both the common law of New York State (as the conduct that caused the injury was centered in New York) and/or Florida Stat. § 688.008(1), Virgin misappropriated the business ideas which Veitch presented to Virgin.

230.    Veitch presented Virgin with a business idea and other strategic ideas to launch a new cruise line, including the Ultra Ships Plan and other Confidential Information disclosed pursuant to the NDA.

231.    Veitch took steps to protect the secrecy of the Ultra Ships Plan and other Confidential Information, as it was disclosed with the express understanding that the disclosure was made in confidence, as expressly stipulated in the NDA.

232.    The Ultra Ships Plan contains novel ideas, including a plan to break down the barriers to entering the cruise line industry by designing and building two new ultra ships that would be developed using equity financing from third parties based upon their high return potential.

233.    The Ultra Ships Plan and other Confidential Information which Mr. Veitch disclosed to Virgin pursuant to the NDA were of actual or potential economic value which was derived from their secrecy.

234.    After Virgin reneged on its deal with Mr. Veitch in May 2012, Virgin nevertheless proceeded in secrecy to improperly make use of the Ultra Ships Plan and other Confidential Information without his consent.

235.    Upon information and belief, the entities responsible for developing the "Virgin Cruises" announced in February 2014 and again in December 2014, and who improperly used the Confidential Information, were VGHL, VGIL, VEL, VGL and Virgin Cruises for whom Virgin USA acted as agent.

236.    In particular, each of the defendants, VMUSA, VGHL, VEL, VGIL, VGL and Virgin Cruises used Plaintiffs' confidential information and trade secrets knowing that their knowledge of the trade secret was derived under circumstances giving rise to a duty to limit its use, including but not limited to the NDA.

WHEREFORE, Plaintiffs demand judgment in their favor for: (a) actual damages; (b) plus the unjust enrichment caused by the misappropriation; (c) exemplary and punitive damages based upon the defendants willful conduct, (d) a reasonable royalty for the misappropriator's unauthorized use of the trade secret, (e) imposition of a constructive trust over the Virgin Cruise business, including defendant Virgin Cruises Intermediate Limited, and also its parent company Virgin Cruises Limited, and its subsidiary Virgin Cruises US Limited, (f) injunctive relief, enjoining the Defendants from further use of Plaintiffs confidential and proprietary information contained in the Ultra Ships Business Plan or otherwise disclosed

pursuant to the NDA, (g) interest, (h) court costs; and (i) any and all further relief that is proper and just.

## COUNT IV
## UNJUST ENRICHMENT
### (Against VMUSA, VGIL, VGHL, VEL, VGL and Virgin Cruises)

237.    Plaintiffs incorporate by reference into this count paragraphs 24 to 208.

238.    This claim for unjust enrichment is asserted in the alternative to the breach of contract claim asserted against Defendants.

239.    Virgin's planned entry into the cruise business uses the business plan Veitch proposed to them, and as well as design and product ideas.  Virgin is even using the investment bank that Mr. Veitch brought to the fold to raise money.

240.    In particular, all the ideas and concepts behind the Ultra Ships Plan, and the additional Confidential Information developed and disclosed pursuant to the NDA, is Veitch's work product.  Virgin contributed little more than their name and their ideas of how to reflect their "brand voice" on the ships.

241.    Yet, despite the fact that during the crucial development period, Mr. Veitch contributed the key ideas and plans, his own labor, leveraged his relationships throughout the industry to have work done on spec, and even contributed his own money, Virgin now stands to benefit without Mr. Veitch receiving any consideration.

242.    Further, rather than partnering with Mr. Veitch, Virgin exploited his work product and entered the market, thereby "boxing out" Mr. Veitch from entering the market.

243.    With Virgin now in the market, and Mr. Veitch having tapped his connections already to develop the venture, it would be near impossible for Mr. Veitch to begin anew with a different partner or on his own.

244.    Plaintiffs conferred benefits upon Defendants by presenting them the Ultra Ships Plan, and the additional Confidential Information developed and disclosed pursuant to the NDA, necessary to launch a cruise line.  These benefits are of real and tangible value to both Plaintiffs and Defendants.

245.    Defendants had knowledge of the benefits conferred upon them by Plaintiffs, and voluntarily accepted and retained those benefits.

246.    Under the circumstances, it would be inequitable for Defendants to retain the benefits conferred by Plaintiffs without paying for their fair value.

247.    Plaintiffs, by not receiving fair value for conferring its Ultra Ships Plan and not benefiting from Defendants future use of the Ultra Ships Plan, and the additional Confidential Information developed and disclosed pursuant to the NDA, have suffered and will continue to suffer damages as a direct, foreseeable and proximate result of Defendant's unjust enrichment.

248.    Upon information and belief, the entities responsible for developing the "Virgin Cruises" announced in February 2014 and again in December 2014, and who improperly used the Confidential Information, and were unjustly enriched thereby, were VGHL, VGIL, VEL, VGL and Virgin Cruises, for whom Virgin USA acted as agent.

249.    In particular, each of the defendants, VMUSA, VGHL, VEL, VGIL, VGL and Virgin Cruises used Plaintiffs' confidential information and trade secrets knowing that their knowledge of the trade secret was derived under circumstances giving rise to a duty to limit its use, including but not limited to the NDA.

WHEREFORE, Plaintiffs demand judgment in their favor for: (a) actual damages; (b) plus the unjust enrichment caused by the misappropriation; (c) exemplary and punitive damages based upon the defendants willful conduct, (d) a reasonable royalty for the

misappropriator's unauthorized use of the trade secret, (e) imposition of a constructive trust over the Virgin Cruise business, including defendant Virgin Cruises Intermediate Limited, and also its parent company Virgin Cruises Limited, and its subsidiary Virgin Cruises US Limited, (f) injunctive relief, enjoining the Defendants from further use of Plaintiffs confidential and proprietary information contained in the Ultra Ships Business Plan or otherwise disclosed pursuant to the NDA, (g) interest, (h) court costs; and (i) any and all further relief that is proper and just.

## COUNT V
## UNFAIR COMPETITION
### (Against VMUSA, VGIL, VGHL, and VES)

250.    Plaintiffs incorporate by reference into this count paragraphs 24 to 208.

251.    Virgin has a long history of deceiving businessmen.  As detailed in the Tom Bower book, Branson: Behind the Mask, the practice is for Virgin to engage a businessman with a novel idea, to induce the businessman to do the preparatory work, and then use aggressive negotiating tactics to force the businessman into accepting a minority stake and small financial rewards.

252.    According to Bower, this was done at the launch of Virgin Atlantic in 1985 and happened with Virgin Mobile as well.

253.    Here, in May 2011, Virgin sought to get a guaranteed royalty payment, plus an equal share of the Promote.  When Mr. Veitch refused, Virgin represented that it would agree to its large guaranteed royalty payment and a 90/10 split of the Promote between Mr. Veitch (90%) and Virgin (10%).

254.    Thereafter, Virgin induced Mr. Veitch to develop the Venture to the point of being investor ready.

255.    Significant time, labor, and money were expended by Mr. Veitch in developing the Ultra Ships Plan and the additional Confidential Information developed and disclosed pursuant to the NDA.

256.    Instead of taking the deal to the investors as agreed, Virgin proposed dramatically different terms, believing Mr. Veitch would cave into this unfair practice.

257.    As a result, Mr. Veitch has suffered damage.

258.    Virgin engaged in unfair competition by virtue of acting with commercial immorality.

259.    Virgin engaged in unfair competition as it exploited the skill, expenditures and labors of Mr. Veitch before setting itself up as a competitor to Mr. Veitch.

260.    Virgin engaged in unfair competition as it misappropriated Mr. Veitch's Ultra Ships Plan, and the additional Confidential Information developed and disclosed pursuant to the NDA, in order to obtain a commercial advantage.

261.    Virgin's unfair and deceptive actions violated Florida's Deceptive and Unfair Trade Practices Act.

262.    The principals responsible for developing the "Virgin Cruises," and who improperly used the Confidential Information, were VGHL, VGIL, VEL, and Virgin Cruises, for whom Virgin USA acted as agent.

WHEREFORE, Plaintiffs demand judgment in their favor for: (a) actual damages; (b) an accounting of, and payment to Plaintiffs of all gains, capital, profits, and advantages derived by Defendants from their breach of the NDA; (c) imposition of a constructive trust over the Virgin

Cruise business, including defendant Virgin Cruises, and also its parent company Virgin Cruises Limited, and its subsidiary Virgin Cruises US Limited, (d) injunctive relief, enjoining the Defendants from further use of Plaintiffs confidential and proprietary information contained in the Ultra Ships Business Plan or otherwise disclosed pursuant to the NDA, (e) interest, (f) court costs; and (g) any and all further relief that is proper and just.

### COUNT VI
### BREACH OF CONTRACT
### (Against VMUSA, VGIL, VGHL, and VES)

263.    Plaintiffs incorporate by reference into this count paragraphs 47 to 208.

264.    The parties reached the Veitch-Virgin Agreement in May 2011 through meetings, negotiations, and the exchange of e-mails setting forth a complete and binding agreement between Veitch and Virgin.

265.    Under to the Veitch-Virgin Agreement, Virgin and Mr. Veitch reached an understanding as to the essential terms of their relationship.  Key among those terms was, as consideration for their respective obligations to Virgin Cruises, Virgin would get a large licensing fee and 10% of the Promote, while Mr. Veitch would get 90% of the Promote.

266.    These were the terms that Mr. Veitch and Virgin agreed to present to investors. These terms were not subject to renegotiation between Mr. Veitch and Virgin.  While both parties understood, that the investors may seek adjustments to either the licensing fee or the total amount of the Promote that would be split between Mr. Veitch and Virgin, the split between the two of them was set.

267.    Subsequently, and pursuant to the Veitch-Virgin Agreement, both parties began performing under the terms of the Agreement, and expended substantial time and resources

furthering the venture by obtaining financing, beginning the ship building process, and seeking out investors.

268.    Then, in 2012, Virgin breached the Veitch-Virgin Agreement by demanding 60% of the Promote for itself, and demanding that Mr. Veitch accept only 10% of the Promote on a vested basis, and a mere 30% more on an unvested basis.

269.    Under the Veitch-Virgin Agreement, Mr. Veitch is owed 90% of the Promote that was to be split between Mr. Veitch and Virgin.  Virgin's refusal to honor that agreement is a breach of the Veitch-Virgin Agreement.

270.    Thus, as a direct and proximate result of Virgin's breach of the Veitch-Virgin Agreement, Plaintiffs suffered damages.

271.    The Veitch-Virgin Agreement was negotiated by Messrs. Saverimuttu and Marino in their role as agents for the broader Virgin Group, which included VGHL, VGIL, and VEL, which had control over the negotiations of the licensing fees, the split of the Promote, the equity commitment, and other matters.

WHEREFORE, Plaintiffs demand judgment in their favor for: (a) actual damages; (b) an accounting of, and payment to Plaintiffs of all gains, capital, profits, and advantages derived by Defendants from their breach of the NDA; (c) imposition of a constructive trust over the Virgin Cruise business, including defendant Virgin Cruises, and also its parent company Virgin Cruises Limited, and its subsidiary Virgin Cruises US Limited, (d) injunctive relief, enjoining the Defendants from further use of Plaintiffs confidential and proprietary information contained in the Ultra Ships Business Plan or otherwise disclosed pursuant to the NDA, (e) interest, (f) court costs; and (g) any and all further relief that is proper and just.

## COUNT VII
## BREACH OF PARTNERSHIP AGREEMENT
### (Against VMUSA, VGIL, VGHL, and VES)

272.     Plaintiffs incorporate by reference into this count paragraphs 47 to 208.

273.     In May 2011, Virgin said that because Mr. Veitch's plan was "still a power point presentation," it was a start-up venture and Mr. Veitch and Virgin would therefore be partners in the venture.   Mr. Veitch agreed, noting in particular the equity upside for Virgin to incentivize Virgin as a partner.   Virgin agreed with this and said that they want to look at it in the same way as Mr. Veitch.

274.     Under Florida law, a partnership is created where both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business.

275.     Here, Veitch and the Virgin Group established and operated as a partnership.

276.     Veitch and Virgin had a common purpose in creating a new cruise line.

277.     Both Veitch and Virgin contributed labor, experience, and skill to the enterprise.

278.     Both Veitch and Virgin contributed capital to the enterprise.   Veitch paid approximately $500,000 out of his own pocket.  Virgin contributed somewhat less, but still paid various invoices.

279.     In addition, Virgin had committed to contributing $10 million in capital, and Veitch had committed to contributing $1 million in capital.

280.     Veitch and Virgin also agreed to share profits with Veitch set to receive 90% of the Promote and Virgin 10% of the Promote, plus its licensing fees.

281.     Veitch and Virgin also agreed to risk losses in the venture.  Both stood to lose the labor, experience and skill they had contributed, the funds they had contributed, and also the capital investment they had committed to make.

282.     In fact, the parties referred to each other as partners and co-venturers.

283.     The trust and confidence placed by Veitch in Virgin as his partner formed a fiduciary relationship where Veitch reasonably expected that Virgin would abide by the Veitch-Virgin Agreement, would not seek to dramatically alter the terms of the Veitch-Virgin Agreement, and would not use Veitch's confidential information to create the cruise line without him.

284.     However, Virgin breached its fiduciary duty of loyalty by seeking in bad faith to dramatically alter the Veitch-Virgin Agreement, forcing Mr. Veitch out, and then subsequently using Veitch's ideas, plans, and labor, thereby preventing Veitch from eventually profiting from the cruise line.

285.     As a direct and proximate result of Virgin's breach, and Veitch's resultant inability to participate in the cruise ship venture, Veitch is damaged in the amount of his efforts and expenditures, and will incur further harm from lost profits and lost equity.

286.     Mr. Veitch, and his company, VSL, operated as partners in developing the Venture with the Virgin Group, which consisted of, at the very least, VMUSA, VGHL, VGIL, and VEL.

WHEREFORE, Plaintiffs demand judgment in their favor for: (a) actual damages; (b) an accounting of, and payment to Plaintiffs of all gains, capital, profits, and advantages derived by Defendants from their breach of the NDA; (c) imposition of a constructive trust over the Virgin Cruise business, including defendant Virgin Cruises, and also its parent company Virgin Cruises

Limited, and its subsidiary Virgin Cruises US Limited, (d) injunctive relief, enjoining the Defendants from further use of Plaintiffs confidential and proprietary information contained in the Ultra Ships Business Plan or otherwise disclosed pursuant to the NDA, (e) interest, (f) court costs; and (g) any and all further relief that is proper and just.

## COUNT VIII
## BREACH OF JOINT VENTURE AGREEMENT
### (Against VMUSA, VGIL, VGHL, and VES)

287.    Plaintiffs incorporate by reference into this count paragraphs 47 to 208.

288.    A joint venture is be created by (a) express or implied contract, (b) a community of interest in the performance of the common purpose, (c) joint control or right of control, (d) a joint proprietary interest in the subject matter, (e) the right to share profits and (f) duty to share losses,

289.    Here, the agreement reached by Veitch and Virgin established both a partnership and a joint venture.  In fact, the parties referred to each other as partners and co-venturers.

290.    Here, Veitch and the Virgin Group established and operated as a partnership.

291.    Veitch and Virgin had a common purpose in creating a new cruise line.

292.    Both Veitch and Virgin contributed labor, experience, and skill to the enterprise.

293.    Both Veitch and Virgin contributed capital to the enterprise.  Veitch paid approximately $500,000 out of his own pocket.  Virgin contributed somewhat less, but still paid various invoices.

294.    In addition, Virgin had committed to contributing $10 million in capital, and Veitch had committed to contributing $1 million in capital.

295.    Veitch and Virgin also agreed to share profits with Veitch set to receive 90% of the Promote and Virgin 10% of the Promote, plus its licensing fees.

296.    Veitch and Virgin also agreed to risk losses in the venture.  Both stood to lose the labor, experience and skill they had contributed, the funds they had contributed, and also the capital investment they had committed to make.

297.    The trust and confidence placed by Veitch in Virgin as his partner formed a fiduciary relationship where Veitch reasonably expected that Virgin would abide by the Veitch-Virgin Agreement, would not seek to dramatically alter the terms of the Veitch-Virgin Agreement, and would not use Veitch's confidential information to create the cruise line without him.

298.    However, Virgin breached its fiduciary duty of loyalty by seeking in bad faith to dramatically alter the Veitch-Virgin Agreement, forcing Mr. Veitch out, and then subsequently using Veitch's ideas, plans, and labor, thereby preventing Veitch from eventually profiting from the cruise line.

299.    As a direct and proximate result of Virgin's breach, and Veitch's resultant inability to participate in the cruise ship venture, Veitch is damaged in the amount of his efforts and expenditures, and will incur further harm from lost profits and lost equity.

300.    Mr. Veitch, and his company, VSL, operated as joint venturers in developing the Venture with the Virgin Group, which consisted of, at the very least, VMUSA, VGHL, VGIL, and VEL.

WHEREFORE, Plaintiffs demand judgment in their favor for: (a) actual damages; (b) an accounting of, and payment to Plaintiffs of all gains, capital, profits, and advantages derived by Defendants from their breach of the NDA; (c) imposition of a constructive trust over the Virgin Cruise business, including defendant Virgin Cruises, and also its parent company Virgin Cruises

Limited, and its subsidiary Virgin Cruises US Limited, (d) interest, (e) court costs; and (f) any and all further relief that is proper and just.

## COUNT IX
## BREACH OF DUTY OF GOOD FAITH
### (Against VMUSA, VGIL, VGHL, and VES)

301.    Plaintiffs incorporate by reference into this count paragraphs 47 to 208.

302.    The Veitch-Virgin Agreement did not contain any reservation of any rights not to be bound until any further agreements were reached.

303.    The Veitch-Virgin Agreement created an enforceable obligation on Virgin to negotiate in good faith.

304.    The Veitch-Virgin Agreement resulted in the creation of a partnership and joint venture which entailed, at a minimum, a duty to deal in good faith to conclude documents containing the final details of the partnership and joint venture.

305.    Virgin acted in bad faith when it:

(a)      proposed terms that directly contradicted the Veitch-Virgin Agreement;

(b)      proposed and demanded terms that were drastically different from the Veitch-Virgin Agreement; and

(c)      proposed and demanded terms that were significantly more favorable to Virgin than had been negotiated in the Veitch-Virgin Agreement.

306.    In proposing the drastically different terms, and acting in bad faith, Mr. Saverimuttu was acting in his role as an agent for -- and at the instructions and under the control of -- VGHL, VGIL, and VEL.

WHEREFORE, Plaintiffs demand judgment in their favor for: (a) actual damages; (b) an accounting of, and payment to Plaintiffs of all gains, capital, profits, and advantages derived by

Defendants from their breach of the NDA; (c) imposition of a constructive trust over the Virgin Cruise business, including defendant Virgin Cruises, and also its parent company Virgin Cruises Limited, and its subsidiary Virgin Cruises US Limited, (d) interest, (e) court costs; and (f) any and all further relief that is proper and just.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiffs demand trial by jury of all issues.

Dated this 4th day of May, 2015.                     Respectfully submitted,

                                                  By:   /s/ Jeffrey W. Gutchess
                                                        Jeffrey W. Gutchess (FBN 702641)
                                                        jgutchess@bilzin.com
                                                        Daniel Tropin (FBN 100424)
                                                        dtropin@bilzin.com
                                                        Brandon Rose (FBN 99984)
                                                        brose@bilzin.com

                                                        **BILZIN SUMBERG BAENA PRICE
                                                        & AXELROD LLP**
                                                        1450 Brickell Ave., 23rd Floor
                                                        Miami, FL 33131
                                                        Telephone: (305) 350-7312
                                                        Facsimile: (305) 351-2132
                                                        eService@bilzin.com
                                                        margote@bilzin.com

                                                        *Attorneys for Plaintiffs*