**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-20989-CIV-MOORE/MCALILEY**

**COLIN VEITCH,**
**VSM DEVELOPMENT, INC.,**

      Plaintiffs,

v.

**VIRGIN MANAGEMENT USA, INC.,**
**VIRGIN GROUP INVESTMENTS LTD.,**
**VIRGIN GROUP HOLDINGS LIMITED,**
**VIRGIN ENTERPRISES LIMITED,**
**VIRGIN CRUISES INTERMEDIATE LIMITED,**
**VIRGIN CRUISES LIMITED**

      Defendants.

_____/

**PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS [D.E. 52] FILED BY
VIRGIN MANAGEMENT USA, INC., VIRGIN GROUP INVESTMENTS LTD.,
<u>VIRGIN GROUP HOLDINGS LIMITED, AND VIRGIN ENTERPRISES LIMITED</u>**

Plaintiffs Colin Veitch and VSM Development, Inc. ("Plaintiffs") file this opposition to the Motion to Dismiss filed by Virgin Management USA, Inc. ("VMUSA"), Virgin Group Investments Ltd. ("VGIL"), Virgin Group Holdings Limited ("VGHL") and Virgin Enterprises Limited ("VEL"), (collectively "Virgin") (the "Motion").

## I.     BACKGROUND

Plaintiff, Colin Veitch, the former CEO of Norwegian Cruise Lines, developed a novel plan that would enable a new entrant, such as Virgin, to break through the barriers to entry by financing and constructing two new "Ultra Ships." (Am. Compl. ("A.C. at ¶¶ 12, 24-42") [D.E. 26].) Ultra Ships feature an array of attractions, command premium pricing and onboard revenue that would reward pioneering, non-traditional, investors with extremely profitable returns. (*Id.* at ¶ 25.) Mr. Veitch first enlisted the support of a prominent investment bank, Allen & Co. (*Id.* at ¶¶ 43-46.) When Allen & Co. supported the plan and expressed confidence in their ability to raise the equity required for the venture, Mr. Veitch then set out to enlist a brand partner. (*Id.* at ¶ 47.)

The Virgin Group – a leading brand in leisure and travel – sought to enter the cruise market for more than a decade without any success. (*Id.* at ¶ 66-67.) Virgin agreed to evaluate Mr. Veitch's plan pursuant to the terms of a Non-Disclosure Agreement ("NDA"). (*Id.* at ¶¶ 70-79.) Virgin expressed strong interest, and Mr. Veitch and Virgin proceeded to negotiate the financial structure of the deal between them (defined in the Amended Complaint as the Veitch-Virgin Agreement). (*Id.* at ¶¶ 86-120.) With the financial terms settled, Mr. Veitch set out to develop the Virgin Cruise business to the point where it was ready to take to the investors. (*Id.* at ¶ 122.)

With the Veitch-Virgin Agreement in place, Mr. Veitch spent the next year assembling a team of industry experts to design the ships, signed a letter of intent with a shipyard to build the ships, obtained a letter of intent from a bank to provide debt financing for the ships, presented to and secured the support of two German government ministries responsible for providing export credit guarantees to the banks providing the debt financing, and completed the management presentation and other materials necessary for the road show to enlist the equity investors. (*Id.* at ¶¶ 121-160.) But then, upon recognizing the full potential for Virgin Cruises to be one of Virgin's "biggest, sexiest businesses," Virgin refused to proceed under the Veitch-Virgin Agreement and instead reneged on the Veitch-Virgin Agreement. (*Id.* at ¶¶ 172-200.)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Thereafter, Virgin proceeded without Mr. Veitch, engaging Mr. Tom McAlpin as the CEO of Virgin Cruises in the summer of 2012, just weeks after squeezing Mr. Veitch out of their erstwhile "partnership." (*Id.* at ¶ 201, n.4.)  Under a shroud of secrecy, Virgin obtained the debt and equity financing to proceed with the very business plan it misappropriated from Mr. Veitch. (*Id.* at ¶¶ 201-208.)  They even used Allen & Co. to raise the equity, the very bank introduced into the project by Mr. Veitch in late 2010, even before he approached Virgin.  (*Id.* at ¶ 202.)  On December 4, 2014, Virgin generated tremendous publicity when it formally announced the "formation of Virgin Cruises, its new cruise line business," based on the financing and construction of two new Ultra Ships, just as Mr. Veitch had planned.  For the reasons set forth below, the Motion should be denied.[1]  (*Id.* at ¶ 205.)

## II.   ARGUMENT

### A.  THE COMPLAINT ADEQUATELY ALLEGES EACH CLAIM AGAINST EACH VIRGIN GROUP DEFENDANT BASED ON AGENCY THEORY

#### 1.   The Amended Complaint Adequately Alleges an Agency Theory of Liability

Virgin argues that Plaintiffs have improperly "lumped" the defendants as the "Virgin Group" and provided "no basis for each of the Virgin Defendants to distinguish their alleged individual misconduct." (Virgin's Mot. to Dismiss Am. Compl. ("Defs.' Mot. at 7") [D.E. 52].) This argument is without merit.   The Amended Complaint pleads in great detail the role of each defendant, as well as the "Virgin Group."   It pleads in great detail that VMUSA (and Messrs. Anthony Marino ("Marino") and Nirmal Saverimuttu ("Saverimuttu") were acting as agents – with both actual[2] and apparent authority – of VGHL, VGIL and VEL, with respect to each of the counts.  Because VMUSA and Marino and Saverimuttu were acting as agents for VGHL, VGIL

---

[1] Plaintiffs Amended Complaint alleges Breach of the Non-Disclosure Agreement (Count I); Permanent Injunction (Count II); Misappropriation (Count III); Unjust Enrichment (Count IV); Unfair Competition (Count V); Breach of Contract (Count VI); Breach of Partnership Agreement (Count VII); Breach of Joint Venture Agreement (Count VIII); and Breach of Duty of Good Faith (Count IX).  VMUSA has not moved to dismiss Count I or Count III.

[2] "To demonstrate an actual agency relationship, a plaintiff must allege '(1) that the principal acknowledges the reputed agent was acting as its agent; (2) the reputed agent accepts that undertaking; and (3) control by the principal over the agent's day-to-day activities during the course of the agency relationship.'" *Continent Aircraft Trust, 1087 v. Diamond Aircraft Indus., Inc.,* No. 11-61663-CIV, 2013 WL 2285539, at *3 (S.D. Fla. May 23, 2013).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

and VEL, there is no need – indeed it would make no sense – to plead separate facts as to each entity.[3]

Moreover, "[q]uestions as to the existence and scope of the agency are issues of fact and are not properly the basis of a motion to dismiss." *Heredia v. United States,* 887 F. Supp. 77, 80 (S.D.N.Y. 1995).[4]  In fact, where "the circumstances alleged in the pleading 'raise the possibility of a principal-agent relationship' . . . questions as to the existence and scope of the agency" are issues for the jury.[5]  Thus, to "survive a motion to dismiss . . . a plaintiff need only 'raise[ ] a sufficient inference that some sort of agency relationship existed between' the purported principal and agent . . . ."  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 344-45 (S.D.N.Y. 2010).  The reason for this lenient standard is because usually "an outsider will not be privy to the details of what conversation or conduct took place between a principal and the agent." *Id*.[6]

### 2.  VMUSA and Messrs. Marino and Saverimuttu Operated as Agents for VGHL, VGIL, and VEL

To plead apparent authority, a plaintiff must allege "words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Hallock v. State,* 64 N.Y.2d 224, 231 (1984).[7]  For

---

[3] *See, e.g., Barnet v. Drawbridge Special Opp. Fund LP*, No. 14-cv-1376 (PKC), 2014 WL 4393320, at *11 (S.D.N.Y. Sept. 5, 2014) (rejecting lumping argument where each of the defendants was involved in making major decisions); *City of Newburgh v. Sarna,* 690 F. Supp. 2d 136, 158-59 (S.D.N.Y. 2010) (rejecting lumping argument where the complaint set forth good faith factual allegations giving rise to the reasonable inference that all defendants were liable); *Mobil Oil Corp. v. Dade Cnty. Esoil Mgmnt. Co., Inc.*, 982 F. Supp. 873, 879 (S.D. Fla. 1997) (rejecting lumping argument and noting that the capacity in which parties were acting, "may be a factual issue that will need to be resolved").

[4] "Questions of agency relationships, however, are generally reserved for the trier of fact." *Bent v. Smith, Dean & Assocs., Inc*., No. 3:11-CV-66-J-TEM, 2011 WL 2746847, at *4 (M.D. Fla. July 14, 2011) (denying defendant's motion to dismiss)*; accord, e.g., Borg-Warner Leasing, a Div. of Borg-Warner Acceptance Corp. v. Doyle Elec. Co*., 733 F.2d 833, 836 (11th Cir. 1984).

[5] *Maurillo v. Park Slope U–Haul,* 194 A.D.2d 142, 147 (N.Y. App. Div. 1993) (quoting *Fogel v. Hertz Int'l,* 141 A.D.2d 375, 376 (N.Y. App. Div. 1988); *Hedeman v. Fairbanks, Morse & Co.,* 286 N.Y. 240 (1941).

[6] In *Royal Indus. Ltd. v. Kraft Foods, Inc*., 926 F. Supp. 407, 413 (S.D.N.Y. 1996), *aff'd* 164 F.3d 619 (2d Cir. 1998), the court held that, "as in any agency case, the issue should be one of authority: did the subsidiary have authority, actual or apparent, to act on behalf of the parent? As another court in this district has put it, 'a parent corporation may become a party to its subsidiary's contract under an agency theory if the parent's conduct manifests an intent to be bound by the contract' . . . The theory behind any such agency claim is that the subsidiary's acts were, in both form and substance, those of the parent."

[7] In addition "apparent authority may arise absent any direct contact between the principal and the third party. Apparent authority is conferred by the conduct of a principal which justifies a third party's belief that an agency relationship exists." *Prop. Advisory Grp., Inc. v. Bevona,* 718 F. Supp. 209, 211 (S.D.N.Y. 1989) (quoting *E.F.*

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

example, the "appointment of a person to a position with generally recognized duties may create apparent authority." *Bevona*, 718 F. Supp. at 211.  Similarly, the use by affiliated companies of a trademarked logo or an integrated marketing campaign gives rise to apparent agency.[8]

The Virgin Group promotes itself as "a leading international investment group" with "a portfolio run by professional investment managers."  (A.C. at ¶¶ 48, 50.)  Sir Richard Branson has explained that Virgin's Investment Committee "assesses your potential, whether it fits with the group's ambitions and strategy, and of course brand values, and what the possible returns and profits will be.  Then it works out what kind of stake the Virgin Group should take."  (*Id.* at ¶ 170.)  Mr. Veitch made a presentation to this very Investment Committee.  (*Id.*)

The agency of Messrs. Marino and Saverimuttu was explained by Virgin itself in a slide from its presentation for investors, entitled, "Virgin Group Structure" showing the top company, VGHL, with Peter Norris as "Chairman."  Beneath VGHL are six industries, including "Leisure & Hospitality," under which are listed Messrs. Marino and Saverimuttu.  (*Id.* at ¶ 163.)  Messrs. Marino and Saverimuttu confirmed to Mr. Veitch "that nothing was done without the approval of the Virgin Group's 'non-executive chairman,' Peter Norris."  (*Id.* at ¶ 85.)

The party listed on the NDA is VMUSA, but VMUSA is a mere agent for the Virgin Group.  The Virgin Group itself states that VMUSA "is the North American headquarters of Sir Richard Branson's Virgin Group" whose "role is to develop the Virgin brand in North America . . . ."  (*Id.* at ¶¶ 59-60.)

Mr. Marino, who signed the NDA on behalf of VMUSA, was introduced to Mr. Veitch as, and describes his role as, "Managing Partner, Leisure" of "Virgin Group," "leading its investment program . . . in North America."  (*Id.* at ¶ 64.)  Mr. Saverimuttu, who concluded the Veitch-Virgin Agreement, describes himself as a "Principal at Virgin Group" with

---

*Hutton & Co. v. First Fla. Securities, Inc.*, 654 F. Supp. 1132, 1142 (S.D.N.Y. 1987)); *see also, e.g., Gen. Motors Acceptance Corp. v. Finnegan*, 156 Misc. 2d 253, 255 (N.Y. Sup. 1992) ("[A]pparent authority may arise without any contact between the principal and the third party.").

[8] *See, e.g., Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 91 (S.D.N.Y. 2010) (denying motion to dismiss apparent agency claim where the plaintiffs "alleged that the cover letter enclosing the Policies bore the Chubb trademarked logo; that an integrated advertising and marketing campaign relating to the Policies referred only generally to "Chubb"; that insureds under the Policies were directed to make all inquiries to Chubb and to make payments "payable to Chubb"); *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 539-40 (E.D.N.Y. 2011) (describing "the New York headquarters of CSS as a 'local office' within an 'integrated bank'" is sufficient for apparent authority).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

"responsibility for Virgin Group's North American investments in the aviation and leisure/hospitality segments." (*Id.* at ¶ 65.)

The Veitch-Virgin Agreement was negotiated by Messrs. Marino and Saverimuttu and both made it clear that "they were acting not on behalf of Virgin Management USA, but rather on behalf of the Virgin Group generally and specifically the arms of the Virgin Group that dealt with licensing and investments (i.e., VGHL, VGIL, and VEL)." (*Id.* at ¶ 88.)[9]

This was confirmed in many ways. For example, in negotiating the Veitch-Virgin Agreement, Mr. Marino explained the "issues I need to contend with" regarding a "worldwide license," that "Virgin always looks at these deals versus the opportunity cost of locking up the rights to the brand" and that "the licensor's orientation is a patient one . . . ." (*Id.* at ¶ 103, Ex. C.) He signed the email, "Anthony S. Marino, **Virgin Group**." (*Id.*) In that context, Mr. Marino was clearly acting as an agent for the Virgin entity that licenses the Virgin brand, which is VEL.

Virgin's $10 million equity commitment was negotiated by Mr. Marino, not on behalf of VMUSA, but rather on behalf of VGIL. (*Id.* at ¶ 110.) And, in fact, VMUSA's counsel advised that "VGIL is one of the topco's that we use for new initiatives. It's likely to be the shareholder of Virgin Cruises." (*Id.* at ¶ 166.) He then prepared engagement letters that "**included both VGIL and VSM on the document as partners**." (*Id.* at ¶ 169.) The engagement letter was for counsel to "Virgin Group Investments Limited and VSM Development, Inc. in a matter involving the raising of equity capital for an entity to be formed to engage in the cruise industry." (*Id.* at ¶ 171.)[10]

Thus, Plaintiffs have pled facts demonstrating that Messrs. Marino and Saverimuttu, and VMUSA, were acting as agents for VGHL, VGIL, and VEL in signing the NDA, negotiating the Veitch-Virgin Agreement, and developing Virgin Cruises as partners and joint venturers.

---

[9] "An agent may enter into a single contract on behalf of multiple principals, and each of those principals is a party to the contract with standing to enforce its rights thereunder." *In re Suffolk Reg'l Off-Track Betting Corp.*, 462 B.R. 397, 410 (Bankr. E.D.N.Y. 2011). "*Multiple principals may consent that an agent take action on their behalf in the same transaction or other matter.*" Restatement (Third) of Agency §3.16 (emphasis added).

[10] The fact that VGIL, the specific name of the principal entity making the investment, was not disclosed until later is insignificant. *See, e.g., Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc*., 241 F. Supp. 2d 246, 265 (S.D.N.Y. 2002) (apparent authority can exist "regardless of whether the principal's identity is disclosed"); *J.M. Heinike Assocs., Inc. v. Chili Lumber Co.*, 443 N.Y.S.2d 512, 513 (App. Div. 1981) (finding that defendant, knowing the nature of the transaction and that plaintiff would look to him for payment, ratified by his silence the agreement to bind him as the principal in the purchase).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

**B.  THE VEITCH-VIRGIN AGREEMENT HAD ALL ESSENTIAL TERMS
AND WAS NOT SUBJECT TO FUTURE NEGOTIATION WITH VIRGIN**

Virgin argues that claims dependent on the alleged Veitch-Virgin Agreement should be dismissed because the agreement fails to name a specific Virgin entity and because it was subject to future negotiations. (Defs.' Mot. at 9-13.)  Each argument is contradicted by the facts properly pleaded in the Amended Complaint and contrary to controlling law.

**1.  Allegations Regarding The Veitch-Virgin Agreement**

After the NDA was signed, the parties negotiated whether to proceed and, if so, under what terms. (A.C. at ¶ 87.)  This process began in April with the meetings in New York and Miami and culminated in daily negotiations between May 16, 2011 and May 20, 2011, when Mr. Veitch set forth a proposal that "would give [Virgin] 17% of all net distributions." (*Id.* at Ex. C.) Virgin's response is set forth in Mr. Saverimuttu's May 20, 2011 email: "in the interests of **moving our discussion to a conclusion**, we can largely **accept the proposal** with some changes." (*Id.*)[11]  He then stated: "we are **prepared to move forward on the following basis**:"

- Base royalty: 2.25%
- Override: 2%
- Virgin investment commitment: $10 million
- B/C split of promote: 33/67
- Virgin share of C:10%[12]

A summary of the associated economics of this proposal is as follows:

|  | Base Case | Realistic Upside Case |
|---|---|---|
| Colin Veitch |  |  |
| IRR | 93.3% | 115.3% |
| Proceeds $M | $11 | $315 |
| Proceeds % of Total Distributions | 6% | 9% |
|  |  |  |
| Virgin |  |  |
| IRR | 73.8% | 78.7% |
| Proceeds $1m (excluding TV of royalty) | $156 | $240 |
| Proceeds $m (including TV of royalty EBITDA | $353 | $483 |

---

[11] Mr. Saverimuttu explained that "if the project had been brought to them all packaged up and financed already, then it would just have been a licensing discussion; but instead it is a start-up and they and Mr. Veitch were therefore partners in this." (*Id.* at ¶ 18.)

[12] The "C shares" represent the split of the "Promote," which is the "share [of] any returns" that "active manager(s) of the investment" would receive, with "the active managers being Mr. Veitch and Virgin." (*Id.* at n.1.)

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

| multiple) | | |
|---|---|---|
| Proceeds % of Total Distributions | 17% | 13% |
| Proceeds $m (including TV of royalty, perpetuity) | $129 | $427 |
| Proceeds % of Total Distributions | 15% | 12% |

Virgin closed the email by explaining: "In this Realistic Upside Case, your take is a very attractive $315m or 9% of proceeds. This compares favorably to Virgin's take of 12-13% of proceeds. Even in the 'downside' base case the return to you is $122m." (*Id.*)

After discussing the possible changes on a phone conference, "**both parties agreed to stick with the new numbers they had proposed in their e-mail**." (A.C. at ¶ 111.) (emphasis added). Thus, the parties did not leave these terms open to future negotiation between them. Rather, because there was a possibility that the equity investors might seek changes, Virgin emphasized that "[t]his is only **a deal between the two of us** . . . ." (*Id.* at ¶ 108, Ex. C.) Further signifying that a deal had been reached is the change in the title of the subject line. (*Id.* at Ex. C.) While Mr. Veitch sent his email with the title "Structure," when Mr. Saverimuttu sent back his acceptance, he changed the title to "Virgin Cruises." This concluded the "Veitch-Virgin Agreement." (*Id.*)

### 2. The Veitch-Virgin Agreement Identified The Parties

Virgin argues that Mr. Saverimuttu's email did not establish a contract because it lacked an essential term – the "identity of the parties." (Defs.' Mot. at 10.) That, of course, is incorrect.[13] VMUSA was clearly a party to the Veitch-Virgin Agreement. Mr. Saverimuttu was employed by VMUSA and at all times was clearly representing VMUSA. The only issue – and it is a factual issue – is if he sent the email on behalf of VMUSA only, or if he was acting as an agent of other Virgin entities. Plaintiffs allege: "Mr. Veitch held these negotiations with Mr. Marino and Mr. Saverimuttu, and both made it clear that they were acting not on behalf of Virgin Management USA, but rather on behalf of the Virgin Group generally and specifically the arms

---

[13] Virgin argues that Plaintiffs apparently believed they were dealing with the "Virgin Group," which must mean that Plaintiffs believed they were "contracting with all 400 of the entities that form the alleged 'Virgin Group'" and therefore, "Plaintiffs apparently do not know with whom they contracted." (*Id.* at 10.) Of course, the A.C. alleges no such thing.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

of the Virgin Group that dealt with licensing and investments (i.e., Virgin Group Holdings Limited, Virgin Group Investments Limited, and Virgin Enterprises Limited.)" (*Id.* at 86.)[14]

### 3. The Promote Was Not Subject to Future Negotiation with Virgin

Virgin also argues that Mr. Saverimuttu's email left the issue of the percentage of the Promote to future negotiation. (Defs.' Mot. at 10-11.) In support, Virgin quotes only the first sentence of paragraph 112: "Both parties recognized that when the fundraising began, the investors might seek certain changes in the deal, such as the minimum return or the percentage of the Promote … available to Mr. Veitch and Virgin." (*Id.* at 11.) The part Virgin omits alleges: "**However, as between Mr. Veitch and Virgin, the essential terms – and in particular the economics of the deal between them -- were finalized at this point**." (A.C. at ¶ 122.)

This allegation is supported by Virgin's own email in which Mr. Saverimuttu stated that, to bring "**our discussion to a conclusion**, we can largely **accept the proposal** with some changes." (*Id.* at Ex. C.) He then stated: "we are **prepared to move forward on the following basis**" and set forth the detailed economic terms. Because investors might weigh in, this is "only **a deal between the two of us** . . . ." (*Id.*) This language demonstrates an intent to be bound. In fact, this Court has held that the use of the phrase "[I] accept your offer" in an e-mail was sufficient to show the parties' "recognition that the agreement contained the essential terms, but also their intent to be bound by them." *Romacorp, Inc. v. Prescient, Inc.,* No. 1:10-CV-22872, 2011 WL 1430277, at *5 (S.D. Fla. Apr. 14, 2011) (citing *Sands v. Wagner & Hunt, P.A.*, No. 09–30557, 2009 WL 2730469, at *3 (S.D. Fla. Aug. 28, 2009)).[15]

---

[14] The fact that these particular names were omitted from the email exchange is immaterial. *See, e.g., Morrow v. Putnal*, No. 3:06-cv-543-J-33TEM, 2007 WL 1452914, at *2 (M.D. Fla. May 14, 2007) ("Defendants have listed various details of the contract that are not specified, such as the name of the entity, the person charged with forming the entity, the officers and bylaws of the new entity, and an agreement regarding exclusivity. The Court is not convinced that the failure to include these terms is fatal at this stage."). Virgin overstates its legal argument by quoting minor portions of sentences out of context. *See, e.g., Nelson v. Target Corp.*, No. 07-cv-1990, 2009 WL 2150893, at *3 (M.D. Fla. July 13, 2009) (denying Target's motion for summary judgment where Target claimed to have a contract with Tower Cleaning Systems, Inc. but the contract was signed by a different, unrelated company, U.S. Maintenance); *Zell v. Cobb*, 566 So. 2d 806, 808 (Fla. 3d DCA 1990) (holding that memo entitled "Status Report" was insufficient to form a contract because plaintiff admitted that "he did not know the identity of the party or parties to be bound by the alleged contract; the identity of the corporation in which the shares were to be purchased; the number of shares to be sold; the price of the shares; the description of the shares to be purchased . . . or the terms and conditions of the leveraged buy-out"); *Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 439 (Fla. 3d DCA 1997) (finding that oral partnership was unenforceable because, at trial, a son testified that he did not know whether, at the time he had the conversation with his father, his father was acting in his individual capacity or in his corporate capacity, nor could he recall the financial specifics of the alleged contract, such as how profits were to be split).

[15] While the investors might have sought an overall smaller Promote for Veitch and Virgin, whatever the Promote was, Mr. Veitch's share would still be 90% and Virgin's would still be 10%. (A.C. at Ex. C.) Moreover, Virgin's

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

### 4. Anticipation of Formal Documentation Does Not Invalidate the Veitch-Virgin Agreement

Virgin argues that the Letter of Intent ("LOI") with the shipyard, in stating VGIL and VSM were finalizing their co-venturing arrangements, is grounds to conclude as a matter of law that no agreement was formed. (Defs.' Mot. at 12.) Once again, Virgin is wrong.

The email accepting Mr. Veitch's proposal did not contain any reservation to not be bound by the agreement until execution of formal documentation. *See, e.g., Highland Capital Mgmt. v. Bank of Am., Nat'l Assoc.,* 698 F.3d 202, 209 (5th Cir. 2012) (finding that district court erred in dismissing breach of contract claim where "there is no indication that [the defendant] expressly reserved the right not to be bound without a writing"); *Art & Fashion Grp. Corp. v. Cyclops Prod., Inc.,* 120 A.D.3d 436, 438 (N.Y. App. Div. 2014) (affirming denial of motion to dismiss regarding breach of joint venture agreement where, "although defendants contend[ed] that they did not intend to proceed with the alleged joint venture until they executed a formal written agreement, no such express reservation [was] contained in any of the emails.").[16]

In fact, it is common for parties to form an agreement with an intent to be bound before execution of a formal instrument. "[T]he mere intention to commit the agreement to writing will not prevent contract formation prior to execution." *Elizabeth St. Inc. v. 217 Elizabeth St. Corp.*, 755 N.Y.S.2d 33, 34 (App. Div. 2003).[17] For example, in *Lo Casico v. Aquavella*, 206 A.D.2d 96, 98 (N.Y. App. Div. 1994), the parties signed a Letter of Intent stating that if plaintiff met

---

email stated "We will of course, need to reconsider the above is [sic] there is a material movement (including our $10m commitment)." *Id.* Of course, "reconsider" does not mean subject to future negotiations and, moreover, the events that might prompt reconsideration never occurred.

[16] There is no merit to Virgin's argument that the exhibits to the complaint show, as a matter of law, that no agreement and no joint venture were reached. *See, e.g. Art & Fashion*, 120 A.D.3d at 438 ("There is no merit to defendants' assertion that the emails show, as a matter of law, that no joint venture agreement was reached and that the parties were merely engaging in preliminary negotiations."); *Highland Capital Mgmt.*, 698 F.3d at 210 ("Here, the emails between Highland and Bank of America do not clearly negate an intent to be bound when viewed in light of Highland's well-pleaded facts.").

[17] *See, e.g., Art & Fashion*, 120 A.D.3d at 438 (affirming denial of motion to dismiss as to breach of joint venture agreement where "[e]ven where the parties acknowledge that they intend to hammer out details of an agreement subsequently, a preliminary agreement may be binding" (quoting *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288, 298 (N.Y. App. Div. 2003)); *Specialized Transp. of Tampa Bay, Inc. v. Nestle Waters N. Am., Inc*., 356 F. App'x 221, 230 (11th Cir. 2009) ("[T]he parties intended that the oral Reimbursement Agreement be binding immediately, and that it last until a long-term written contract—the Services Agreement—was executed."); *Conopco, Inc. v. Wathne Ltd.,* 190 A.D.2d 587, 588 (N.Y. App. Div. 1993) ("The Letter Agreement contains all of the essential terms of the contract, and the fact that the parties intended to negotiate a 'fuller agreement' does not negate its legal effect.").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

certain conditions (e.g., complete two year period of employment) he would receive 50% of the company's stock and the parties would enter into a shareholder agreement.  Plaintiff met the conditions, but the parties could not agree on the terms of the shareholders agreement or the value of the company.  *Id.* at 98-99.  The plaintiff sued to enforce the LOI.  *Id.* at 99.  In response to the same argument Virgin makes, the Court held that the need to finalize formal documentation did not invalidate the contract.  *Id.*  The Court explained that "[n]othing in either the letter of intent or the parties' conduct supports the conclusion that the right of plaintiff to become a shareholder was contingent upon entering into the shareholder and employment agreements. The fact that some matters were left open in the letter of intent does not defeat it as an otherwise binding contract."  *Id.* at 101.  The same is true here.  Mr. Veitch's right to receive 90% of the C shares was not contingent upon execution of any formal documentation.

In *Four Seasons Hotels v. Vinnick,* 127 A.D.2d 310, 317 (N.Y. App. Div. 1987), the Court explained that if "the parties have completed their negotiations of what they regard as essential elements, and performance has begun on the good faith understanding that agreement on the unsettled matters will follow, the court will find and enforce a contract even though the parties have expressly left these other elements for future negotiation and agreement . . . ."  In affirming the denial of the motion to dismiss, the Court held that "to be enforceable as a contract, the letter need contain only the terms deemed material by the parties to their bargain."  *Id*. at 323.

In *WrestleReunion, LLC v. Live Nation Television Holdings, Inc.*, No. 8:07–cv–2093–JDW–MAP, 2009 WL 2473686, at \*4 (M.D. Fla. Aug. 11, 2009), the parties executed a "proposal" that was "intended to outline principal terms" and that noted a "long form agreement to be negotiated in good faith would follow thereafter."  *Id.* at \*1.  The defendant sought summary judgment, arguing the Outline of Terms was an unenforceable "agreement to agree" because it was subject to finalization, but the court denied the motion, noting that there was no express reservation of rights not to be bound by the Outline of Terms and parties had partially performed under the contract.  *Id.* at \*4.[18]

---

[18] Finally, in *Fincher v. Belk-Sawyer Company,* 127 So. 2d 130 (Fla. 3d DCA 1961), the parties agreed that the plaintiff would supervise and direct defendant's fashion departments, shopping services and beauty salon, but left "to the future agreement of the parties the establishment by the defendant of a beauty consulting service, shopping service and the amount of additional compensation based upon the gross sales of the defendant's fashion department, beauty consulting service and shopping service."  *Id.* at 132.  The court held that these issues left for future agreement did not render the remaining promises unenforceable.  The court explained: "in 1 Corbin, Contracts, § 29, that authority points out that 'two persons may fully agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

In sum, the Amended Complaint pleads (1) the acceptance of Mr. Veitch's proposed deal by Mr. Saverimuttu (acting as agent for VGHL, VGIL, and VES) using concrete language, (2) the acceptance without any reservation not to be bound until final documentation, (3) partial performance of the agreement over the course of the next year, and (4) there is no evidence the parties planned to continue negotiating between themselves the essential terms concerning the royalty rate or the split of the Promote.[19]

### 5.  Mr. Axelrod's Letters Assert Virgin's Breach

Virgin attaches to its Motion a letter from Plaintiffs' counsel and quotes language regarding the termination of "discussions . . . regarding the long-term cruise line partnership" to argue that no enforceable agreement was ever formed.  (Defs.' Mot. at 12-13.)

Virgin's reliance on this is improper.  *See  Flamenbaum v. Orient Lines, Inc.*, No. 03-22549-CIV, 2004 WL 1773207, at *4 (S.D. Fla. July 20, 2004) (declining to consider letter from attorney preceding the lawsuit attached to response to a  motion to dismiss because it was not central to any of plaintiffs' claims).  Regarding centrality, courts have found attached documents to be "central" where they are "at the very heart of the plaintiffs claim." *Botero v. S. Fla. Pain & Rehab Ctr. Corp.*, No. 12-20924-CIV, 2012 WL 3614329, at *2-3 (S.D. Fla. Aug. 21, 2012) (finding that documents were not central to claims where plaintiffs placed no dependence on the documents in submitting their claims to the court).  Here, the June 8, 2012 letter is not central because it does not lie at the very heart of Plaintiffs' claims nor do Plaintiffs depend on the existence of the letter in submitting their claims.

Consideration of the letter is also improper because Virgin cherry-picks a quote taken out-of-context in a chain of correspondence not attached to the Motion.[20]  Indeed, by letter dated

---

expectation does not prevent the agreement already made from being an enforceable contract. This may be true even though they expressly provide in their agreement that the new matters, when agreed upon, shall be incorporated into a written lease or other formal document along with the contract already made.' *See* 1 Williston, Contracts, 3d ed., § 48." *Id.*

[19] Virgin's cases are inapplicable.  (Defs.' Mot. at 10.)  *See, e.g., Univ. Creek Assocs., II, Ltd. v. Boston Am. Fin. Grp., Inc.*, 100 F. Supp. 2d 1337, 1340 (S.D. Fla. 1998) (finding that a "loan commitment letter" was not an enforceable contract because it omitted essential terms such as amount of interest, terms of repayment, and funding); *Lieberman v. Good Stuff Corp.*, No. 94-cv-5061, 1995 WL 600864, at *3 (S.D.N.Y. Oct. 11, 1995) (holding that "equity letter" was an unenforceable contract where it "left all material terms open" and stated it was only an "expression of intent" and "shall not create rights and obligations on the parties").

[20]  In determining whether an agreement is enforceable, "disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain."  *PMJ Capital Corp. v. PAF Capital, LLC*, 949 N.Y.S.2d 385 (App. Div. 2012).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

September 21, 2012, "to set the record straight" counsel for Plaintiffs emphasized that "[i]t was demonstrably not the case that our client 'unilaterally terminated discussions' with the Virgin Group." *See* Ex. A. Instead, "shortly before commencing to seek equity funding" Virgin presented to Plaintiffs "a set of new financial and other terms" that were "radically and fundamentally different terms relative to the prior written record and discussions." (*Id.*) It was the termination of discussions regarding the acceptability of these new terms unilaterally proposed by Virgin that the June 8, 2012 letter referenced. *See Art & Fashion*, 120 A.D.3d at 439 (finding that an e-mail from a partner stating, "not to proceed anymore with 359P" does not establish that no joint venture agreement had been reached and can just as easily be read as indicating the partner's decision to terminate an already-established joint venture). Therefore, Virgin's attempt to introduce the June 8, 2012 letter – a factual dispute – is improper for consideration at this early stage.

### C. PLAINTIFFS PROPERLY ALLEGE PARTNERSHIP AND JOINT VENTURE CLAIMS.

Virgin also seeks dismissal of Plaintiffs Partnership and Joint Venture Counts (VII & VIII). (Defs.' Mot. at 13-15.) Once again, Virgin is wrong on the facts and the law.

#### 1. Plaintiffs Properly Allege a Right to Share Profits

Virgin does not dispute that the parties agreed how they would share profits[21] but instead argues that the agreement to share profits was not finalized. (Defs.' Mot. at 13-14.) As with the Veitch-Virgin Agreement, contemplation of further documentation does not invalidate the partnership and joint venture claims.

This same argument was made by the defendants in *Richbell Information Services, Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 297-98 (N.Y. App. Div. 2003). The court affirmed denial of the motion to dismiss because the plaintiff pled that "notwithstanding the intent to hammer out details subsequently, the parties agreed to the joint venture itself, with the essential understanding of what each party's contribution and potential exposure would be." *Id.* at 298. The court in *Art & Fashion*, also affirmed the denial of a motion to dismiss where, "[a]lthough

---

[21] In determining whether the sharing of profits and losses was properly pled, courts must draw all reasonable inferences in favor of the plaintiff. *See, e.g., De Ribeaux v. Del Valle*, 531 So. 2d 992 (Fla. 3d DCA 1988) (reversing dismissal of oral joint venture claim where party properly plead a joint venture agreement, including, the allegation that the parties agreed to share profits equally); *Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06-CV-3893, 2007 WL 1434990, at *1 (E.D.N.Y. May 14, 2007) (denying motion to dismiss an oral joint venture claim where parties were to share profits from the endeavor based on agreed pricing charged to consumers, in relation to their costs, and stood to lose their individual contributions to the venture).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

some parts of the emails suggest that all of the details of the joint venture were not fully agreed upon, the emails, when read in their entirety, do not conclusively refute plaintiffs' allegations that an oral joint venture agreement had in fact been reached." 120 A.D.3d at 438.

The most similar case is *Foster v. Kovner*, 840 N.Y.S.2d 328 (App. Div. 2007). In *Foster*, the plaintiff alleged breach of an oral joint venture or partnership agreement to raise $1 billion for defendant Caxtong Health Holdings ("CHH"). *Id.* at 332. Part of the agreement to enter into the joint venture included plaintiff's promise to "assume major responsibilities critical to the development and eventual success of CHH, in addition to managing the day-to-day operations of CHH" and that plaintiff perform those duties over the course of the next year. *Id.* at 331. Plaintiff alleged that defendants breached a joint venture or partnership agreement reflected in a letter dated March 11, 2004 by "refusing . . . his equity interest in the joint venture and ceasing payment of the promised $1,000,000 per year." *Id.* at 330. Defendants sought dismissal, arguing that the "March 18, 2004 letter confirms the parties never agreed on the material terms and 'numerous substantive issues' remained unresolved, including 'the level of ownership to be acquired' and 'the full details of Foster's compensation.'" *Id.* The court correctly held that "[a]n agreement may exist even where parties acknowledge that they intend to subsequently finalize the details of the agreement." *Id.* at 332.[22] The same applies here.

Here, Mr. Veitch and Virgin had come to an agreement as to the sharing of the profits of the venture, and the sharing of control over the venture. The mere fact that it was possible the investors might ask Mr. Veitch and Virgin to amend their agreement had no effect on the binding nature of the agreement and cannot serve as a basis to dismiss Counts VII and VIII.

### 2.  **Plaintiffs Have Properly Alleged Joint Control**

Virgin next argues that Plaintiffs have not pleaded joint control. (Defs.' Mot. at 14.) Yet, all that is required is a general allegation of the parties' joint control, a threshold which the Amended Complaint easily exceeds. *See, e.g., Artco, Inc. v. Kidde, Inc.*, No. 88 CIV. 5734 (MJL), 1989 WL 140284, at *4 (S.D.N.Y. Nov. 15, 1989) (finding that party sufficiently alleged joint-control where the complaint stated that "[Plaintiff] and [Defendant] agreed to jointly control and manage the joint venture, with each concentrating its efforts in the areas of its

---

[22] The *Foster* court also refused to dismiss the unjust enrichment claim as an "alternative basis for relief in the event it is determined that there was no oral agreement." 840 N.Y.S.2d at 333 (citing *Zuccarini v. Ziff-Davis Media, Inc.*, 762 N.Y.S.2d 621, 622 (App. Div. 2003) (holding that if "there is a bona fide dispute as to the existence of a contract . . . a plaintiff may proceed upon a theory of quasi contract as well as contract")).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

greatest professional expertise."); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) ("Under traditional agency law, joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venture an agent of the others.").[23]

Plaintiffs easily meet that standard by alleging that, "[a]s to control of the venture, Mr. Veitch and Virgin agreed to share control in the development of the project" and to "establish a formal general partner that would be owned and controlled jointly by Mr. Veitch and Virgin." (A.C. at ¶ 115.)  Furthermore, this joint control was reflected in Virgin's own documents, which expressly state that: "[t]he Virgin Group and Colin Veitch (the Principal) **shall own and control** the General Partner." (*Id.*) (emphasis added).  Plaintiffs allege that "Mr. Veitch and Virgin proceeded . . . to share control over the development of the project as partners or co-venturers." (*Id.*)  Exhibits to the Amended Complaint also evidence the joint control.  For example, on May 12, 2012, the Parties executed a Letter of Intent (LOI) with the German shipyard Meyer Werft for the construction of the Ultra Ships.  (*Id.* at Ex. D.)  The document was executed by Mr. Veitch, on behalf of VSM, and Mr. Ian Cuming, on behalf of VGIL.  The Parties' joint execution of the LOI demonstrates their joint control over the venture.  The Letter of Interest from KfW IPEX Bank is likewise addressed to both Mr. Veitch and the Virgin Group. (A.C. at Ex. E.)  And when Virgin sought to enlist its own investment banker, it noted that on the fee agreement Virgin "included both VGIL and VSM on the document as partners."  (*Id.* at ¶ 120.)

The management presentations also reveal joint control.  They are both entitled, "Virgin Cruises Cruising for the 21st Century - Opportunity to Make 'Ultra' Returns."  (A.C. at Exs. F, G.)  The January 2012 presentation devotes pages 13 through 28 to the role of Virgin, the Virgin Group Structure, and the "incubation process for Virgin Cruises."  Page 54 discusses the "transfer-in of resources from Virgin, particularly in marketing & sales, design, entertainment, business planning, and administrative services," and also "Senior Virgin design resources on team - ex Virgin Atlantic Director of Product and Services."  The February 2012 presentation moves up the Virgin pages to 1 to 6, with page 6 emphasizing Virgin's "incubation process" using "Virgin Group resources."  All of these facts demonstrate shared control over the venture.

---

[23] Virgin's cases are inapplicable. (Defs.' Mot. at 14-15.)  First, these cases **do not require** a specific allegation of authority to bind your partner or co-venturer.  Second, in these cases the alleging parties made no allegation of joint control whatsoever.  *See, e.g., Bridgewater v. Carnival Corp.*, No. 10-22241-CIV, 2011 WL 976467, at *2 (S.D. Fla. Mar. 2, 2011); *Ely v. Shuman*, 233 So. 2d 169, 170 (Fla. 3d DCA 1970) shares the identical flaw.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

### D. PLAINTIFFS PROPERLY ALLEGE BREACH OF THE DUTY OF GOOD FAITH

Virgin argues that if they are correct that the Veitch-Virgin Agreement was unenforceable, then no claim for the breach of duty of good faith can stand. (Defs.' Mot. at 10-15.) Virgin misunderstands this claim. Plaintiffs' breach of the duty of good faith claim is pled in the alternative to Count V for breach of the Veitch-Virgin Agreement. Plaintiffs plead that the Veitch-Virgin Agreement contains all essential terms and is fully enforceable as is. However, even assuming, *arguendo*, that the Veitch-Virgin Agreement left any essential terms open to future negotiations (which it did not), Plaintiffs nevertheless plead that,the Veitch-Virgin Agreement gives rise to a duty to negotiate in good faith.

In *Teachers Insurance and Annuity Association of America v. Tribune Company*, the Southern District of New York recognized the importance that "courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation." 670 F. Supp. 491, 497-98 (S.D.N.Y. 1987). Otherwise, "parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms." *Id.* at 499. Parties who enter into such agreements "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement . . ." *Id.* at 498. The obligation to negotiate in good faith "precludes the imposition of conditions not found in the preliminary agreement." *See Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005). This obligation bars a party from "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Tribune Co.*, 670 F. Supp. at 498.

Courts find bad faith when a party attempts to alter the terms on which the parties have already reached agreement. *See Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*, 791 F. Supp. 401, 415 (S.D.N.Y. 1991) ("[The defendant] acted in bad faith in refusing to proceed under the Commitment Agreement's original terms.").[24] Of course, "whether particular conduct violates . . . the duty of good faith and fair dealing . . . is ordinarily a question of fact to be determined by the jury or other finder of fact." 23 Willison on Contracts §63:22 (4th ed.

---

[24] *See, e.g., EQT Infrastructure Ltd. v. Smith,* 861 F. Supp. 2d 220, 231 (S.D.N.Y. 2012) (denying motion to dismiss good faith claim and holding "the imposition of a new condition could violate the obligation to negotiate in good faith"); *L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430-31 (2d Cir. 2011) ("[The plaintiff] stated a claim for breach of contract for failure to negotiate in good faith."); *Tribune Co.,* 670 F. Supp. at 498 (finding that good faith obligation to negotiate "bar[s] a party from . . . insisting on conditions that do not conform to the preliminary agreement").

2006); *Credit Suisse First Boston v. Utrecht-Am. Fin. Co.,* 915 N.Y.S.2d 531, 533-34 (2011). Virgin's Motion should, therefore, be denied.

### E. THE UNJUST ENRICHMENT AND UNFAIR COMPETITION COUNTS ARE NOT PREEMPTED

Virgin argues that the Florida Uniform Trade Secrets Act ("FUTSA") preempts Plaintiffs' unjust enrichment claim. (Defs.' Mot. at 18-19.) This argument is also misguided.

FUTSA specifically provides that its preemptive power does not affect "[o]ther civil remedies that are not based upon misappropriation of a trade secret." Fla. Stat. § 688.008(2)(b). Here, Plaintiffs plead the unjust enrichment claim not only as an alternative to the misappropriation claim, but also as an alternative to their breach of contract, joint venture, and partnership claims. (A.C. at ¶ 238) ("This claim for unjust enrichment is asserted in the alternative to the breach of contract claim asserted against Defendants."). As the *Foster* court noted in refusing to dismiss the unjust enrichment claim in that case, it is an "alternative basis for relief in the event it is determined that there [is] no oral agreement." 840 N.Y.S.2d at 333.[25]

In addition, Plaintiffs also plead facts other than misappropriation to support their unjust enrichment claim. For example, Plaintiffs plead that because "Mr. Veitch contributed the key ideas and plans, his own labor, leveraged his relationships throughout the industry to have work done on spec, and even contributed his own money, Virgin now stands to benefit . . . ." (A.C. at ¶ 241.); *see also* (*id*. at ¶ 129) ("Mr. Veitch spent hundreds of thousands of dollars of his own money and, of course, devoted substantial time and expertise"); (*id*. at ¶ 175) (stating that "many thousands of man hours were spent by Mr. Veitch and his team, SMC's team, and Meyer's team"); (*id*. at ¶ 186) (Virgin reneged on the deal after "having the benefit of a year's worth of Mr. Veitch's work, and after seeing the value of that work"). The Virgin defendants benefitted from, and were unjustly enriched by, all of these contributions.

Courts have consistently rejected the application of preemption where unjust enrichment claims are not founded upon misappropriation of trade secrets. *See Chetu, Inc. v. Salihu*, No. 09-60588-CIV, 2009 WL 1916609, at *1 (S.D. Fla. July 3, 2009) (denying motion to dismiss unjust enrichment claim because plaintiff "ma[de] both contractual and quasi-contractual claims for

---

[25] S*ee also Zuccarini*, 762 N.Y.S.2d at 622 (stating that if "there is a bona fide dispute as to the existence of a contract . . . a plaintiff may proceed upon a theory of quasi contract as well as contract"); *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218, 1227 (S.D. Fla. 2013) ("[U]njust enrichment may only be pleaded in the alternative where one of the parties asserts that the contract governing the dispute is invalid.").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

[defendant's] misappropriation of all confidential material, which might prove to be a broader field of material than what FUTSA defines as 'trade secrets'"); *Melville Capital, LLC v. Tenn. Commerce Bank*, No. 3:11-cv-00888, 2011 WL 6888476, at *10-11 (M.D. Tenn. Dec. 29, 2011) (finding no preemption of unjust enrichment claim where party's claim was distinguishable from its trade secrets claim); *Lucini Italia Co. v. Grappolini*, 231 F. Supp. 2d 764, 772 (N.D. Ill. 2002) (holding that there was no preemption where the unjust enrichment claim was based on the usurpation of a business opportunity).   Given that Plaintiffs' unjust enrichment claim is distinguishable from their claim for misappropriation, dismissal on the basis of preemption is improper.

Finally, FUTSA may not apply at all to the instant action.   Rather, New York common law may apply based upon a conflicts of law analysis, because the misappropriation of Veitch's novel business idea likely did not occur in Florida, but rather in New York, where VMUSA offices are located.[26]   New York law does not follow the Uniform Trade Secrets Act and therefore does not preempt claims for unjust enrichment that are based on factual allegations of trade secret misappropriation.[27]   *See, e.g., JTH Tax, Inc. v. Gouneh*, 721 F. Supp. 2d 132, 134 (N.D.N.Y. 2010) (finding that party properly stated claim for misappropriation of trade secrets and unjust enrichment); *SRM Beauty Corp. v. Sook Yin Loh*, 926 N.Y.S.2d 347 (Sup. Ct. 2011) (denying motion to dismiss as to misappropriation of trade secrets and unjust enrichment claims); *Isra Fruit Ltd. v. Agrexco Agric. Export Co. Ltd.*, 631 F. Supp. 984, 990 (S.D.N.Y. 1986) (denying motion to dismiss claims for breach of joint venture, unjust enrichment and misappropriation of trade secrets).

Virgin also argues Plaintiffs "cannot allege that any benefit has been conferred on the Virgin Defendants" (Defs.' Mot. at 19.)   Virgin is wrong.   In addition to presenting Virgin with the Ultra Ships Plan, Plaintiffs also devoted thousands of man hours, and hundreds of thousands

---

[26] (*See* A.C. at ¶ 3); (*see also generally* A.C. at ¶¶ 186-208, 241-242.); *see also Grupo Televisa, S.A. v. Telemundo Commc'n Grp., Inc.*, 485 F.3d 1233, 1241 (11th Cir. 2007) (noting that choice of law analysis, "**the principal location of the defendant's conduct' is the single most important contact** in cases involving misappropriation of trade values") (quoting Restatement (Second) of Conflict of Laws § 145 cmt. f (1971)) (emphasis added); *Sarkissian Mason, Inc. v. Enter. Holdings, Inc.*, 955 F. Supp. 2d 247, 254 (S.D.N.Y. 2013) (recognizing, in the context of conflict of laws, that "[i]n trade secrets cases, the Second Circuit and its district courts have often used **the locus of the misappropriation** to determine the locus of the tort and the state with the greatest interest.") (emphasis added).

[27] *See Innovative BioDefense, Inc. v. VSP Tech., Inc.*, No. 12 Civ. 3710, 2013 WL 3389008, at *3 (S.D.N.Y. July 3, 2013) (noting that New York does not preempt claims for unjust enrichment that are based entirely on the same factual allegations that form the basis of a party's trade secrets claim).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

of dollars, which conferred benefits on the Virgin Defendants.  (*See* A.C. at ¶¶ 129, 175, 186, 245.)

For the same reasons identified above, Plaintiffs' claim of unfair competition is not preempted by FUTSA.  In fact, New York courts have specifically recognized that "the doctrine of unfair competition has been applied to various situations, like this, where a plaintiff alleges a misappropriation of information that does not rise to the level of misappropriation of trade secrets."  *See LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 501 (S.D.N.Y. 2002).[28] Additionally, like unjust enrichment, Plaintiffs' allegations supporting its unfair competition claim are entirely distinguishable from the claim for misappropriation.  Plaintiffs allege a pattern and practice of Virgin to lure in potential partners and cast them aside when the business opportunity becomes ripe.[29]  This immoral and illegal practice exercised upon Plaintiffs is separate and distinct from the misappropriation claim.  Accordingly, the unfair competition claim is not preempted by FUTSA.  *See Greif, Inc. v. MacDonald*, No. 3:06CV-312-H, 2007 WL 679040, at *2 (W.D. Ky. Mar. 1, 2007) (finding that unfair competition claims were not preempted by the Kentucky Uniform Trade Secrets Act where the count was distinguishable from misappropriation of a trade secret).

Additionally, Plaintiffs properly pleaded a claim for unfair competition as a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  For example, in a factually analogous case, *CareerFairs.com v. United Bus. Media LLC*, , the court recognized that the stated purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  838 F. Supp. 2d 1316, 1326 (S.D. Fla. 2011) (internal citation omitted).  Consumer confusion is not a required element of a FDUTPA claim and therefore the case cited by Virgin, *N. Atl. Marine Ltd. v. Sealine Int'l, Ltd*, No. 06-cv-20200, 2007 WL 5298433 (S.D. Fla. Mar. 29, 2007), is

---

[28] *See Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 303 (S.D.N.Y. 2010) (permitting unfair competition claim to proceed because "New York law permits recovery on a claim of unfair competition where a defendant has misappropriated the product of a plaintiff's investment of labor, skill, and expenditures with respect to a business plan . . . even absent a showing of 'novelty.'").

[29] *See* (A.C. at ¶ 251.) ("Virgin has a long history of deceiving businessmen. As detailed in the Tom Bower book, Branson: Behind the Mask, the practice is for Virgin to engage a businessman with a novel idea, to induce the businessman to do the preparatory work, and then use aggressive negotiating tactics to force the businessman into accepting a minority stake and small financial rewards"); (*id.* at ¶ 252.) ("According to Bower, this was done at the launch of Virgin Atlantic in 1985 and happened with Virgin Mobile as well.").

18

inapplicable.   Plaintiffs have properly pled a violation of FDUTPA by alleging, among other things, that Virgin agreed to partner with Plaintiffs, thereby creating fiduciary duties between the Parties, and then subsequently "induced Mr. Veitch to develop the Venture to the point of being investor ready," "[i]nstead of taking the deal to the investors as agreed . . . proposed dramatically different terms," "act[ed] with commercial immorality," "exploited the skill, expenditures and labors of Mr. Veitch before setting itself up as a competitor," and "misappropriated Mr. Veitch's Ultra Ships Plan, and the additional Confidential Information . . . in order to obtain a commercial advantage." (A.C. at ¶¶ 256-59.) Therefore, Counts IV and V of Virgin's Motion must be denied.

**F.  PLAINTIFFS PROPERLY SEEK INJUNCTIVE RELIEF.**

Virgin argues Mr. Veitch is not entitled to injunctive relief because the NDA between Mr. Veitch and Virgin expired "by its express terms at least 14 months ago, on March 11, 2014." (Defs.' Mot. at 8.)   Section 688.003, Florida Statutes, authorizes the court to enter an order enjoining misappropriation.   Recognizing that trade secrets may cease to exist, the statute provides that "an injunction shall be terminated when the trade secret has ceased to exist, **but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation**."  (emphasis added).  This is an express recognition of the Court's equitable powers to extend injunctions under appropriate circumstances. *See, e.g., MicroStrategy Inc. v. Bus. Objects, S.A.,* 331 F. Supp. 2d 396, 431 (E.D. Va. 2004) ("The court is well-aware that the documents described may no longer constitute trade secrets . . . However, the statute also permits the court to extend the injunction for a reasonable period despite this fact.").

The Florida Supreme Court affirmed the equitable extension of a non-compete agreement in *Capelouto v. Orkin Exterminating Company of Florida, Inc.* when it found that an employee had been in competition with his former employer continuously since his resignation two years prior.  183 So. 2d 532, 534 (Fla. 1966).  There, the trial court entered an injunction against the employee that began to run from the time of the final decree.  *Id*. at 533.  On appeal before the Florida Supreme Court, the employee argued it was an abuse of discretion to enjoin him from competing for a period of two years starting from the time of the entry of the final decree, rather than two years from the date he terminated his employment.  *Id*. at 534.  The Court, found, however, that the trial court must have found that the "employer was entitled to a period of two years during which the [employee] would not be in competition with it" and since the employee

had been in competition with the employer since his resignation, extending the duration of the agreement was "the only way to give the [employer] its two competition-free years", even though the time period extended beyond that contemplated by the agreement. *Id*.[30]

Similarly here, Plaintiffs are entitled to a period of three years during which Virgin may not use the confidential information "received or acquired from, or on behalf of, the [d]isclosing [p]arty, in the course of evaluating the [p]otential [t]ransaction." (A.C. at Ex. B.) Virgin's contention that Mr. Veitch is somehow not entitled to the nondisclosure of the confidential information because the NDA expired in March 2014 is unavailing. Virgin simply ignores the fact that Mr. Veitch is still entitled to the benefit of the bargain; namely, three years during which Virgin would not disclose confidential information. Here, extending the duration of the NDA is the only way Mr. Veitch will receive the competition-free period that was originally intended by the NDA.

## III.   <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs respectfully request that this Court deny Virgin's Motion to Dismiss.

Dated: June 18, 2015.

Respectfully Submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Attorneys for Plaintiffs*
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone:  (305) 374-7580
Facsimile:  (305) 374-7593

By:   */s/ Jeffrey Gutchess*
       Jeffrey W. Gutchess (FBN 702641)

---

[30] *See United Subcontractors, Inc. v. Godwin,* No. 11-81329-CIV, 2012 WL 1593173, at *10 (S.D. Fla. Feb. 3, 2012) ("In Florida, tolling of the non-competition agreement . . . so that the former employer receives the competition-free period that was intended in the bargain is allowed."); *see also Overholt Crop Ins. Serv. Co. v. Travis,* 941 F.2d 1361, 1371 (8th Cir. 1991) (extending the term of the covenant, in part, based on the defendant's breach of the covenant not to compete); *Premier Indus. Corp. v. Tex. Indus. Fastener Co.*, 450 F.2d 444, 448 (5th Cir. 1971) (holding that grant of injunction beyond time provided for in employment agreement was proper in light of the fact the employee worked for competitor during portion of the agreed-upon term).

20

jgutchess@bilzin.com
David Massey (FBN 86129)
dmassey@bilzin.com
Daniel Tropin (FBN 100424)
dtropin@bilzin.com
Brandon Rose (FBN 99984)
brose@bilzin.com
margote@bilzin.com
eservice@bilzin.com

21

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 18th day of June, 2015, a true and correct copy of the above and foregoing was sent via email to counsel for Defendants below:

| | |
|---|---|
| Janet T. Munn<br>**Rasco Klock Perez & Nieto, PL**<br>2555 Ponce de Leon, Suite 600<br>Coral Gables, FL 33134<br>Telephone: (305) 476-7101<br>Telecopy: (305) 476-7102<br>jmunn@rascoklock.com | Claude M. Stern<br>Evette D. Pennypacker<br>**Quinn Emanuel Urquhart & Sullivan LLP**<br>555 Twin Dolphin Drive, Suite 500<br>Redwood Shores, CA 94065<br>Telephone: (650) 801-5000<br>Telecopy: (650) 801-5100<br>claudestern@quinnemanuel.com<br>evettepennypacker@quinnemanuel.com |
| Marc Greenwald<br>**Quinn Emanuel Urquhart & Sullivan LLP**<br>50 Madison Avenue, 22d Floor<br>New York, New York 10010<br>Telephone: 212.849.7000<br>Telecopy: 212.849.7100<br>marcgreenwald@quinnemannuel.com | Dale Cendali<br>Phillip Hill<br>Johanna Schmitt<br>**Kirkland & Ellis, LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: 212-446-4846<br>Telecopy: 212-446-4900<br>johanna.schmitt@kirkland.com<br>phil.hill@kirkland.com<br>dale.cendali@kirkland.com |
| Daniel Bond<br>**Kirkland & Ellis, LLP**<br>300 North LaSalle<br>Chicago, IL 60654<br>Telephone: 312-862-7026<br>Telecopy: 312-862-2200<br>daniel.bond@kirkland.com | |

*/s/ Jeffrey Gutchess*
Jeffrey Gutchess

BILZIN SUMBERG BAENA PRICE & AXELROD LLP

1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456