IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.: 15-cv-20989-KMM

COLIN VEITCH,
VSM DEVELOPMENT, INC.,

     Plaintiffs,

vs.

VIRGIN MANAGEMENT USA, INC.,
VIRGIN GROUP INVESTMENTS LTD.,
VIRGIN GROUP HOLDINGS LIMITED,
VIRGIN ENTERPRISES LIMITED,
VIRGIN CRUISES INTERMEDIATE
LIMITED, and VIRGIN CRUISES
LIMITED,

     Defendants.
_____/

## ORDER ON MOTION TO DISMISS

THIS CAUSE came before the Court upon Defendants Virgin Management USA, Inc. ("VMUSA"), Virgin Group Investments Ltd. ("VGIL"), Virgin Group Holdings Limited ("VGHL"), and Virgin Enterprises Limited ("VEL")'s (collectively, the "Virgin Defendants") Motion to Dismiss (ECF No. 52).  Plaintiffs filed a Response (ECF No. 64) and Defendants filed a Reply (ECF No. 72).  The Motion is now ripe for review.  UPON CONSIDERATION of the Motion, the Response, the Reply, the pertinent portions of the record, and being otherwise fully advised in the premises, for the reasons set forth below, the Court now enters the following Order.

    **I.**    **BACKGROUND**

This is an action brought by Plaintiffs Colin Veitch and VSM Development, Inc. (collectively, "Veitch" or "Plaintiffs") alleging misappropriation of a business idea, business

plan, and business developed by Plaintiffs and presented to the Virgin Group pursuant to non-disclosure, non-use, and other agreements.[1]  Am. Compl. at 1.  The following facts are taken from Plaintiffs' Amended Complaint.

Plaintiffs allege that in 2010, Veitch, a former cruise industry CEO, came up with an idea for a fleet of "Ultra Ships."  Id.  Veitch's plan would enable a new entrant to break through the barriers to entry in the cruise industry.  Id. ¶ 12.  Veitch first enlisted the support of a prominent investment bank, Allen & Company.  Id. ¶¶ 43–46.  When Allen & Company supported the plan and expressed confidence in their ability to raise the equity required for the venture, Veitch then set out to enlist a brand partner.  Id. ¶ 47.  He found his potential partner in the Virgin Group, which had sought to enter the cruise market for more than a decade without success.  Id. ¶ 12.

Veitch had two primary contacts who worked out of the VMUSA office in New York: Anthony Marino and Nirmal Saverimuttu.[2]  Id. ¶ 63.  Plaintiffs state that Marino is a "Managing Partner" of Virgin Group, spending time "leading its investment program and product innovation teams in North America."  Id. ¶ 64.  Plaintiffs state that Saverimuttu is a "Principal at Virgin Group," with "responsibility for Virgin Group's North American investments in the aviation and leisure/hospitality segments."  Id. ¶ 65.  In December 2010 and February 2011, Veitch met with Marino, and informed Marino that he had developed a business plan for a new entrant in the

---

[1] Plaintiffs refer to "Virgin" or the "Virgin Group" as "a leading international investment group" with "a portfolio run by professional investment managers."  Am. Compl. ¶¶ 48, 50.  Plaintiffs maintain that the "Virgin Group" "consists of about 400 operations, a tangled web of enterprises owned via a complicated series of offshore trusts and overseas holding companies."  Id. ¶ 52.  Accordingly, Plaintiffs generally refer to the "Virgin Group" or "Virgin" throughout their Amended Complaint and Response when referring to all Defendants.
[2] "[VMUSA] is held out to the public as an agent for Virgin Group for purposes of developing the Virgin Group's brand and managing the Virgin Group's investments."  Id. ¶ 58.  "VMUSA's LinkedIn page states: '[VMUSA] is the North American headquarters of Sir Richard Branson's Virgin Group. Its role is to develop the Virgin brand in North America and to manage Virgin's investments in its portfolio companies.'"  Id. ¶ 59.

cruise industry.  Id. ¶¶ 68, 70.  Virgin agreed to evaluate Veitch's plan pursuant to the terms of a Non-Disclosure Agreement (the "NDA").  Id. ¶¶ 70–79.

In March 2011, Veitch met with Marino and Saverimuttu in Virgin's offices in New York City for purposes of signing the NDA.  Id. ¶ 73.  On March 11, 2011, Veitch and Thayer Thompson, on behalf of VMUSA, signed the NDA.  Id. at Ex. B (ECF No. 26-2).  Plaintiffs state that Veitch believed and intended that he was contracting with the Virgin Group through VMUSA, that VMUSA was acting as the authorized agent for the Virgin Group, and that its contracts and agreements were binding on the Virgin Group.  Id. ¶ 74.

After the NDA was executed, Veitch presented his Ultra Ships Business Plan to Virgin in April 2011 in New York City.  Id. ¶¶ 79, 80.  Virgin expressed a strong interest in Veitch's project.  Id. ¶ 79.  A week later, Veitch met with Marino and Peter Norris, the Chairman of VGHL, in Miami.  Id. ¶¶ 82, 83.  Marino and Saverimuttu subsequently confirmed to Veitch that nothing was done without the approval of Norris, the Virgin Group's "non-executive chairman."  Id. ¶ 85.

In May 2011, in New York and later over the phone and email, the Parties negotiated the financial structure of the deal between them.[3]  Veitch held these negotiations with Marino and Saverimuttu, and Plaintiffs allege that "both made it clear that they were acting not on behalf of [VMUSA], but rather on behalf of the Virgin Group generally and specifically the arms of the Virgin Group that dealt with licensing and investments (i.e., [VGHL], [VGIL], and [VEL])."  Id. ¶ 88.  On May 20, 2011, Virgin responded via email to Plaintiffs proposed terms: "We have reviewed your document of yesterday, and in the interests of moving our discussion to a conclusion, we can largely accept the proposal with some changes."  Id. ¶ 106.  After this point,

---

[3] Plaintiffs refer to the emails which together form the agreement as the "Veitch-Virgin Agreement."  Id. ¶ 86, Ex. C (ECF No. 26-3).

3

Plaintiffs understood that: 1) that there was a deal between Veitch and Virgin, and 2) that the deal that had been concluded at that point might need to be revisited at a later date if the third party investors requested any changes. Id. ¶ 108.

In the Veitch-Virgin Agreement, Virgin sought a guaranteed return in the form of a licensing fee for its brand that would be paid regardless of the performance of the ships, and a higher return if the ships were successful as planned. Id. ¶ 91. In exchange for this guaranteed licensing fee, Virgin agreed to accept 10% of the "Carried Interest" or "Promote."[4] Id. In the event the venture performed as planned, Virgin expected a return between $427 and $483 million to Virgin over a ten-year period. Id. Veitch, in exchange for his ideas, plan, and leadership in developing the business to the point where it was investor ready, would receive a 90% share of the available Promote. Id. By Virgin's calculation, Veitch would receive $315 million if he delivered the performance he was proposing. Id. at 2–3. These returns and projected amounts were predicated on just an initial two-ship fleet, whereas Allen & Company, the investment bank charged with raising the equity financing, consistently told the parties that the returns would end up being much larger as the venture naturally added ships in response to a successful launch of the first two. Id. at 3.

Veitch spent the next year assembling a team of industry experts to design the ships, signed a letter of intent with a German shipyard to build the ships, obtained a letter of intent with

---

[4] "A 'Carried Interest', also known as a 'Promote' . . . is a standard feature of private equity type investments . . . . Essentially, the investors providing the cash funding demand a base return on their money – for example 8% per annum - and once that base return has been achieved they share any returns above that with the active manager(s) of the investment. In this case, the active manager(s) would be Mr. Veitch and Virgin. Typically, the returns above the required base return would be split 80% to the cash investors and 20% to the active manager(s). If the investment were to do poorly, the active manager(s) may receive nothing at all. If the investment were to do very well, the active manager(s) would receive 20% of all profits above the required base level; potentially very substantial rewards." Am. Compl. at 2 n.1.

a German bank to provide debt financing for the ships,[5] presented to and secured the support of two German government ministries responsible for providing export credit guarantees to the banks providing the debt financing, and completed the management presentation and other materials necessary for the road show to enlist the equity investors. Id. ¶¶ 124–153, Ex. D (ECF No. 26-4), Ex. E (ECF No. 26-5). Veitch and Virgin prepared a video rendering of the ship and the branding, and Sir Richard Branson, Virgin's founder, recorded a video expressing his support. Id. ¶¶ 154–160, 185.

However, immediately after Veitch secured the commitments from the shipyard to build the ship and the bank to finance the ship, Virgin sought to "turn the Veitch-Virgin Agreement on its head." Id. at 3. Instead of Veitch receiving 90% of the Promote to Virgin's 10%, Virgin now insisted on a sliding scale under which the Promote up to $100 million would be divided 80% for Virgin and 20% for Veitch, up to $400 million would be divided 70% for Virgin and 30% for Veitch, and up to $600 million divided 60% for Virgin and 40% for Veitch. Id. ¶ 188. Further, Virgin's share of the Promote would be vested, but Veitch's share would be unvested and earned only if Veitch remained employed. Id. After further negotiations, Virgin's final demand was that its 10% of the Promote would be increased to 60% and that Veitch's share of the Promote be reduced from 90% to 40%, with only 10% of that vested, with the remainder to be earned over a period of five years only if Veitch served as CEO of the cruise line for that entire period. Id. ¶ 193. This proposal would have changed Veitch's role from that of the founder and fully vested owner of the business to an employee. Id. ¶ 194. In late May 2012, Mr. Saverimuttu informed Veitch that Virgin did not have any "flexibility" in the "firm view of their board." Id. ¶ 197.

---

[5] The parties to the Letter of Intent were VSM Development, Inc. and VGIL. Veitch signed in his capacity as CEO of VSM Development, and Ian Cuming, Director of VGIL, signed on behalf of VGIL. Id. ¶¶ 136, 137.

5

Plaintiff states that this should have brought the project to an end.  Id. ¶ 198.  Veitch's counsel sent Virgin a letter reminding Virgin that it had no authorization to continue with the project without Veitch.  Id. ¶ 199.  In response, Virgin stated that they would abide by the terms of the NDA.  Id. ¶ 200.

In the summer of 2012, however, Virgin subsequently proceeded without Veitch, engaging Tom McAlpin to take over leadership of the project.  Id. at 6.  Virgin proceeded to obtain the debt and equity financing to proceed with the business plan.  Id.  Virgin used Allen & Co. to raise the equity for Virgin Cruises, the bank introduced into the project by Veitch in late 2010 before he approached Virgin.  Id. ¶¶ 198, 202.  Virgin Group formed a number of new entities to establish the Virgin Cruises Business, including Defendants Virgin Cruises Intermediate Limited and Virgin Cruises Limited, the shareholders of which are private equity/sovereign wealth/family-office type investors.  Id. ¶ 204.  On December 4, 2014, Virgin formally announced the "formation of Virgin Cruises, its new cruise line business," based on the financing and construction of two new Ultra Ships.  Id. ¶¶ 201–208.

Plaintiffs subsequently filed the instant suit, alleging that Virgin's proceeding with the Virgin Cruises business is in breach of the NDA  it signed with Veitch, and is also in breach of both the Veitch-Virgin Agreement and the joint venture or partnership the parties had created to pursue the venture.  The Complaint alleges nine counts: Breach of the NDA (Count I); Permanent Injunction (Count II); Misappropriation (Count III); Unjust Enrichment (Count IV); Unfair Competition (Count V); Breach of Contract (Count VI); Breach of Partnership Agreement (Count VII); Breach of Joint Venture Agreement (Count VIII); and Breach of the Duty of Good Faith (Count IX).

On June 1, 2015, the Virgin Defendants moved to dismiss the Amended Complaint. (ECF No. 52). The Virgin Defendants maintain that: (1) the repeated improper lumping of entities as parties mandates that the entire Amended Complaint be dismissed without prejudice; (2) Count II (Permanent Injunction) should be dismissed with prejudice because Plaintiffs may not seek an injunction enforcing the terms of an expired NDA or protecting a trade secret that Plaintiffs disclosed to the public; (3) Counts IV (Unjust Enrichment) and V (Unfair Competition) should be dismissed with prejudice because they are preempted by Plaintiffs' Florida Uniform Trade Secrets Act ("FUTSA") misappropriation claim and Plaintiffs fail to allege essential elements under Florida law; (4) Counts VI (Breach of Contract), VII (Breach of Partnership Agreement), VIII (Breach of Joint Venture Agreement), and IX (Breach of Duty of Good Faith) should be dismissed with prejudice as to all Defendants because the documents incorporated by reference in the Amended Complaint contradict Plaintiffs' conclusory allegations that any enforceable agreements were ever created; and (5) Counts I (Breach of NDA), II (Permanent Injunction), VI (Breach of Contract), VII (Breach of Partnership Agreement), VIII (Breach of Joint Venture Agreement), and IX (Breach of Duty of Good Faith) should be dismissed with prejudice as to VGIL, VGHL, and VEL because the record indisputably demonstrates that those parties were never parties to any agreement with Plaintiffs.

The Court shall address each argument in turn.

## II.   STANDARD OF REVIEW

On a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. SEC v. ESM Group, Inc., 835 F.2d 270, 272 (11th Cir. 1988). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint must also contain enough facts to indicate the presence of the required elements. Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1302 (11th Cir. 2007). "A pleading that offers 'a formulaic recitation of elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III. DISCUSSION

### a. Improper Lumping of Entities as Parties

The Virgin Defendants first argue that by continuing to lump the Virgin Defendants together with 400 other entities, Plaintiffs fail to meet the basic pleading requirement of Rule 8 that they distinguish the conduct of each named defendant in the Amended Complaint. See Lane v. Capital Acquisitions and Mgmt. Co., No. 04-cv–60602, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006). The Virgin Defendants contend that Plaintiffs' agency allegations do not cure their improper lumping of the Virgin Defendants and their continued refusal to adhere to this pleading requirement mandates dismissal of the Amended Complaint with prejudice.

However, to "survive a motion to dismiss . . . a plaintiff need only 'raise[ ] a sufficient inference that some sort of agency relationship existed between' the purported principal and agent." Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 327, 344–45 (S.D.N.Y. 2010). Here, Plaintiffs have pled facts alleging that Marino, Saverimuttu, and VMUSA were acting as agents for VGHL, VGIL, and VEL in signing the NDA, negotiating the Veitch-Virgin Agreement, and developing Virgin Cruises as partners and joint venturers. For example, Plaintiffs include statements made that VMUSA was the North American headquarters of the Virgin Group, a

declaration in the offices of VMUSA setting forth the history of the Virgin Group, and the titles of Marino as "Managing Partner, Leisure, Virgin Group," and Saverimuttu as "Principal at Virgin Group" with "responsibility for Virgin Group's North American investments." See Am. Compl. ¶¶ 48, 50, 59–60, 64, 65, 85, 88, 110, 163, 166, 169, 171.

The Court finds that the allegations in Plaintiffs' Amended Complaint adequately allege that some sort of agency relationship existed between Marino, Saverimuttu, and VMUSA. This is not an instance where Plaintiffs have conclusorily and summarily lumped entities together who have no connection to the events giving rise to Plaintiffs' claims. Rather, Plaintiffs have provided specific allegations regarding each of the Virgin Defendants. The Court concludes that Plaintiffs have sufficiently distinguished the conduct of each Virgin Defendant and have not improperly lumped them together with other Virgin entities.

      **b. Counts I, II, VI, VII, VIII, and IX Should Be Dismissed as to VGIL, VGHL, and VEL Because Those Parties Were Never Parties To Any Agreement With Plaintiffs.**

Defendant maintains that even if the Court finds that Plaintiffs sufficiently distinguished the misconduct of each Defendant, Counts I (Breach of NDA), II (Permanent Injunction), VI (Breach of Contract), VII (Breach of Partnership Agreement), VIII (Breach of Joint Venture Agreement), and IX (Breach of Duty of Good Faith) must be dismissed as to VGIL, VGHL, and VEL because VMUSA is the only Virgin Defendant that is a party to the NDA. Defendants maintain that Plaintiffs cannot rely on parol evidence to avoid the unambiguous record and further, that the merger clause in the NDA precludes Plaintiffs from relying on any alleged representations from Virgin. Plaintiffs maintain that VMUSA, Marino, and Saverimuttu operated as agents for VGHL, VGIL, and VEL in negotiating and signing all of the alleged agreements.

The Court agrees with Defendants that the NDA expressly states that VMUSA is the only Virgin Defendant that is a party to that agreement: "This NONDISCLOSURE AGREEMENT . . . is made by and between [VMUSA], a Delaware corporation . . . and Colin Veitch, an individual." Am. Compl. at Ex. B (ECF No. 26-2).  While Plaintiffs state that Veitch believed and intended that he was contracting with the Virgin Group through VMUSA when he signed the NDA, the record indisputably shows otherwise.  The NDA was signed by "Thayer Thompson" acting as "authorized signatory" for "Virgin Management, USA, Inc." Id.  Further, the NDA contains a merger clause which states that the NDA "contain[ed] the entire agreement between [Veitch and VMUSA] with respect to the subject matter, and supersede[d] all prior and contemporaneous agreements with respect to the subject matter." Id. § 8.  The Court concludes that VGIL, VGHL, and VES were never parties to the NDA.

Accordingly, Count I of Plaintiffs' Amended Complaint, alleging Breach of Contract regarding the NDA, shall be dismissed as to VGIL, VGHL, and VES.  Similarly, Count II of Plaintiffs' Amended Complaint, alleging Breach of Contract for Injunction regarding the NDA, shall also be dismissed as to VGIL, VGHL, and VES.

However, the Court finds that the record is not unambiguous as to the other alleged agreements.  While Defendants assert that VMUSA is the only signatory to the email purportedly forming the basis for the alleged Veitch-Virgin, partnership, and joint venture agreements, Plaintiffs point to evidence that these agreements were negotiated by agents acting on behalf of the Virgin Group.  For instance, Plaintiffs allege that the Veitch-Virgin Agreement was negotiated by Marino and Saverimuttu "on behalf of the Virgin Group generally and specifically the arms of the Virgin Group that dealt with licensing and investments (i.e., VGHL, VGIL, and VEL)." Am. Compl. ¶ 88.  In negotiating the Veitch-Virgin Agreement, Plaintiffs allege that

Marino explained that the "issues I need to contend with" regarding a "worldwide license," that "Virgin always looks at these deals versus the opportunity cost of locking up the rights to the brand" and that "the licensor's orientation is a patient one." Id. ¶ 103, Ex. C. He signed the email, "Anthony S. Marino, Virgin Group." Id. Further, Plaintiffs allege that VMUSA's counsel advised that "VGIL is one of the topco's that we use for new initiatives. It's likely to be the shareholder of Virgin Cruises." Id. ¶ 166. He then prepared engagement letters that "included both VGIL and VSM on the document as partners." Id. ¶ 169. The engagement letter was for counsel to "Virgin Group Investments Limited and VSM Development, Inc. in a matter involving the raising of equity capital for an entity to be formed to engage in the cruise industry." Id. ¶ 171. Plaintiffs' Amended Complaint contains numerous examples of Virgin's alleged representations that adequately allege an agency relationship existed.

Therefore, Counts VI, VII, VIII, and IX shall not be dismissed as to the Virgin Defendants.

### c. Count II Fails Because the NDA is Expired and Plaintiffs Disclosed the Trade Secret[6]

Defendants assert that an injunction is a type of remedy rather than a separate cause of action, and therefore, Count II (Preliminary Injunction) should be dismissed with prejudice. Venerus v. Avis Budget Car Rental, LLC, No. 13-cv-921, 2014 WL 4092323, at *7 (M.D. Fla. Aug. 18, 2014); Trustees of the Nat. Ret. Fund v. Wildwood Corp., No. 11-cv-6287, 2013 WL 8446003, at *2 n.1 (S.D.N.Y. Dec. 17, 2013). Further, Defendants state that the NDA expired on March 11, 2014 and that Plaintiffs voluntarily disclosed their alleged trade secrets to the public on March 11, 2015, by detailing them in and attaching them as exhibits to their initial complaint.

---

[6] The Court notes that because Count II shall be dismissed as to VGIL, VGHL, and VEL, see supra p. 10, it is only validly asserted against VMUSA. Accordingly, the Court shall discuss and analyze Count II only as to VMUSA.

11

See Am. Compl.  As a result, Defendants assert that injunctive relief would be moot.  See TNS Media Research, LLC v. TRA Global, Inc., No. 11-cv-4039, 2014 WL 1370279, at *1 (S.D.N.Y. Apr. 7, 2014) (declining to award injunctive relief enforcing expired contractual confidentiality obligations).

First, the Court finds that although Defendants cite to cases where courts dismissed claims seeking injunctive relief, other courts have permitted claims for injunctive relief to go forward.  See  NPA Assocs., LLC v. Lakeside Portfolio Mgmt., LLC, No. 12-23930-CIV, 2014 WL 714812, at *1 (S.D. Fla. Feb. 22, 2014); City Line Rent A Car, Inc. v. Alfess Realty, LLC, 823 N.Y.S.2d 214, 215 (2006).  Further, in the instant case, the Parties expressly agreed that a party disclosing confidential information would be entitled to seek injunctive or other equitable relief.  The Court finds that Plaintiffs' Count II is supported by factual allegations which adequately support a claim for injunctive relief.

Second, section 688.03 of the Florida Statutes, which provides for injunctive relief, states that "[a]ctual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." Fla. Stat. § 688.003(1). While recognizing that trade secrets may cease to exist, the statute provides an express recognition of the Court's equitable powers to extend injunctions under appropriate circumstances.  Therefore, the Court concludes that the plain language of the statute allows for an injunction even when a trade secret has ceased to exist in certain circumstances. Plaintiffs have stated a claim upon which relief can be granted.

Accordingly, Plaintiffs claim for injunctive relief in Count II shall not be dismissed as to VMUSA.

### d. FUTSA Preemption of Counts IV and V and Failure to Allege Essential Elements Under Florida Law[7]

Defendants argue that (1) Count IV of Plaintiffs' Amended Complaint, alleging unjust enrichment, is barred by the FUTSA and fails to identify any present benefit conferred on the Virgin Defendants; and (2) Count V, alleging unfair competition, is also barred by the FUTSA and fails to properly plead a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). The Court shall discuss each count separately.

#### i. Count IV (Unjust Enrichment)

Defendants state that the factual predicate underlying Plaintiffs' unjust enrichment claim (Count IV) is the same as that underlying Plaintiffs' FUTSA misappropriation claim (Count III). Compare Am. Compl. ¶ 244 with id. ¶ 230. "It is well settled in Florida that unjust enrichment is an equitable remedy and is, therefore, not available where there is an adequate legal remedy." Am. Honda Motor Co. v. Motorcycle Info. Network, Inc., 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005). Defendants assert that because an adequate remedy exists at law under the FUTSA, Plaintiffs have not stated a claim upon which relief may be granted for unjust enrichment, and Count IV should be dismissed with prejudice.

---

[7] The Court notes that FUTSA and FDUTPA may not apply at all to the instant action. Rather, New York common law may apply based upon a conflicts of law analysis, because the misappropriation of Veitch's novel business idea may have occurred in New York, where VMUSA offices are located. New York law does not follow the FUTSA or the FDUTPA, and therefore, a preemption analysis may be unnecessary. At this point, however, the Court does not have enough information to determine whether New York or Florida law should apply to the agreements.

Defendants also contend that Plaintiffs cannot allege that any benefit has been conferred on the Virgin Defendants. Henry M. Butler, Inc. v. Trizec Properties, Inc., 524 So. 2d 710, 712 (Fla. Dist. Ct. App. 1988) (under Florida law, "there must be a benefit conferred before unjust enrichment exists"). Defendants maintain that Plaintiffs fail to allege that any Virgin Defendant has, to date, benefitted from a future cruise venture, other than through misappropriation of an alleged trade secret (which claim would be preempted).

Plaintiffs note that FUTSA specifically provides that its preemptive power does not affect "[o]ther civil remedies that are not based upon misappropriation of a trade secret." Fla. Stat. § 688.008(2)(b). Plaintiffs assert that they plead the unjust enrichment claim not only as an alternative to the misappropriation claim, but also as an alternative to their breach of contract, joint venture, and partnership claims in the event the Court determines there is no oral agreement. Am. Compl. ¶ 238. Further, Plaintiffs assert that their unjust enrichment claim is based on facts which extend beyond merely misappropriation of trade secrets. See id. ¶ 241 ("Mr. Veitch contributed the key ideas and plans, his own labor, leveraged his relationships throughout the industry to have work done on spec, and even contributed his own money, Virgin now stands to benefit."); id. ¶ 129 ("Mr. Veitch spent hundreds of thousands of dollars of his own money and, of course, devoted substantial time and expertise"; id. ¶ 175 (stating that "many thousands of man hours were spent by Mr. Veitch and his team, SMC's team, and Meyer's team"); id. ¶ 186 (Virgin reneged on the deal after "having the benefit of a year's worth of Mr. Veitch's work, and after seeing the value of that work").

The Court agrees with Plaintiffs and concludes that Plaintiffs plead facts in support of their unjust enrichment claim which extend beyond merely misappropriation of trade secrets to

contributions of labor, money, relationships, time, and expertise.  Second, the Court finds that Plaintiffs adequately allege that these benefits have been conferred on the Virgin Defendants.

Accordingly, Count IV shall not be dismissed.

### ii. Count V (Unfair Competition)

Count V seeks to recover for "unfair competition" and is based on allegations that Virgin's "unfair and deceptive actions" violated the FDUTPA.[8]  Id. ¶ 261.  Defendants maintain that an FDUTPA claim may only be pursued if the plaintiff is a consumer involved in a transaction with the defendant.  Carroll v. Lowes Home Centers, Inc., No. 12-23996-CIV, 2014 WL 1928669, at *3 (S.D. Fla. May 6, 2014) (only a consumer "engaged in the purchase of goods or services" may sue under the FDUTPA).   Defendants argue that the harm Plaintiffs allege here was not the result of a consumer transaction, thus Plaintiffs lack standing to pursue an FDUTPA claim.

The stated purpose of the FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).  The FDUTPA protects against deceptive acts that mislead consumers, and also protects against unfair practices, which "offend[ ] established public policy and [are] immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

---

[8] Defendants assert that Plaintiffs' Amended Complaint was unclear on whether Plaintiffs asserted a claim under both common law and the FDUTPA, or only under the FDUTPA.  In their Response to Defendants' Motion, Plaintiffs clarify that they have not alleged consumer confusion.  However, consumer confusion is a required element of unfair competition under common law.  M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1493 (11th Cir. 1990) ("Florida law requires that [plaintiff] establish deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion.").  Failure to establish a likelihood of consumer confusion is fatal to any attempt to recover for unfair competition under common law.  Accordingly, Count V of Plaintiffs' Amended Complaint shall be dismissed to the extent it seeks to recover under common law.

CareerFairs.com v. United Bus. Media LLC, 838 F. Supp. 2d 1316, 1325 (S.D. Fla. 2011). Furthermore, the FDUTPA defines "consumer" as "an individual; . . . business; . . . corporation; any commercial entity . . . ." Fla. Stat. § 501.203(7) (2006). Pursuant to this definition, Plaintiffs qualify as a "consumer" under FDUTPA.

Accordingly, Count V shall not be dismissed to the extent it seeks to recover under the FDUTPA.

### e. Counts VI, VII, VIII, and IX Should Be Dismissed Because No Enforceable Agreements Were Created

It is well-settled that a contract is not enforceable without a "meeting of the minds between the parties" on the essential terms of the agreement. Personalized Media Commc'ns, L.L.C. v. StarSight Telecast, Inc., No. 99 CIV. 0441 (DAB), 2000 WL 1457079, at *3 (S.D.N.Y. Sept. 28, 2000); Dreyfuss v. Dreyfuss, 701 So. 2d 437, 438 (Fla. Dist. Ct. App. 1997). Further, where a purported agreement leaves essential terms "subject to future negotiation, there can be no enforceable contract." Univ. Creek Assocs., II, Ltd. v. Boston Am. Fin. Grp., Inc., 100 F. Supp. 2d 1337, 1340 (S.D. Fla. 1998); Lieberman v. Good Stuff Corp., No. 94-cv-5601, 1995 WL 600864, at *3 (S.D.N.Y. Oct. 11, 1995).

The Virgin Defendants argue that here, no enforceable agreements were created, and therefore, assert that Counts VI (Breach of Contract), VII (Breach of Partnership Agreement), VIII (Breach of Joint Venture Agreement), and IX (Breach of Duty of Good Faith) should be dismissed. The Court shall address the counts separately to prevent confusion.

### i. No Veitch-Virgin Agreement Was Ever Formed (Count VI)

Defendants assert that no Veitch-Virgin Agreement was ever formed and therefore, Count VI must be dismissed. Defendants state that there was no meeting of the minds as to the

16

essential terms of the agreement. Specifically, Defendants maintain that the identification of the parties is lacking, and further assert that essential terms such as the licensing fee and percentage of the Promote were purposely left open subject to further review. Therefore, Defendants contend that no enforceable agreement was reached.

Plaintiffs first maintain that the Veitch-Virgin Agreement identified the parties. Plaintiffs state that VMUSA was clearly a party to the Veitch-Virgin Agreement, and the only factual issue is if Saverimuttu sent the email on behalf of VMUSA only, or if he was acting as an agent of other Virgin entities. Second, Plaintiffs maintain that the parties came to an agreement as to the essential terms. Plaintiffs state that after the NDA was signed, the parties negotiated whether to proceed and, if so, under what terms. Am. Compl. ¶ 87. On May 20, 2011, Veitch set forth a proposal. Id. at Ex. C. Virgin's response was set forth in Saverimuttu's May 20, 2011 email: "in the interests of moving our discussion to a conclusion, we can largely accept the proposal with some changes." Id. Saverimuttu then set forth numbers and stated: "we are prepared to move forward on the following basis." After discussing the possible changes on a phone conference, "both parties agreed to stick with the new numbers they had proposed in their e-mail." Id. ¶ 111. Thus, Plaintiffs contend that the parties did not leave these terms open to future negotiation between them. Rather, because there was a possibility that the equity investors might seek changes, Virgin emphasized that "[t]his is only a deal between the two of us." Id. ¶ 108, Ex. C.

The Court finds that Plaintiffs have adequately plead facts supporting the allegation that an enforceable agreement was reached. The Amended Complaint pleads (1) the acceptance of Veitch's proposed deal by Saverimuttu (acting as agent for VGHL, VGIL, and VES) using concrete language, (2) the acceptance without any reservation not to be bound until final documentation, (3) partial performance of the agreement over the course of the next year, and (4)

no evidence that the parties planned to continue negotiating between themselves regarding the essential terms concerning the royalty rate or the split of the Promote.  At this stage of the litigation, the Court finds this is sufficient to permit the claim of breach of the Veitch-Virgin Agreement to continue.

Therefore, Count VI shall not be dismissed.

### ii.  No Partnership and/or Joint Venture Was Formed (Counts VII and VIII)

Defendants maintain that no agreement was reached on the parties' respective right to share in the profits of an alleged venture.  Under Florida law, there are five elements necessary for a joint venture claim: "1) the intention of the parties to create a joint venture; 2) joint control or right of control; 3) joint proprietary interests in the subject matter of the venture; 4) right of both ventures to share in the profits; and 5) duty of both to share in the losses."  Bridgewater v. Carnival Corp., No. 10-cv-22241, 2011 WL 976467, at *2 (S.D. Fla. Mar. 2, 2011).  "These requirements are strictly construed," Dreyfuss, 701 So. 2d at 439, and "Florida courts have interpreted these requirements to preclude a finding that a partnership or joint venture exists where any factor is missing."  Williams v. Obstfeld, 314 F.3d 1270, 1276 (11th Cir. 2002).

Defendants contend that Plaintiffs fail to allege that the parties maintained "joint control" over any partnership or venture.  Dreyfuss, 701 So. 2d at 439; Bridgewater, 2011 WL 976467, at *2.  "Joint control" under Florida law requires that each member "have mutual control over the subject matter of the venture and the authority to bind one another with respect to the subject matter of the venture."  Progress Rail Servs. Corp. v. Hillsborough Reg'l Transit Auth., No. 04-cv-200, 2005 WL 1051932, at *3 (M.D. Fla. Apr. 12, 2005).  Defendants maintain that there is no allegation that Plaintiffs ever had the authority to bind any of the Virgin Defendants, or that the Virgin Defendants had the authority to bind Plaintiffs.  Accordingly, the absence of an

agreement allowing the parties to bind one another with respect to a purported cruise venture precludes Plaintiffs' partnership and joint venture claims as a matter of law.  Defendants also assert that Plaintiffs fail to allege that there was a right to share profits.

At this stage of the proceedings, the Court concludes that Plaintiffs have adequately alleged that Veitch and Virgin had come to an agreement as to the sharing of the profits of the venture and the sharing of control over the venture.  The Court finds that Plaintiffs' Amended Complaint clearly contains a general allegation of the Parties' joint control.  See Am. Compl. at ¶ 115 ("As to control of the venture, Veitch and Virgin agreed to share control in the development of the project" and to "establish a formal general partner that would be owned and controlled jointly by Veitch and Virgin.").  As Plaintiffs note in their opposition papers, joint control was reflected in Virgin's own documents, which expressly state that: "[t]he Virgin Group and Colin Veitch (the Principal) shall own and control the General Partner."  Id.  The Court further finds that Plaintiffs have adequately alleged that there was a right to share profits.  While the Virgin Defendants assert that the agreement to share profits was not finalized, this does not invalidate Plaintiffs' claims.  The fact that it was possible investors might ask Veitch and Virgin to amend their agreement did not affect the fact that Veitch and Virgin agreed to share profits.

Accordingly, Counts VII and VIII shall not be dismissed.

### iii. Breach of Duty of Good Faith Cannot Stand Absent An Enforceable Contract (Count IX)

As the Court has concluded that Plaintiffs have adequately pled the existence of an agreement, Plaintiffs' claim for breach of duty of good faith may stand.  Senter v. JPMorgan Chase Bank, N.A., 810 F. Supp. 2d 1339, 1362 (S.D. Fla. 2011) ( "[A] proper pleading of breach of the covenant of good faith and fair dealing necessarily requires the pleading of a valid

contract"); Miller v. HSBC Bank U.S.A., N.A., No. 13-cv-7500, 2015 WL 585589, at *5 (S.D.N.Y. Feb. 11, 2015).

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED that Defendants' Motion to Dismiss (ECF No. 51) is GRANTED IN PART AND DENIED IN PART. Accordingly, it is hereby ORDERED AND ADJUDGED that:

1. Count I of Plaintiffs' Amended Complaint, alleging Breach of Contract regarding the NDA, is hereby DISMISSED as to VGIL, VGHL, and VES.  Count I of Plaintiffs' Amended Complaint shall continue against VMUSA.

2. Count II of Plaintiffs' Amended Complaint, alleging Breach of Contract for Injunction regarding the NDA is hereby DISMISSED as to VGIL, VGHL, and VES. Count II of Plaintiffs' Amended Complaint shall continue against VMUSA.

3. Counts III–IX shall continue against all of the Virgin Defendants.

DONE AND ORDERED in Chambers at Miami, Florida, this 18th day of September, 2015.

/s/ K. M. Moore
K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

cc:   All counsel of record